Nos. 2015-1804

# United States Court of Appeals
# for the Federal Circuit

VOCALTAG LTD. and SCR ENGINEERS LTD.,

*Plaintiffs-Appellants,*

v.

AGIS AUTOMATISERING B.V.,

*Defendant-Appellee.*

**Appeal from the United States District Court for the Western District of Wisconsin, Case No. 3:13-cv-00612-JDP**

## CORRECTED NON-CONFIDENTIAL BRIEF FOR APPELLANTS VOCALTAG LTD. AND SCR ENGINEERS LTD.

ISRAEL SASHA MAYERGOYZ
JONES DAY
77 West Wacker Drive
Chicago, IL  60601-1692
(312) 782-3939

FRED H. PERKINS
ALVIN C. LIN
MORRISON COHEN LLP
909 3rd Avenue
New York,  NY 10022
(212) 735-8600

GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
(202) 879-3939

BARRY G. MAGIDOFF
PAUL J. SUTTON
SUTTON MAGIDOFF
909 3rd Avenue, 27th Floor
New York, NY 10022
(212) 584-1990

*Attorneys for Plaintiffs-Appellants VocalTag Ltd. and SCR Engineers Ltd.*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, undersigned counsel for Appellants SCR Engineers Ltd. and VocalTag Ltd. certifies the following:

1.    The full name of every party or amicus represented by us is:

       SCR Engineers Ltd.
       VocalTag Ltd.

2.    The names of the real party in interest represented by us are:

       Not Applicable

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

       Appellant VocalTag Ltd. is 100% owned by SCR Engineers Ltd.
       SCR Engineers Ltd. is 100% owned by Allflex Dairy Israel, Ltd.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

       JONES DAY:  Gregory A. Castanias, Israel Sasha Mayergoyz

       MORRISON COHEN:  Fred H. Perkins, Alvin C. Lin

       SUTTON MAGIDOFF:  Paul J. Sutton, Barry G. Magidoff

       REINHART, BOERNER VAN DEUREN:  Jessica H. Polakowski

Dated:  <u>December 7, 2015</u>        <u>/s/ Israel Sasha Mayergoyz</u>
                                      JONES DAY
                                      77 W. Wacker Drive, Suite 3500
                                      Chicago, IL 60601-1692
                                      (312) 269-1572

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................i

TABLE OF CONTENTS.............................................................. ii

TABLE OF ABBREVIATIONS ....................................................ix

STATEMENT OF RELATED CASES .............................................x

STATEMENT OF JURISDICTION.................................................1

STATEMENT OF THE ISSUES......................................................1

STATEMENT OF THE CASE..........................................................3

    A.    Preliminary Statement ....................................................3

    B.    The Parties ......................................................................4

        1.    Plaintiffs SCR And VocalTag...................................4

        2.    Defendant Agis ........................................................5

    C.    The Asserted Patents ......................................................6

        1.    The '481 Patent .......................................................6

        2.    The '149 Patent .......................................................9

    D.    Agis's Accused CowManager System ........................12

    E.    The District Court Proceedings ...................................13

SUMMARY OF ARGUMENT ......................................................17

STANDARDS OF REVIEW ..........................................................19

ARGUMENT ................................................................................20

I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
    JUDGMENT OF NON-INFRINGEMENT OF THE '481 PATENT.........20

    A.    The District Court Erroneously Limited The Corresponding
        Structure For "Sensing Chewing Actions" To Sound Sensors .........21

        1.    The '481 Specification Specifically Discloses And
            Expressly Links Motion Sensors With The Function Of
            "Sensing Chewing Actions" .....................................22

        2.    The District Court Incorrectly Held That The
            Specification Must Disclose The Underlying Details Of
            A Motion Sensor In Order To Constitute Corresponding
            Structure ................................................................25

3.    The District Court's Reasoning Is Contrary To Well-Settled Precedent ................................................................... 30

4.    The District Court's Judgment Should Be Vacated Given The Erroneous Construction of "Sensor For Sensing Chewing Actions" .................................................................. 32

B.    The District Court Erroneously Excluded The Algorithm From Figure 6 As Corresponding Structure For The Term "Data Processor" ....................................................................................... 33

C.    The District Court Improperly Resolved Factual Disputes and Made Credibility Determinations In Favor Of Movant Agis ............ 37

1.    The District Court Fundamentally Misapplied The Claim Language ................................................................................. 38

2.    The District Court Improperly Made Factual Findings Contrary To SCR's Experts' Submissions .............................. 40

3.    The District Court Improperly Made Credibility Determinations In Favor Of The Movant Agis ...................... 46

II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT REGARDING THE '149 PATENT ........................................................................................................ 49

A.    The District Court Erroneously Construed The Term "Attenuating The Energy Level Of The Acceleration Signal" To Require That Attenuation Must Occur During Transmission And Be "In Proportion" To An Animal's Eating .............................. 50

1.    The District Court Incorrectly Required Attenuation To Occur During Transmission "From The Acceleration Sensor" .................................................................................... 50

2.    The District Court Incorrectly Required Attenuation To Be "In Proportion" To The Animal's Eating .......................... 53

3.    The District Court Misapplied The Prosecution History ......... 54

B.    Under A Proper Construction, There Exist Genuine Issues Of Material Fact ....................................................................................... 56

III.    THIS COURT SHOULD ALSO VACATE THE SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT ................................. 59

CONCLUSION ..................................................................................................... 60

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 5-6, 12-13, 15-16, 18, 38, 40, 41, 42, 43, 46-47, 48, 57-58, and 59 contains technical information that Defendant Agis Automatisering B.V. designated as confidential pursuant to the protective order entered in the district-court proceedings.

# TABLE OF AUTHORITIES

Page

## CASES

*AllVoice Computing PLC v. Nuance Comm., Inc.*,
  504 F.3d 1236 (Fed. Cir. 2007) ......................................................... 29

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ......................................................... 39

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................... 37

*Aristocrat Tech. Australia Pty Ltd. v. Multimedia Games, Inc.*,
  266 F. App'x 942 (Fed. Cir. Feb. 22, 2008) ...................................... 29

*Atmel Corp. v. Info. Storage Devices, Inc.*,
  198 F.3d 1374 (Fed. Cir. 1999) ......................................................... 27

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*,
  780 F.3d 1364 (Fed. Cir. 2015) ......................................................... 55

*Callicrate v. Wadsworth Mfg., Inc.*,
  427 F.3d 1361 (Fed. Cir. 2005) ......................................................... 34

*Conoco, Inc. v. Energy & Envtl. Int'l*,
  460 F.3d 1349 (Fed. Cir. 2006) ......................................................... 39

*Contessa Food Prods., Inc. v. Conagra, Inc.*,
  282 F.3d 1370 (Fed. Cir. 2002) ......................................................... 40

*Creo Prods. v. Pressteck, Inc.*,
  305 F.3d 1337 (Fed. Cir. 2002) ................................................... 22, 33

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container*
  *Corp.*,
  635 F.3d 1373 (Fed. Cir. 2011) ................................................... 40, 48

*Cummins, Inc. v. TAS Distrib. Co.*,
   700 F.3d 1329 (Fed. Cir. 2012) ........................................................19

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   769 F.3d 1371 (Fed. Cir. 2014), *cert. granted*, 136 S. Ct. 356
   (2015) ...............................................................................................60

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ..........................................................53

*In re Rambus Inc.*,
   694 F.3d 42 (Fed. Cir. 2012) .............................................................54

*In re Thrift*,
   298 F.3d 1357 (Fed. Cir. 2002) ........................................................53

*InterDigital Communications, LLC v. USITC*,
   690 F.3d 1318 (Fed. Cir. 2012) ........................................................31

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
   456 U.S. 844 (1982).........................................................................48

*Johnson Worldwide Assoc., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999) ..........................................................53

*K–2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ........................................................40

*Med. Instrumentation & Diagnostics Corp. v. Elketa AB*,
   344 F.3d 1205 (Fed. Cir. 2003) ..................................................22, 25

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999) ........................................................31

*MIT v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006) ..................................................45, 46

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014).......................................................................29

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................29, 32, 51, 52

*Plantronics, Inc. v. Aliph, Inc.*,
    724 F.3d 1343 (Fed. Cir. 2013) ....................................................................56

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005) ...................................................................22, 33

*Process Control Corp. v. HydReclaim Corp.*,
    190 F.3d 1350 (Fed. Cir. 1999) ....................................................................40

*S3 Inc. v. nVIDIA Corp.*,
    259 F.3d 1364 (Fed. Cir. 2001) .......................................................22, 25, 26, 27

*Serrano v. Telular Corp.*,
    111 F.3d 1578 (Fed. Cir. 1997) ....................................................................34

*SRI Int'l v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985) ....................................................................39

*Stryker Corp. v. Zimmer, Inc.*,
    782 F.3d 649 (Fed. Cir. 2014), *cert. granted*, 136 S. Ct. 356 (2015)................60

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008) ....................................................................27

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
    612 F.3d 1365 (Fed. Cir. 2010) ................................................................27, 29

*Teva Pharm. Indus., Ltd. v. AstraZeneca Pharm. LP*,
    661 F.3d 1378 (Fed. Cir. 2011) ....................................................................19

*Teva Pharm., USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)............................................................................20, 29

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ....................................................................20

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014)..........................................................38, 41, 42

**STATUTES**

28 U.S.C. § 1295(a)(1)...........................................................................1

28 U.S.C. §§ 1331 & 1338(a) ................................................................1

**OTHER AUTHORITIES**

Fed. R. Civ. P. 16(d) .......................................................................44, 46

Fed. R. Civ. P. 83(b) ............................................................................45

Fed. R. Civ. P. 26(e)............................................................................44

# <u>TABLE OF ABBREVIATIONS</u>

### *Parties*

| | |
|---|---|
| Agis | Defendant-Appellee Agis Automatisering B.V. |
| SCR | Plaintiff-Appellant SCR Engineers Ltd. |
| VocalTag | Plaintiff-Appellant VocalTag Ltd. |

### *Cites*

| | |
|---|---|
| A__ | Joint Appendix at page(s) __ |
| A__:__ | Joint Appendix at page __: line __ |
| A__:__:__ | Joint Appendix at page __: minu-script page ___:line ___, or page __:column __:line __ |

### *Terms*

| | |
|---|---|
| '149 Patent | U.S. Patent No. 7,878,149, issued to Voronin *et al.* and entitled "Method and Device for Detecting Estrus" |
| '481 Patent | U.S. Patent No. 7,350,481, issued to Bar-Shalom and entitled "Method and System for Monitoring Physiological Conditions Of, and/or Suitability of Animal Feed for Ruminant Animals" |
| CowManager System | Defendant Agis's accused product |
| Heatime System | Plaintiff SCR's commercial product |

***All emphasis is added throughout unless otherwise indicated.***

## STATEMENT OF RELATED CASES

Currently pending in the district court is a motion for attorneys' fees filed by Appellee Agis Automatisering B.V.  There are no other related cases or proceedings involving the asserted patents.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 & 1338(a).  On June 4, 2015, the court issued an opinion granting summary judgment of non-infringement and no willful infringement with respect to the asserted claims of U.S. Patent Nos. 7,350,481 and 7,878,149 (the "'481 Patent" and "'149 Patent," respectively).  (A1-29.)  On June 8, 2015, the court entered final judgment.  (A30-31.)  On July 6, 2015, SCR Engineers Ltd. and VocalTag Ltd. (collectively, "SCR") timely filed a notice of appeal.  (A60-61.)  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

The '481 and '149 Patents claim certain methods and systems for monitoring dairy cow behavior—more specifically, for monitoring rumination to optimize milk production (the '481 Patent) and monitoring estrus to implement artificial insemination (the '149 Patent).

With respect to the '481 Patent, the issues are:

1.     Whether the district court improperly limited the corresponding structure of the means-plus-function element "sensor for sensing chewing actions" to only a sound sensor, and excluded motion sensors, when the specification expressly states that "other sensors could be used," and particularly describes "sensors for sensing the motion of the animal's lower jaw" for sensing chewing?

2.     Whether the district court erred in construing the term "data processor" by excluding the algorithm of Figure 6 as corresponding structure when the specification describes—and both parties' experts identified—the Figure 6 algorithm as performing the claimed function of "accumulating both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval" for determining the chewing rhythm of an animal?

3.     Should the district court's summary-judgment ruling be vacated in view of the court's misapplication of the claim language, making of credibility determinations, and resolution of factual disputes in favor of the movant Agis, all with respect to its finding that the accused system did not sense the "time of each chewing action and the number of chewing actions per predetermined time interval" for determining the chewing rhythm of an animal?

With respect to the '149 Patent, the issue is:

4.     Did the district court err in granting summary judgment of non-infringement based on a claim construction of the term "attenuating the energy level of the acceleration signal as the indication of eating is stronger" that imported unrecited limitations of "during transmission" and "in proportion" into the claim language?

And, with respect to both patents, the issue is:

5.    Should the district court's judgment of no willful infringement be vacated in view of the reversible errors outlined above?

## STATEMENT OF THE CASE

### A.    Preliminary Statement

This is a patent-infringement case between direct competitors. (A2-3.)  The plaintiffs SCR and VocalTag, and defendant Agis Automatisering B.V. ("Agis"), market and sell competing systems for electronically monitoring the activity of dairy animals to determine when the animals are in various conditions, such as rumination or estrus.  These determinations are important for dairy farmers to optimize milk production and increase the rate of successful artificial insemination.

The case involves two asserted patents—the '481 Patent and the '149 Patent. The '481 Patent generally relates to an improved system for detecting when animals are ruminating (*i.e.*, when animals chew, swallow, regurgitate, and repeat the chewing of their cud to further break down food and stimulate digestion), to detect sick animals and track changes in groups of cows to improve management and feeding.  The '149 Patent generally relates to an improved system for detecting when animals are in estrus (*i.e.,* the state during which female animals can be impregnated), to implement artificial insemination and replace hormone injection or manual estrus detection.

This case was filed in the Western District of Wisconsin and was initially pending before Judge William M. Conley.  The case was reassigned to Judge James D. Peterson in the same district.  With the parties only two weeks away from trial, Judge Peterson ordered summary judgment of non-infringement on all claims of both patents, with an opinion following over two weeks later.  The court entered summary judgment despite never holding an in-person conference with counsel, nor a *Markman* hearing, nor an evidentiary hearing, nor oral argument on the summary-judgment motions.  The resultant summary-judgment order rests on erroneous claim constructions and is improperly predicated on resolution of factual disputes and credibility determinations made in favor of the movant Agis.  It should be reversed.

## B.    The Parties

### 1.    Plaintiffs SCR And VocalTag

SCR and VocalTag are both Israel-based companies that develop, manufacture, and sell electronic systems for monitoring the behavior of dairy animals.  (A2801 ¶ 2.)  VocalTag is a small startup company founded in 2000 that pioneered wireless rumination technology for the purpose of animal health and feed management.  (A3767-68.)  VocalTag owns the '481 Patent.  (A2801 ¶ 3.)  SCR is the exclusive licensee of the '481 Patent and owns the '149 Patent.  (A2801 ¶ 4.)

CONFIDENTIAL MATERIAL REDACTED

In 2007, SCR entered the United States market with its branded Heatime®
system, which incorporates technology covered by the '481 Patent and '149 Patent.
(A2802 ¶¶ 5-6.)  Among other things, the Heatime system electronically monitors
a cow's activity to detect estrus, as claimed in the '149 Patent, and to monitor
rumination, as claimed in the '481 Patent, to improve management and feeding and
to identify sick animals.  (A2-3.)  SCR's Heatime product was the first remote
wireless rumination monitoring product available to commercial dairy farmers.  (A
3787:127:13-16.)

### 2.   Defendant Agis

Defendant Agis is a Netherlands-based company that also sells systems for
electronically monitoring the behavior of dairy cows, in particular for determining
when the cows are ruminating and in estrus.  (A3, A12.)  Agis sells its system
under the brand name CowManager.  (A3.)  During its development of
CowManager, ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED



### C.    The Asserted Patents

#### 1.    The '481 Patent

The '481 Patent, entitled "Method And System For Monitoring

Physiological Conditions Of, And/Or Suitability Of Animal Feed For Ruminant

Animals," was issued on April 1, 2008, and claims priority to an application filed on July 19, 2000. The '481 Patent is assigned to VocalTag, and SCR is an exclusive licensee.

The '481 Patent explains that ruminant animals, such as cattle, "have a stomach divided into a plurality of chambers, the first of which is called the rumen." (A107:1:19-21.) A ruminant animal "ingests relatively large amounts of feed into the rumen with a minimum of chewing (a cud), before swallowing, periodically regurgitates a portion of the contents of the rumen (in the form of a bolus) back into the mouth, and further chews the regurgitated portion (bolus) before it is again swallowed and then directed to the other chambers of the stomach where it is further digested." (A107:1:21-27.) In dairy animals, proper rumination is vital for increased milk production and overall health. (A107:1:29-56.)

Addressing the need for improved monitoring of rumination, the '481 Patent discloses and claims a system for "monitoring the suitability of animal feed, of ruminant animals" that includes "at least one sensor for sensing actions of the animal indicating a ruminating activity" and "a data processor for accumulating the time of the sensed actions indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production and/or maintaining animal health." (A107:2:36-42.)

During litigation, SCR asserted independent claim 1 and dependent claims 8-9.  Claim 1 is reproduced below with the language at issue in this appeal shown in italics:

> A monitoring system for monitoring the suitability of animal feed, of ruminant animals, comprising:
>
> at least one *sensor for sensing chewing actions of the animal produced by the animal* while chewing animal feed, *including the time of each chewing action and the number of chewing actions per predetermined time interval*, for indicating a ruminating activity;
>
> and *a data processor accumulating both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval, for determining the chewing rhythm* of the animal indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health.

(A110:8:56-9:3.)  Claim 8 adds a transmitter and a remove receiver to the system of claim 1, and claim 9 adds an alarm to the remote receiver of claim 8.  (A110:10:12-20.)

While the '481 Patent notes that "sensors for sensing chewing actions are *preferably* sound sensors, and those for sensing regurgitations are *preferably* microswitches," the specification also teaches that "other types of sensors could be used."  (A107:2:44-47.)  The specification goes on to give "example[s]" of those "other types of sensors":  "chewing actions could be sensed by sensors for sensing the motions of the animal's lower jaw, or the tightening of the animal's muscles in

8

the throat when swallowing.  Regurgitations could also be sensed by sound sensors."  (A107:2:46-51.)

In addition, the '481 Patent describes a variety of algorithms by which a data processor can "determin[e] the chewing rhythm of the animal indicating rumination activities."  (A110:8:65-67.)  For example, Figure 6 provides a flow chart for "determining the rhythm (*e.g.*, duration and frequency) of the chewing sounds at time-spaced intervals and comparing the determined rhythm with a predetermined rhythm representing a ruminating activity as distinguished from an eating activity."  (A109:5:18-23.)

### 2.    The '149 Patent

The '149 Patent, entitled "Method and Device For Detecting Estrus," was issued on February 1, 2011, and claims priority to an application filed on January 19, 2005.  The '149 Patent is assigned to SCR.

The '149 Patent explains that artificial insemination of cattle animals is common and "[s]uccess of artificial insemination depends highly on accurate identification of the term in which an animal is in estrus.  Therefore it is important to have reliable information regarding the estrus term to ensure a successful insemination resulting in pregnancy."  (A116:1:22-26.)  During estrus, "the behavior of the cattle animal changes and the overall activity rises….  This high

activity level is clearly different from the normal activity level of cattle animals, which spends most of the time eating and ruminating." (A116:1:29-34.)

The '149 Patent notes that prior systems were ineffective for detecting estrus because the motion sensing could not adequately distinguish general cattle activity (such as eating and ordinary movements) from estrus-related activity. (A116:1:56-66.) The '149 Patent addresses this problem "by collecting information related to the animal's motion and information related to the animal's eating periods and combining them together to reduce the impact of the animal's eating habits on the results." (A116:2:31-34.) The patent teaches that the disclosed system "sens[es] and accumulat[es] along time signals indicative of the motion of a cattle animal and identif[ies] when the sensed motion is statistically not related to eating periods of said cattle animal and when it statistically deviates from the range of data indicative of normal behavior of said cattle animal." (A116:2:43-48.) The patent explains that "changes in activity level of the said animal which is neutralized from the effect of eating activity (herein after neutralized activity or NUT-ACT) can be detected, and the animal can be identified as in estrus based on the changes in NUT-ACT level." (A116:2:57-62.)

During litigation, SCR asserted independent claims 1 and 12 and dependent claims 2-6, 11, 13-17, 23 and 24 of the '149 Patent. Representative claim 12 is reproduced below with the language at issue in this appeal shown in italics:

A device for detecting estrus in a cattle animal, comprising:

at least one acceleration sensor for sensing acceleration level of said cattle animal over a period of time, wherein the acceleration level is indicated by energy level of an acceleration signal produced by the acceleration sensor;

at least one sensor for sensing over a period of time, data indicative of eating performed by said cattle animal; and

*at least one microprocessor for* accumulating said acceleration signal, *attenuating the energy level of the acceleration signal as the indication of eating is stronger*, *the energy attenuated acceleration signal identifying neutralized motion data*, extracting typical activity level of said animal based on said neutralized motion data and identifying abnormal behavior indicative of said estrus in said animal by comparing recently identified neutralized motion data with the extracted typical activity level.

(A119:8:66-A120:9:15.)  The dependent claims add additional features to the independent claims, such a "sensor for sensing the motion is adapted to measure the accelerations in up to three orthogonal directions."  (A120:10:5-7.)

The '149 Patent explains that the microprocessor can receive data "to neutralize the effect of motion associated with eating (during eating periods) on the sensed motion to get a NUT-ACT," and then detect relevant changes in activity level by comparing "new collected data to the data base of typical behavior." (A117:3:6-13.)  "The changes in activity level may be indicative that said animal is in estrus."  (A117:3:13-14.)  The '149 Patent notes that estrus detection "may be performed almost or completely entirely by the microprocessor."  (A117:3:25-26.)

**CONFIDENTIAL MATERIAL REDACTED**

### D.    Agis's Accused CowManager System

The accused CowManager system monitors dairy animal behavior to detect when animals are ruminating, and when they are in an estrus condition.  (A12.) The CowManager system monitors animal activity by using a SensOor tag that is attached to a cow's ear.  (A11.)  The SensOor tag contains, among other things, both an accelerometer and a microprocessor.  (A11-12.)

The accelerometer in the SensOor ear tag senses a cow's movements and provides the acceleration data to the microprocessor.  (A11.) ▮▮▮▮▮

CONFIDENTIAL MATERIAL REDACTED



### E.    The District Court Proceedings

SCR and VocalTag filed this action on September 3, 2013.  The case was originally assigned to Judge Conley.  On February 24, 2014, the court issued a scheduling order setting the discovery cut-off for March 27, 2014, the Final Pre-Trial Conference for May 26, 2015, and trial for June 8, 2015.  (A173, A175.)

On May 16, 2014, the case was reassigned to Judge Peterson.  On December 19, 2014, Agis moved for summary judgment on, among other things, non-

infringement of all the asserted claims of the '481 Patent and '149 Patent. Summary-judgment briefing was completed on February 3, 2015, many months before discovery was completed. During and after summary-judgment briefing, substantial additional discovery occurred, including Agis's production of thousands of documents and depositions of various party experts and representatives.

On May 21, 2015, only five days before the Final Pre-Trial Conference and only two weeks before trial was set to begin, the district court issued a four-sentence "text only order" granting summary judgment of non-infringement. The text-only order contained no reasoning, but stated that a written opinion would follow. (A91 (Docket Entry 288).) The district court issued the order despite never conducting a *Markman* hearing or holding oral argument on the disputed issues. The text-only order indicated simply that "the infringement case turns on claim construction" and under the district court's (not-yet-disclosed) constructions, the "CowManager system does not infringe either patent-in-suit." (*Id.*) The order cancelled the pre-trial conference scheduled for two business days later and struck the case from its trial calendar. (*Id.*)

On June 4, 2015, the district court issued its summary-judgment opinion. (A1-29.) Addressing the '481 Patent, the court treated the claim limitations of "at least one sensor for sensing chewing actions" and "a data processor accumulating

both the time of each of said sensed chewing actions and the number of said

chewing actions per unit time interval" as means-plus-function limitations.  (A7-8;

A10.)  The district court additionally concluded that, despite the specification's

reference to "sensors for sensing the motion of the animal's lower jaw"

(A107:2:47-50), the corresponding structure of the "sensor" limitation was limited

to only sound sensors.  (A10.)  Further, the court held that, despite the

specification's language—and the parties' experts' agreement to the contrary—the

corresponding structure for the "data processor" limitation excluded the algorithm

in Figure 6.  (A11.)

Based on these constructions, the district court concluded that the accused

CowManager system did not infringe because it used an accelerometer—a type of

motion sensor—to sense chewing, rather than the sound sensor to which it had

limited the claims of the '481 Patent.  (A14-15.)  The district court also concluded

that the accused system did not sense "the time of each chewing action" and "the

number of chewing actions per predetermined time interval."  (A15-17.)  To arrive

at the conclusion, this district court credited Agis's expert reports over SCR's

submissions, ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████  (A16.)

Addressing the '149 Patent, the district court construed the term "attenuating the energy level of the acceleration signal as the indication of eating is stronger" to require attenuation (reduction) of the acceleration signal during transmission from the accelerometer, and to further require that such attenuation be "in proportion" to an animal's eating.  Specifically, the court stated that the term "requires that the energy level of the signal *from the acceleration sensor* be reduced *in proportion* to the strength of the indication that the animal is eating."  (A25.)  The district court's construction, which rejected SCR's "more expansive, common-sense construction" (A20), ignored the fact that independent claim 12 expressly requires that "attenuating" occur in the microprocessor rather than during transmission from the accelerometer.  The district court also failed to cite any intrinsic evidence to support importing an "in proportion" limitation into the claim language.  The court then concluded there was no infringement because SCR's expert did not "raise[] a genuine issue of fact as to whether the CowManager system performs the attenuating step *as the court has construed that limitation*" and did not show that attenuation "*is proportionate* to the strength of the indication of eating."  (A27-28.)

Based on its claim constructions and grant of summary judgment of non-infringement, the district court further determined that "plaintiffs cannot meet the objective first prong of the *Seagate* test, and defendant is entitled to summary judgment on the willful infringement allegation." (A28.)

## SUMMARY OF ARGUMENT

Two days before the Pre-Trial Conference and less than two weeks before the start of the jury trial, the district court ordered summary judgment of non-infringement and no willful infringement. The district court did so despite never conducting a *Markman* hearing, never holding oral argument on the summary-judgment motions, and never having a hearing on any disputes regarding infringement. As a result, the district court's conclusions were driven by improperly importing limitations recited nowhere in the claim language, resolving factual disputes and credibility determinations in favor of the moving party Agis, and largely ignoring SCR's evidence that, at minimum, established genuine issues of material fact.

Regarding the '481 Patent, the district court held that the corresponding structure for the element "sensor for sensing chewing actions" was limited to sound sensors despite the specification's explicit disclosure of motion sensors for performing the recited function. The '481 Patent expressly teaches that, in addition to sound sensors, "other types of sensors could be used" and specifically

17

describes "sensors for sensing the motion of the animal's lower jaw."  (A107:2:47-

50.) ████████████████████████████████████████████████

████

In the same vein, the district court incorrectly excluded the Figure 6

algorithm from serving as corresponding structure for the "data processor" element

even though the specification makes clear that Figure 6 performs the recited

function, as confirmed by *both of Agis's own experts* who conceded that Figure 6

provides a corresponding algorithm.

The district court's claim-construction errors were compounded by its

infringement analysis, which compared the accused product to features described

in the specification but not recited in the claims.  (A11-18.)  In granting summary

judgment, the district court credited Agis's experts in order to conclude that Agis

had made a "good case," yet the court failed to assess whether SCR's expert

evidence raised an issue of fact.  Further, while noting that Agis's key development

engineer provided internally inconsistent testimony, parts of which establish

infringement, the court simply resolved those contradictions in favor of the moving

party, Agis.  (A16.)

Regarding the '149 Patent, the district court again imported unrecited

limitations into the claim term "microprocessor … for attenuating the energy level

of the acceleration signal as the indication of eating is stronger."  The district court

required attenuation to occur during transmission from accelerometer to the microprocessor, even though the claim language itself establishes that attenuation is performed by the microprocessor and can only occur after the signal is received (*i.e.,* after, not during, transmission).  The district court also scrambled the claim language by requiring attenuation of the "signal *from the acceleration sensor*" (A25) whereas the claims recite attenuation "*of* the acceleration *signal*."  The district court further required that the attenuation occur "*in proportion* to the strength of the indication that the animal is eating" (A25), yet neither the claim language, the specification, nor the prosecution history ever suggest, let alone require, the "in proportion" limitation.  Nor did the district court cite any evidence for importing the "in proportion" limitation into the claim language.  By contrast, based on a proper construction, the record evidence, including SCR's expert submissions, establish the existence of genuine issues of material fact.

These errors also compel vacatur of the district court's judgment of no willful infringement, which was based on these erroneous findings of non-infringement.

## STANDARDS OF REVIEW

This Court applies the law of the regional circuit when reviewing a district court's grant of summary judgment.  *Teva Pharm. Indus., Ltd. v. AstraZeneca Pharm. LP*, 661 F.3d 1378, 1381 (Fed. Cir. 2011).  The Seventh Circuit reviews a

grant of summary judgment *de novo*. *Cummins, Inc. v. TAS Distrib. Co*., 700 F.3d 1329, 1335 (Fed. Cir. 2012).  Claim construction is an issue of law reviewed *de novo*, with certain subsidiary factual determinations reviewed for clear error.  *Teva Pharm., USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1337 (Fed. Cir. 2015).

## ARGUMENT

## I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '481 PATENT

Based on erroneous claim constructions and improper resolutions of fact and credibility issues, the district court granted summary judgment that independent claim 1 and dependent claims 8-9 of the '481 Patent were not infringed.

The district court held that the terms "sensor for sensing chewing actions of the animal" and "data processor accumulating both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval" are means-plus-function limitations.  (A10.)  Appellants do not challenge those holdings.  However, when identifying corresponding structure for each of these elements, the district court erred by too-narrowly limiting the corresponding structure.  First, the court improperly limited the corresponding structure for the "sensor for sensing chewing actions" element to only a sound sensor, despite the specification's explicit identification of motion sensors as corresponding, alternative structure.  Second, the court improperly excluded Figure 6 and the

20

accompanying description as a corresponding algorithm for the "data processor" element, even though the intrinsic evidence demonstrates, and Agis and its experts both recognized, that Figure 6 provides an algorithm for performing the recited function.

In addition to these claim-construction errors, the district court improperly assessed credibility and resolved factual disputes in favor of the *movant* Agis, thereby ignoring SCR's expert reports as well as testimony from Agis's own witnesses demonstrating that the accused system detects chewing frequency. This was inappropriate on summary judgment and also compels reversal.

## A. The District Court Erroneously Limited The Corresponding Structure For "Sensing Chewing Actions" To Sound Sensors

The asserted claims recite a "sensor for sensing chewing actions of the animal." (A110:8:58-59.) The district court restricted the claims to "sound sensors," based on its conclusions that the specification: (1) does "not adequately disclose alternative structures" for sensing chewing actions, and (2) "does not sufficiently describe any structure that senses jaw motions or muscle tightening." (A9.) These conclusions are refuted by the '481 Patent's teaching that, in addition to sound sensors, "other types of sensors could be used" for sensing chewing actions, including "sensors for sensing the motions of the animal's lower jaw, or tightening of the animal's muscles." (A107:2:46-50.)

21

The district court's conclusions are also contrary to the basic rule that "patent documents need not include subject matter that is known in the field of the invention and is in the prior art." *S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001). In fact, this Court has "been generous in finding something to be a corresponding structure when the specification contained a generic reference to structure that would be known to those in the art." *Med. Instrumentation & Diagnostics Corp. v. Elketa AB*, 344 F.3d 1205, 1213-14 (Fed. Cir. 2003). The same rules control here.

1.    **The '481 Specification Specifically Discloses And Expressly Links Motion Sensors With The Function Of "Sensing Chewing Actions"**

"[P]roper application of § 112 ¶ 6 generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function." *Creo Prods. v. Pressteck, Inc.*, 305 F.3d 1337, 1346 (Fed. Cir. 2002). "When looking to the specification for the structure of a § 112, ¶ 6 claim, one must construe the claim *in accordance with all the structures disclosed* by the inventor." *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005).

Here, the district court erred by holding that "[o]nly one structure is disclosed for sensing chewing actions: a 'sound sensor.'" (A8-9.) That statement is demonstrably wrong. The '481 Patent expressly identifies "sensors for sensing

the motions of the animal's lower jaw" as corresponding structure for "sensing

chewing actions of the animal":

> The sensors for sensing chewing actions are preferably sound sensors, and those for sensing regurgitations are preferably microswitches. However, *other types of sensors could be used.* For example, *chewing actions could be sensed by sensors for sensing the motions of the animal's lower jaw, or the tightening of the animal's muscles in the throat* when swallowing.

(A107:2:44-50.)  In the section titled "Description of Preferred Embodiments," the

specification again describes using motion sensors for sensing chewing action:

> It has been found particularly advantageous to sense both the chewing actions and the regurgitations by a sound sensor, as described above. However, *it is also contemplated that the chewing actions may be sensed in another manner, e.g., by sensing the tightening of the muscles in the animal's neck during chewing or swallowing, **or the movement of the animal's jaw during chewing***, and that the regurgitations may also be sensed in other manners, e.g. by the use of microswitches as described above with respect to FIGS. 9 and 10.

(A110:8:35-44.)

In addition, when describing the sensing of regurgitation, the '481 Patent

identifies microswitches as a specific type of motion sensor.  The specification

explains that regurgitation can be detected by bolus sensors that monitor movement.

(*See, e.g.*, A107:2:21-34.)  The specification then discloses microswitches as a

specific type of bolus sensor that monitors regurgitation movements.  (A110:8:41-

44.)  Microswitches are shown as $S_1$ and $S_2$ in Figure 9 below.  The microswitches

monitor motion—the movement of throat muscles:



Fig. 9

The district court discounted this teaching by concluding that microswitch motion sensors are disclosed for purposes of "sensing swallowing or regurgitation" movements rather than "sensing chewing actions." (A9-10.) This conclusion, however, disregards the specification's disclosure of microswitches for sensing an animal's movements. Put simply, the '481 Patent discloses a microswitch as a well-known type of motion sensor and also teaches that "chewing actions could be sensed by sensors for sensing the motions of the animal's lower jaw, or tightening of the animal's muscles in the throat when swallowing." (A107:2:47-50.) Skilled artisans would therefore understand that microswitches can be used as motion sensors for sensing chewing actions.

2.    **The District Court Incorrectly Held That The Specification Must Disclose The Underlying Details Of A Motion Sensor In Order To Constitute Corresponding Structure**

The district court further erred in concluding that the "specification does not sufficiently describe any actual structure that senses jaw motions or muscle tightening" and "no actual sensor structure is disclosed." (A9.) Inventors, however, are not required to provide a detailed blueprint for a disclosed structure to qualify as corresponding structure under Section 112, ¶ 6. "The law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention. To hold otherwise would require every patent document to include a technical treatise for the unskilled reader." *S3*, 259 F.3d at 1371. Accordingly, a specification's "generic reference to structure" is sufficient when it "would be known to those in the art and that structure was clearly associated with performance of the claimed function." *Elekta AB*, 344 F.3d at 1213-14.

Consistent with these principles, this Court has repeatedly held that disclosure of an identifiable class of structures—such as motion sensors— constitutes adequate disclosure under Section 112, ¶ 6. In *Linear Technology Corp. v. Impala Linear Corp.*, this Court determined that reference to a "PWM [pulse width modulation] circuit" adequately disclosed structure corresponding to the term "means for generating a first control signal." 379 F.3d 1311, 1321-22 (Fed.

25

Cir. 2004).  Rejecting the argument that "generic" structure cannot satisfy Section

112, ¶ 6, this Court explained that "PWM circuits *are not excludable* from the

corresponding structure *for failing to reference a specific structure*.  Although the

expression 'PWM circuit' does not reference a specific circuit structure, persons of

skill in the art would understand that 'PWM circuit' references a discrete class of

circuit structures that perform known functions."  *Id.* at 1322.

Similarly, in *S3*, this Court held that the specification's lone reference to a

"selector" constituted sufficient structure for the term "means ... for selectively

receiving."  259 F.3d at 1370.  This Court based its holding on the "uncontradicted

evidence [ ] that a selector is of well known electronic structure and performs a

common electronic function, and is readily implemented from the description in

the specification."  *Id.* at 1371.

In *Budde v. Harley Davidson, Inc.*, this Court concluded that disclosure of a

"'commercially available' vacuum sensor" was sufficient structure corresponding

to the term "sensing means for … measuring vacuum in the intake manifold."  250

F.3d 1369, 1381-82 (Fed. Cir. 2001).  Rejecting the argument that a "generic

reference in the specification" to commercially available sensors "does not

adequately disclose structure," this Court observed that "the characterization, in the

patent specification, of the vacuum sensor as a 'commercially available unit'

would be understood by one skilled in the art as structure capable of performing

26

the function recited in the claim limitation. The record reflects, as found by the district court, that vacuum sensors were well known in the art." *Id.*

In *Intel Corp. v. VIA Techs., Inc.*, this Court rejected the "conten[tion] that a generic core logic is an inadequate disclosure of structure because no circuitry is disclosed in the patent to show how the core logic is modified." 319 F.3d 1357, 1366 (Fed. Cir. 2003). This Court noted that there is "much supporting precedent" for the proposition that a "generic description of the core logic ... is not inadequate solely because no circuitry is disclosed on how to modify the core logic." *Id.* This Court therefore held that a "generic description of the core logic" adequately disclosed structure for "selectively writ[ing] data." *Id.* at 1356-66.

Other decisions from this Court are to the same effect. *See Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1376-77 (Fed. Cir. 2010) (specification's disclosure of a "controller" depicted as a "black box" constituted adequate structure); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338-39 (Fed. Cir. 2008) (reference to a "video standard detector" shown as a "black box" adequately disclosed corresponding structure because "[a]s our cases demonstrate, [] the absence of internal circuitry in the written description does not automatically render the claim indefinite"); *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1380-82 (Fed. Cir. 1999) (even a single passing reference to a title of an article may provide sufficient structure for a means-plus-function term).

The same reasoning and conclusion apply here.  The '481 Patent expressly identifies a specific class of structures—motion sensors—for performing the claimed function.  The specification also describes a microswitch as a specific type of motion sensor.  The record further establishes that skilled artisans were familiar with motion sensors at the time of the invention.  As Agis's expert Dr. Michael Sidman opined, "[b]y the late 1990s, inexpensive integrated circuit based acceleration sensors were becoming mass produced, commercially available components found in a wide range of applications."  (A425.)  Likewise, Agis's expert Dr. Jeffrey Stevenson explained that "[b]y around 1986, monitoring systems appeared that automatically uploaded the sensed motion information from sensors mounted on individual animals....  In addition, as motion sensing technology has improved, more sophisticated sensors such as accelerometers were widely adopted in systems for monitoring animal activity...."  (A1627 (citing prior-art references from 1997 and 1998 as disclosing motion sensors).)  Further, both parties' experts agreed that motion sensors for monitoring livestock behavior were well known and described in the prior art.  (A425-26 (Agis's expert noting that prior art disclosed motion sensors to sense cattle movement over time); A1874; A3288:66:8-20 (same); A1182-89 (Gettens prior-art reference); A1253-71 (Akiba '655 reference); A1272-91 (Akiba '212 reference).)

The district court's holding is also contrary to this Court's instruction that when identifying corresponding structure, the "question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure." *Telcordia*, 612 F.3d at 1376. "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see Teva*, 135 S. Ct. at 841; *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014) ("[T]he definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application.").

Here, the record contains no suggestion that "motion sensors" would not be readily comprehended by skilled artisans. In fact, the district court never even defined the level of ordinary skill in the art, let alone made any findings that the structure and function of a motion sensor would be unknown to such persons. Failing to do so exacerbated the district court's error, because defining a skilled artisan "is essential to administering the definiteness test" for assessing corresponding structure. *AllVoice Computing PLC v. Nuance Comm., Inc.*, 504 F.3d 1236, 1240 (Fed. Cir. 2007); *see also Aristocrat Tech. Australia Pty Ltd. v. Multimedia Games, Inc.*, 266 F. App'x 942, 947 (Fed. Cir. Feb. 22, 2008) (remanding for a determination of corresponding structure and instructing that "the

district court will need to define the relevant art and the level of ordinary skill in that art," and then determine if "a person of ordinary skill in the art [would] understand the word 'controller' alone in the context of this invention to refer to a particular structure"). Here, the district court entirely discounted the disclosure of motion sensors without undertaking this requisite analysis.

### 3. The District Court's Reasoning Is Contrary To Well-Settled Precedent

To support the overly narrow construction, the district court stated that "accepting [motion sensors] as alternative structures would be tantamount to allowing purely functional claiming, which section 112(f) prohibits." (A9-10.) This Court has repeatedly rejected such flawed reasoning. Put simply, "[t]hat the disputed term is not limited to a single structure does not disqualify it as a corresponding structure, as long as the class of structures is identifiable by a person of ordinary skill in the art." *Linear Tech.*, 379 F.3d at 1322. As this Court explained in *Intel*: "By analogy, if a chair is disclosed in the specification that corresponds to the 'means for seating' limitation in a claim, asserting that there are infinite numbers of structures that could make a chair or there are unlimited types of chairs in the world would not necessarily make the claim indefinite." 319 F.3d at 1367. At bottom, nothing in Section 112 or this Court's precedent permits a court to disregard structure specifically linked to a recited function simply because the specification also discloses other, more detailed structures.

30

Nor does the specification's description of sound sensors as "preferred" justify excluding motion sensors as corresponding structure. "A means-plus-function claim encompasses all structure in the specification corresponding to that element." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258-59 (Fed. Cir. 1999). Accordingly, it is error to limit the claim "to the specific structures of the preferred embodiment." *Id.*

Furthermore, the doctrine of claim differentiation demonstrates the district court's error. Dependent claim 2 states "wherein said at least one sensor is a sound sensor carried by the animal for sensing chewing sounds of the animal." (A111:9:4-6.) By reciting a sound sensor in dependent claim 2, the claim language plainly recognizes that the sensor in claim 1 may be something *other than* a sound sensor. "The doctrine of claim differentiation is at its strongest in this type of case, 'where the limitation that is sought to be "'read into'" an independent claim already appears in a dependent claim.'" *InterDigital Communications, LLC v. USITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012). By restricting claim 1 to sound sensors, the district court's construction violates this doctrine and renders claim 2 redundant.

The understanding that claim 1 cannot be limited to sound sensors is further confirmed by dependent claims 4 and 6, which demonstrate that the sensor in claim 1 can be a microswitch—a kind of motion sensor. Claim 4 depends from

31

claim 1 and recites that "at least one sensor is a bolus sensor which senses

regurgitations of a bolus from the animal's rumen to the animal's mouth."

(A111:9:12-15.)  Claim 6, which is dependent on claims 1 and 4, provides that the

"bolus sensors are microswitches."  (A111:10:3-4.)

The "context in which a term is used in the asserted claim can be highly

instructive.  To take a simple example, the claim in this case refers to 'steel baffles,'

which strongly implies that the term "'baffles'" does not inherently mean objects

made of steel." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).  In

this case, had the inventors intended to limit claim 1 to only "sound sensors" they

would not have expressly recited sound sensors in dependent claim 2 and claimed

motion sensors in claims 4 and 6.  Such "[d]ifferences among claims can also be a

useful guide in understanding the meaning of particular claim terms."  *Id.* at 1314-

15.

> **4.    The District Court's Judgment Should Be Vacated Given
> The Erroneous Construction of "Sensor For Sensing
> Chewing Actions"**

Based on an erroneous construction that restricted the claims to a sound

sensor, the district court granted summary judgment of non-infringement.  (A14-

15.)  The court predicated its holding on the fact that the accused CowManager

system uses a motion sensor rather than a sound sensor.  The court explained that

the accused system "detects rumination *by means of an accelerometer* located on

the ear of the animal.  Plaintiffs' infringement expert, [Dr.] Aneshansley, …

initially confirmed that *the SensOor ear tags detected movements*."  (A14.)  The

district court also noted that it is undisputed that the "CowManager system uses

*accelerometers attached to ear tags to monitor cow movement*, and accelerometer

data is analyzed to classify the cows' activities."  (A11.)

Under a proper construction which recognizes that the corresponding

structure includes motion sensors and their equivalents, there exist (at minimum)

genuine issues of material fact regarding infringement by the accused

CowManager system.  *See Playtex*, 400 F.3d at 909-10 ("Because the district court

erred in its construction of the claim term … and based its holding that the

[accused product] did not infringe the [ ] patent on this improperly construed claim,

we vacate the summary judgment determination.").

**B.**     **The District Court Erroneously Excluded The Algorithm From Figure 6 As Corresponding Structure For The Term "Data Processor"**

Claim 1 recites "a data processor accumulating both the time of each of said

sensed chewing actions and the number of said chewing actions per unit time

interval, for determining the chewing rhythm of the animal."  (A110:8:63-65.)

This Court's precedent establishes that corresponding algorithms for means-plus-

function elements include any disclosed algorithm that performs the claimed

function.  *See Creo*, 305 F.3d at 1346.  "Disclosed structure includes that which is

33

described in a patent specification, including any alternative structures." *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997); *see Callicrate v. Wadsworth Mfg., Inc.,* 427 F.3d 1361, 1369 (Fed. Cir. 2005) (proper construction requires "[a]ccounting for all structure in the specification corresponding to the claimed function").

Here, the district court committed legal error by adopting an overly narrow reading of the specification and incorrectly excluding the algorithm in Figure 6 as a corresponding algorithm. (A10-11.) The court stated that "chew time is represented by 'CT' in Figures 8 and 11. Figure 6 does not determine the chewing rhythm using 'time of each of said sensed chewing actions.'" (A11.) A proper reading of the specification, however, demonstrates that Figure 6 in fact provides a corresponding algorithm for performing the recited function.

The '481 Patent explains that Figure 6, which is reproduced below, "is a flow chart illustrating one *algorithm which may be used by the data processor* 5 for determining whether the detected chewing sounds represented by the received electrical signals are ruminating activities or eating activities." (A109:5:14-18.)



Fig. 6

The algorithm in Figure 6 "determin[es] the rhythm (*e.g.*, *duration and frequency*) of the chewing sounds *at time-spaced intervals* and compar[es] the determined rhythm with a predetermined rhythm."  (A109:5:18-21 & A101 (Figure 6 at boxes 20-22).)[1]

    Referencing Figure 6, the specification further explains that "*the rhythm of the chewing actions are determined*, according to the algorithm of FIG. 6, *by*

---

[1]  While the specification refers to chewing sounds as an example, the algorithm in Figure 6 applies to any sensed chewing actions.  (A108:3:17-20 ("Fig 6 is a flow chart … according to one embodiment of the invention wherein chewing actions are detected and analyzed.").

*counting the number of chewing sounds in a predetermined sample time period* at

periodically spaced intervals, comparing the counted number of chewing sounds in

each sample time period with the counted number in the immediately preceding

sample time period." (A109:5:24-34.) The '481 Patent further provides that:

> During this time interval, a three-second sample time period is
> examined to see whether at least one chew was detected (blocks 20,
> 21). If so, a decision is made whether there were two-four chews
> during the respective sample time period (block 22 ). If 2-4 chews
> were not detected, a time memory is reset (block 23a), but if 2-4
> chews were detected during the three-second sample period, a
> ruminating activity is indicated and the time memory is set to measure
> the times (block 23b).

(A109:5:43-51.)

Thus, the specification, together with Figure 6, provides an algorithm that

accumulates the time of each sensed chew for determining the chewing rhythm of

the animal indicating ruminating activities. In particular, a person skilled in the art

would have recognized that a chew time can be determined by dividing the "time-

spaced interval" by the number of chews during that interval, and the '481 Patent

further teaches that "[d]uring rumination, cows typically chew in a fairly steady

rhythm, with each chew taking about 0.5-1.5 seconds, more particularly 0.70-1.43

seconds." (A108:4:49-51.) Therefore, Figure 6 shows an algorithm illustrating the

required elements of the claims.

Agis's own submissions supported this understanding of the '481 Patent.

Agis itself conceded in its proffered claim construction that "the corresponding

structure provided in the specification of the '481 patent is a data processor

configured *to perform the algorithms of Figures 6* or 8, and equivalents thereof."

(A1295-96.)  Likewise, Agis's expert Dr. Sidman initially stated that Figure 6

provides a corresponding algorithm: "Having examined the specification of the

'481 patent, I conclude that the only disclosed algorithms that carry out that

function are those *depicted in Figures 6*, 8, and 11 of the '481 patent."  (A1764,

A1773.)  Another of Agis's experts, Dr. Stevenson, similarly opined: "I conclude

that the 'data processor' limitation of claim 1 should be understood to cover a data

processor programmed *to perform the algorithm of Figure 6*, Figure 8, and/or

Figure 11."  (A272, A303.)

Having failed to even define a person skilled in the art, the district court

adopted an overly restrictive construction contrary to the intrinsic evidence, and to

Agis's own representations and expert opinions.

### C.     The District Court Improperly Resolved Factual Disputes and Made Credibility Determinations In Favor Of Movant Agis

"Credibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of a judge,

whether he is ruling on a motion for summary judgment or for a directed verdict.

The evidence of the non-movant *is to be believed,* and *all* justifiable inferences are

to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  Here, in three brief paragraphs spanning less than a page, the district court

summarily concluded that the accused system does not sense "the time of each chewing action and the number of chewing actions per predetermined time interval." The Court reached that conclusion by fundamentally misapplying the claim language and resolving factual disputes and making credibility determinations in favor of the movant Agis. (A16-17.) "By weighing the evidence and reaching factual inferences contrary to [non-movant's] competent evidence, the court below neglected to adhere to the fundamental principle[s]" of summary judgment. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

### 1. The District Court Fundamentally Misapplied The Claim Language

The district court's decision hinges on legal errors in addressing the claim language.

*First*, by erroneously reading into the claims numerical limitations nowhere recited there, the district court concluded that the accused system does not sample chewing actions at the rate purportedly disclosed in embodiments of the '481 Patent. (A17.) The district court stated that the accused system ██████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████ (A16.)

38

Infringement, however, "is determined by comparing an accused product *not with a preferred embodiment described in the specification*, or with a commercialized embodiment of the patentee, *but with the properly and previously construed claims* in suit." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). The asserted claims do not recite or require any specific sampling rate. Thus, by comparing the accused product with embodiments in the specification, the court failed to perform a "proper infringement analysis"—which requires "comparing the accused device to the properly construed claims without limiting their scope to the examples in the specification." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003). The error in the infringement analysis was compounded by importing a numerical range into the claims. The rule is well settled that "when a claim term is expressed in general descriptive words, we will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims." *Conoco, Inc. v. Energy & Envtl. Int'l*, 460 F.3d 1349, 1358 (Fed. Cir. 2006).

*Second*, the district court predicated summary judgment on its conclusion that "nowhere in the process does the CowManager system *measure* the time of each chew." (A16-17.) In doing so, the court effectively rewrote the claims to import a "measuring" requirement that is wholly absent from the claims. Here, the claim language provides "*sensing* chewing actions of the animal…, including the

39

CONFIDENTIAL MATERIAL REDACTED

time of each chewing action and the number of chewing actions per predetermined time interval." (A110:8:58-62.) The term "measuring" is not used or required by the claims. "Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K–2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1364 (Fed. Cir. 1999); *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("[W]e do not permit courts to redraft claims.").

## 2.    The District Court Improperly Made Factual Findings Contrary To SCR's Experts' Submissions

In granting summary judgment, the district court credited the movant's expert report and remarked that Agis "makes a good case ███████████ ████████████████████████████████████████████ █████████████" (A16.) Of course, simply "mak[ing] a good case" cannot justify summary judgment for the movant; the movant must show that no reasonable jury could reach any other conclusion. "On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact concerning infringement." *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

The district court credited Agis's expert opinion, and drew inferences in Agis's favor, which is of course improper for a summary-judgment motion. Worse, in doing so, the district court wholly disregarded the testing, analyses, and contrary opinions of SCR's experts. That constitutes legal error: "Where there is a material

40

dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011); *see Tolan*, 134 S. Ct. at 1867-68 (reversing summary judgment because court "failed properly to acknowledge key evidence offered by the party opposing that motion").

Here, SCR's expert Dr. Aneshansley, a professor of Electrical and Agricultural Engineering from Cornell University, analyzed and summarized test results of the accused CowManager system that simulated a cow's chewing motions with computer-controlled stepper motors to which SensOor ear tags were attached. (A1395, A1401-02.) These tests included simulating a cow's chewing motions repeated in sequence for one-hour durations using chewing rates ranging between 0.55 and 1.9 chews-per-second and continuous chewing action for several hour periods with chewing rates between 0.55 and 2.4 chews/second. (A1403, A1405.)

Dr. Aneshansley summarized the test results with graphical and tabular analysis. (A1404-06.) Based on his analysis, Dr. Aneshansley opined that the "results from the rumination and chewing simulation … indicate that ███████

██████████████████████████████████████

████████████████████████" (A1407.) Dr. Aneshansley further explained that the test results fall within the scope of claim 1

41

**CONFIDENTIAL MATERIAL REDACTED**

"which states a sensor detects chewing actions in terms of the 'time of each

chewing action' ████████████████████████████ and 'number of

chewing actions per predetermined time interval' █████████████████████

████████████████████████████████████████████████████████"

(A1407.)

Moreover, SCR's computer source code expert, Jeffrey Hansbury, analyzed

the source code for the CowManager system and concluded that Agis's system

classified ruminating activities by █████████████████████. In so doing, Agis

ensured that the █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ (A1476, A1492.)  The district court,

however, entirely ignored this evidence.

SCR's expert analyses directly refute, and at minimum raise genuine issue of

fact regarding, the district court's findings that the accused system does not detect

chewing frequency.  (A17.)  SCR's expert analyses and opinions are reinforced by

Agis's internal documentation establishing that the accused system ██████

████████████████████████████████████████████████████████

(A2559, A2556, A2570)—as Agis's CEO confirmed.  (A2325:112:3-8,

A2326:114:5-10.)  "By failing to credit evidence that contradicted some of its key

42

**CONFIDENTIAL MATERIAL REDACTED**

factual conclusions, the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." *Tolan*, 134 S. Ct. at 1866.

Dr. Aneshansley also submitted a declaration that underscores the disputed factual issues by identifying errors in Agis's expert opinion relied on by the district court. Consistent with his opening report, Dr. Aneshansley explained that:



The Agis system detects chewing action based

The Agis system gives the 'time of each chewing action' within the context                                    . The Agis system utilizes

(A2085-87 ¶ 10.)  Dr. Aneshansley further noted that the '

(A2087 ¶ 12.)

The district court wrongly ignored Dr. Aneshansley's declaration by cursorily dismissing it as filed "well after the deadline for disclosure of expert reports" and therefore "untimely," without any further elaboration.  (A15.)  The

court's decision, however, is contrary to the Pretrial Conference Order, which was originally entered by Judge Conley and adopted by Judge Peterson. The Pretrial Conference Order—which, under Fed. R. Civ. P. 16(d) "controls the course of the action unless the court modifies it" thereafter—clearly put the parties on notice that "Supplementation pursuant to Rule 26(e) is limited to matters raised in an expert's first report, must be in writing and must be served not later than five calendar days before the expert's deposition, or before the general discovery cutoff if no one deposes the expert." (A171-72.) Here, Dr. Aneshansley's declaration fully complied with the procedures noticed in the Pretrial Order: (1) Dr. Aneshansley opined about matters related to and addressed in his first report (where he explained that Agis's system detected chewing rates indicative of rumination and he addressed the one-second sampling rate); and (2) his declaration was served on January 23, 2015, nearly two months before his March 12, 2015 deposition, and almost three months before the general discovery cutoff of March 27, 2015. (A173.)

Moreover, Dr. Aneshansley's supplemental report issued on March 6, 2015, in advance of his deposition and the discovery cutoff—further shows the disputed factual issues. Based on examination of the accused CowManager system, Dr. Aneshansley explained that when "making its rumination classification, the Agis system detects or senses chewing rhythm or frequency. For any given time period

or interval, this will yield the number of chews during that time period and that chewing rhythm.  The results from the rumination and chewing simulation as shown in Table 1 show experimental data similar to the results of the tests analyzed in my Initial Report."  (A4587, A4592 ¶ 2(b).)

District courts are allowed discretion to manage their cases, but that discretion is cabined:  It is not so broad as to justify the wholesale after-the-fact failure to follow the court's prior orders, which here gave SCR notice that its pre-deposition, pre-discovery-cutoff submission of a supplemental expert report was entirely proper and timely.  As this Court has explained, if a district court intends to change the scope or application of its orders, it is "obligated to provide clear notice of the requirements of its orders."  *MIT v. Abacus Software*, 462 F.3d 1344, 1358-59 (Fed. Cir. 2006) (holding that district court abused its discretion by failing to provide a party with "sufficient notice that its preliminary infringement contentions would be deemed final or that they could only be updated upon a showing of good cause," when neither of these requirements was stated in the court's docket control order); *see also* Fed. R. Civ. P. 83(b) ("No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with *actual notice* of the requirement.").  Exactly the same situation that compelled reversal in *MIT* is present here:  SCR had no

notice that an expert supplementation made in accord with the Pre-Trial

Conference Order—which as noted above, "controls the course of the action unless

the court modifies it," Fed. R. Civ. P. 16(d)—could be deemed untimely.

### 3.    The District Court Improperly Made Credibility Determinations In Favor Of The Movant Agis

The district court's summary-judgment decision also rests on improper

inferences and credibility determinations drawn and made in Agis's favor.

Specifically, the district court credited the testimony of Dr. Paul Rump, Agis's

former Chief Technology Officer, that the accused system allegedly "never [is]

capable of detecting a frequency." (A16.) By doing so, the district court accepted

Dr. Rump's attempt to contradict his other testimony that the accused system

detects chewing frequency. During his deposition, Dr. Rump explained that Agis's

system determines rumination by detecting a cow's chewing:



**CONFIDENTIAL MATERIAL REDACTED**



(A3007: 129:5-130:3.)  Dr. Rump further testified that:



(A3007:131:17-23.)  Dr. Rump's testimony establishes that the accused system

detects chewing at frequencies ███████████████████████:



(A3008:133:25-134:18; A3015:163:3-14 (explaining that testimony referring to

"frequency" means "oscillating in a certain rhythm, the speed of the rhythm is

indicated by the frequency").)  Dr. Rump further explained that the accused system senses the number of chewing actions over a predetermined time interval ▇▇

▇▇▇▇ :



(A3008:134:22-135:7.)

This testimony, at minimum, creates genuine issues of material fact as to whether the accused system senses the time of each chew and the number of chews over a time period.  *See, e.g., Crown Packaging*, 635 F.3d at 1384 (explaining that a witness's "change in position … throughout the course of this litigation are proper matters for a jury to weigh in making a credibility determination").  Resolving the internal contradictions and credibility issues concerning Dr. Rump's testimony is improper at the summary-judgment stage.  "Determining the weight and credibility of the evidence is the special province of the trier of fact."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982).

## II.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT REGARDING THE '149 PATENT

Based on an erroneous claim construction, the district court found that independent claim 1 and 12 and dependent claims 2-6, 11, 13-17, 23 and 24 are not infringed.  During summary-judgment briefing, Agis proposed a construction of the term "attenuating" that required attenuation to occur "*in transmission* between points" by citing extrinsic evidence defining attenuation as occurring "during transmission of a signal."  (A20; A1548.)  The district court "construe[d] the attenuating step as proposed by defendant."  (A25.)  The court thus held that "the attenuating step … requires that the energy level of the signal *from the acceleration sensor* be reduced in proportion to the strength of the indication that the animal is eating."  (A25.)

The district court's claim construction is wrong for several reasons.  First, the court's construction and infringement analysis improperly require attenuating the signal during *transmission from* the acceleration sensor, which ignores the context of the claim language:  The claimed "attenuating" occurs within the microprocessor *after* the signal is received (*i.e.*, after, not "during" transmission).  Second, and related to the first error, the district court's construction improperly scrambles the claim language by requiring attenuating "the signal *from the acceleration sensor*."  The claim, however, recites attenuating "the *energy level* of

the acceleration signal." (A120:9:8-9.) Third, the court's construction requires

that attenuation must be "in proportion" to an animal's eating, when neither the

claim language nor any intrinsic evidence supports engrafting an "in proportion"

requirement onto the claims.

A.    **The District Court Erroneously Construed The Term "Attenuating The Energy Level Of The Acceleration Signal" To Require That Attenuation Must Occur During Transmission And Be "In Proportion" To An Animal's Eating**

1.    **The District Court Incorrectly Required Attenuation To Occur During Transmission "From The Acceleration Sensor"**

Claim 12 recites a "microprocessor" and identifies various functionality

performed by the microprocessor—"accumulating said acceleration signal,"

"attenuating the energy level of the acceleration signal," "extracting typical activity

level," "identifying abnormal behavior," and "comparing" various data. On its

face, the claim language demonstrates that the claimed functionality (including

"attenuating") must be done by the microprocessor that receives the acceleration

signal. The district court's construction, however, ignores this critical fact.

During summary-judgment briefing, Agis urged the court to construe the

term "attenuating" to "necessarily indicate a decrease in signal magnitude or

amplitude *during transmission of a signal*." (A1548; A1547-48 ("An acceleration

signal produced by an acceleration sensor *is the transmission* of information in the

form of a voltage or current generated by the sensor that proportionately represents

acceleration experienced by the sensor.").)  The district court "construe[d] the attenuating step as proposed by defendant" (A25), crediting Agis's expert's citation to a dictionary "which defines 'attenuation' to mean 'decrease in magnitude of current, voltage, or power of a signal *in transmission between points*.'" (A20.)  As a result, the district court held that "the attenuating step … requires that the energy level of the signal *from the acceleration sensor* be reduced in proportion to the strength of the indication that the animal is eating." (A25.) The district court then applied that construction to find no infringement, stating that in the accused system "the level of physical activity of the cow is not expressed by the energy level of the signal *from the accelerometer*." (A26.)

Having viewed the term "attenuating" in isolation, the court's construction cannot be reconciled with the surrounding claim language.  First, the claims, which "themselves provide substantial guidance as to the meaning of particular claim terms," *Phillips*, 415 F.3d at 1314, establish that attenuating is performed by the "microprocessor"—"at least one microprocessor for … attenuating the energy level of the acceleration signal as the indication of eating is stronger." (A120:-9:7-9.) As evident from the language, attenuation cannot occur while the acceleration signal is being transmitted "from the acceleration sensor" to the microprocessor. Rather, attenuation must be done by the microprocessor, and the microprocessor can only do that after it receives the signal.

Second, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Claim 12 recites "attenuating the energy level *of the acceleration signal*." Contrary to Agis's arguments and the court's construction, the claim language does not require, nor recite, attenuating a signal during transmission *from* the accelerometer. The difference is important. Attenuation occurs after the signal has been received by the microprocessor and is performed on the "energy level *of* the acceleration signal." (A120:9:7-9.) The specification confirms this understanding, explaining that the "microprocessor *may receive data* of said sensed motion and of said sensed eating periods. The *data may then* be combined to neutralize the effect of motion associated with eating (during eating periods) on the sensed motion to get a NUT-ACT [neutralized activity]." (A117:3:6-10.) The '149 Patent also teaches that the microprocessor is "capable of receiving input 3 and 4 from a sensor device" and the input can then "be further filtered by microprocessor[] using an appropriate software or combination of software and hardware." (A118:5:66-6:13.) Further, the specification of the '149 Patent makes clear that the "energy level" *of* the acceleration signal "can be deduced"—*i.e.*, inferred—through an arithmetic "RMS" (root mean square) value, which "deduction" would obviously be done in the microprocessor, not during transmission of the signal from the accelerometer. (A117:3:45-47.)

52

## 2.    The District Court Incorrectly Required Attenuation To Be "In Proportion" To The Animal's Eating

The district court further erred in requiring that the "energy level of the signal from the acceleration sensor be reduced *in proportion* to the strength of the indication that the animal is eating." (A25.) Nothing in the claim language compels that attenuation be "in proportion" to an animal's eating. Rather, the claims recite "attenuating … as the indication of eating is stronger." (A119:8:21-22; A120:9:9-10.) Given that the claims are silent as to how much attenuation is necessary as the indication of eating is stronger, it was improper for the court to import an unrecited "proportionality" limitation. "General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *In re Thrift*, 298 F.3d 1357, 1364 (Fed. Cir. 2002) (when claims use a "general term … without any modifiers, appellant's limiting interpretation … is inappropriate").

In fact, the inventors knew how to claim "proportionality," and they did so expressly in claim 25 (which depends from claim 12) by reciting "wherein said combined sensor reports head motion values inversely *proportional* to the head's inclination angle." (A120:10:12-14.) "Had the inventors intended this ['in proportion'] limitation, they could have drafted the claims to expressly include it." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010). But the

inventors "did not, and this court [should] not do so here." *In re Rambus Inc.,* 694 F.3d 42, 47 (Fed. Cir. 2012) ("To the extent [patentee] wanted to limit the memory device to a single chip component, it could have expressly done so.").

Like the claim language, the specification never requires that attenuating must be "in proportion" to an animal's eating. The specification simply explains that the invention "provides a method and device for detecting estrus animals by collecting information related to the animal's motion and information related to the animal's eating periods and combining them together *to reduce the impact* of the animal's eating habits on the results." (A116: 2:31-35.) Nothing in this passage— nor anything else in the specification—dictates that attenuation be "in proportion" to an animal's eating activity.

### 3.    The District Court Misapplied The Prosecution History

The district court's reading of the prosecution history was also misplaced. When the inventors amended the claims to require "attenuating the energy level of the acceleration signal as the indication of eating is stronger" (A1053-54), they did not require that attenuation occur during, or prior to, transmission from the acceleration sensor or that such attenuation be "in proportion" to eating activity. Likewise, the inventors' remarks during prosecution never suggested that patentability was dependent on attenuating "during" transmission or attenuating "in proportion to" the animal's eating, and nothing in the Examiner's rejections

required that attenuating occur before the signal is received by the microprocessor. Nor did the district court find, or rely upon, any such statements. Accordingly, "the prosecution history does not reflect a clear and unmistakable disavowal of the plain and ordinary meaning of that language." *Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1373 (Fed. Cir. 2015)

Moreover, the PTO did not condition the claims' allowance based on "requir[ing] [ ] the energy level of the signal *from the acceleration sensor* be reduced *in proportion* to the strength of the indication that the animal is eating." The Examiner's "statements of reasons for allowance" provide that:

> [T]he prior art of record fails to disclose or render obvious a method or device for detecting estrus in a cattle animal that involves the features as claimed, particularly: sensing and accumulating acceleration level of the cattle animal over a period of time; *sensing, over a period of time, data indicative of eating performed by the cattle animal, using the sensed data indicative of eating to neutralize the accumulated motion data*; extracting typical activity level of the animal based on the neutralized motion data, and identifying abnormal behavior indicative of said estrus in the animal by comparing recently identified neutralized motion data with the extracted typical activity level.

(A1094.)  The Examiner's reasons for allowance make no reference whatsoever to "attenuating," let alone attenuating a signal "during transmission" or doing so "in proportion" to an animal's eating.  Indeed, the Examiner's repeated reference to using the sensed "*data*" to "neutralize the accumulated motion *data*" underscores the understanding that the attenuation occurs in the microprocessor.

Finally, contrary to the district court's statements, SCR does not seek a construction that "would include *any process* by which the level of the physical movement of the animal is discounted while the animal is eating." (A22.) Rather, properly construed, the term "microprocessor for … attenuating the energy level of the acceleration signal as the indication of eating is stronger" means that the microprocessor *statistically* reduces the value of the *acceleration* signal when the indication of the *animal's eating increases*. This construction comports with the claim language by recognizing that the microprocessor performs the attenuation of the signal after it has been received and such attenuation is based on an indication that eating is stronger. That construction also aligns with the specification, which explains that the invention involves "sensing and accumulating along time signals indicative of the motion of a cattle animal and *identifying when the sensed motion is statistically not related* to eating periods of said cattle animal and when it statistically deviates from the range of data indicative of normal behavior of said cattle animal." (A116:2:43-48.)

### B.    Under A Proper Construction, There Exist Genuine Issues Of Material Fact

This Court routinely vacates summary judgments predicated on erroneous claim constructions. *See, e.g., Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1352-53 (Fed. Cir. 2013) ("Since the district court's claim construction is reversed, its finding of no infringement is vacated and the issue is remanded for further

56

proceedings.").  Here, the district court's conclusion of no literal infringement stemmed directly from its erroneous claim construction.  The court discounted SCR's expert opinions as failing to "raise[] a genuine issue of material fact as to whether the CowManager system performs the attenuating step *as the court has construed that limitation*," and then repeatedly stated that SCR did not show that attenuation "is proportionate to the strength of the indication of eating."  (A27-28.)

Under a proper construction, the record evidence demonstrates the existence of genuine issues of material fact.  As the district court noted, the "CowManager system performs statistical analysis of data sampled from the accelerometer in the SensOor ear tag.  The system determines when the sampled data shows an unusually high level of physical activity for a cow, and when certain criteria are met, it deems the monitored cow to be in estrus."  (A26.)  The district court further noted that the CowManager system includes a SensOor ear tag "containing an accelerometer and a microprocessor which performs a statistical calculation on the accelerometer data."  (A11-12.)  The court observed that the SensOor microprocessor performs statistical calculations for acceleration data.  The accused system determines the ██████ value which ███████████████████

████████████████████████████████████████████████

████████████████  (A12-13.)  The district court also noted that certain ██████████

████████████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED

█████████████████████████████████. (A12-13.)  The accused system also calculates the ████████ value which is "████████████████████████ ████████████████████████████████" (A12-13.)

SCR's expert analysis further demonstrates the existence of triable issues. Dr. Aneshansley's report analyzed in detail how the CowManager system attenuates acceleration data through statistical analysis.  (A1407-10.)  Reviewing the ██████████████ classifications used in the accused CowManager system and the calculations performed █████████████████, Dr. Aneshansley explained that the accused system attenuates the acceleration signals as indication of eating increases:



(A1411.)  Dr. Aneshansley further opined that "[b]ased on my review of Mr. Hansbury's inspection and analysis of the Agis source code, and the data made

available to me from the SensOor Tag and its components, 

" by various mechanisms, including by the use of

in Agis's statistical analysis,

(A1415-16.)  The district court also observed that the CowManager system

removes the ⬛⬛⬛⬛⬛, from consideration.

(A12-13.)  Dr. Aneshansley's analysis and opinions create, at minimum, genuine

issues of material fact regarding Agis's infringement of the asserted claims under a

proper claim construction.

## III.   THIS COURT SHOULD ALSO VACATE THE SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT

The district court's sole basis for granting summary judgment of no willful

infringement was its conclusion that "defendant is entitled to summary judgment of

non-infringement of both patents, which shows that defendant had at least a

reasonable non-infringement position.  Thus, plaintiffs cannot meet the objective

first prong of the *Seagate* test."  (A28.)  However, as explained above, the district

court's summary judgment of non-infringement rested on legally erroneous claim

constructions and a basic misapplication of summary-judgment law.  As a result,

this Court should vacate the summary judgment of no willful infringement and remand to the district court to evaluate the issue in light of proper claim construction.  A remand is particularly necessary given evidence that during development of the accused product, Agis had access to, studied, and implemented SCR's patented technology.  *See* pp. 5-6, above.  Moreover, on remand, the district court will need to evaluate willful infringement in view of the Supreme Court's forthcoming decisions in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371 (Fed. Cir. 2014), *cert. granted*, 136 S. Ct. 356 (2015) and *Stryker Corp. v. Zimmer, Inc.*, 782 F.3d 649 (Fed. Cir. 2014), *cert. granted*, 136 S. Ct. 356 (2015).

## CONCLUSION

For these reasons, the district court's summary-judgment order should be vacated and the case remanded for further proceedings.

Dated:  December 7, 2015                    Respectfully submitted,

                                                          /s/ Gregory A. Castanias
                                                          GREGORY A. CASTANIAS
                                                          JONES DAY
                                                          51 Louisiana Avenue, N.W.
                                                          Washington, DC 20001
                                                          (202) 879-3939

                                                          ISRAEL SASHA MAYERGOYZ
                                                          JONES DAY
                                                          77 West Wacker Drive

60

Chicago, IL 60601-1692
(312) 269-1572

FRED H. PERKINS
ALVIN C. LIN
MORRISON COHEN LLP
909 3rd Avenue
New York,  NY 10022
(212) 735-8600

BARRY G. MAGIDOFF
PAUL J. SUTTON
SUTTON MAGIDOFF
909 3rd Avenue, 27th Floor
New York, NY 10022
(212) 584-1990

*Attorneys for Appellants
VocalTag Ltd. and SCR
Engineers Ltd.*

ADDENDUM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

VOCALTAG LTD. and SCR ENGINEERS LTD.,

                        Plaintiffs,                     OPINION & ORDER

     v.

                                          13-cv-612-jdp

AGIS AUTOMATISERING B.V.,

                        Defendant.

This is a patent infringement case involving electronic cattle monitoring systems. The systems at issue in this case track rumination (an indicator of animal health) and estrus (the period in which a cow is receptive to mating). Each plaintiff owns a patent in this area, and they accuse defendant, Agis Automatisering B.V., of infringing both patents with its CowManager system.

The operation of the Agis CowManager system is not genuinely disputed, and thus infringement turns on questions of claim construction. The court will substantially adopt the narrower claim constructions proposed by defendant, which properly reflect choices made by the inventors in claiming their inventions and in prosecuting their patents. Under these constructions, defendant is entitled to summary judgement of non-infringement of both patents. Defendant is also entitled to summary judgment on the willful infringement allegation. The court will exercise its discretion to decline to reach the question of the validity of the patents-in-suit.

## BACKGROUND

We start with some basics of cattle behavior, information well known before the priority dates of the patents-in-suit.

**A1**

Cows are ruminants, which means that they have a multi-chambered stomach. One chamber is the rumen, from which ingested food is regurgitated for re-chewing, or rumination. Rumination breaks food into smaller particles and mixes it with saliva, thus facilitating digestion. A healthy cow will spend about half her time ruminating, and the amount of rumination is a good indicator of animal health and a proper diet. Too little or too much rumination indicates a problem that will reduce milk production. Cows also chew when they eat, but that chewing is erratic and accompanied by head movements. The chewing of rumination, by contrast, is rhythmic and steady, with pauses for regurgitation and swallowing. The distinctive qualities of rumination have made it a natural target of cattle monitoring systems as an indicator of animal health.

Cows reach peak milk production 45 to 90 days after calving, after which production declines. Optimal milk production thus requires conception and renewed calving every 12 to 15 months. Cows are receptive to mating when they are in "estrus," a state that lasts about 5 to 10 hours and occurs about every 19 to 23 days. Cows in estrus tend to engage in characteristic behavior, such as standing receptively while a bull or herd mate mounts them. In general, a cow in estrus is physically much more active than when she is not. Because most dairy cows are bred through artificial insemination, the dairy farmer needs somehow to identify estrus in those cows due for breeding, but direct observation of the behavioral signs of estrus can be difficult and time consuming.

Plaintiffs are Israel-based companies that develop and sell cattle monitoring systems, and they hold patents on such systems. Plaintiff VocalTag Ltd. owns U.S. Patent 7,350,481, to Avshalom Bar-Shalom, for "Method and System for Monitoring Physiological Conditions of, and/or Suitability of Animal Feed for Ruminant Animals" (which the court will refer to as the "'481 patent" or the "rumination patent"). VocalTag licenses the '481 patent to co-plaintiff

2

**A2**

SCR Engineers Ltd. SCR owns U.S. Patent 7,878,149 for "Method and Device for Detecting Estrus" ("'149 patent" or the "estrus patent"). SCR sells a cattle monitoring system in the United States under the tradename "Heatime."

Defendant Agis is a Netherlands-based company that makes cattle monitoring systems and competes with SCR in the United States. The Agis system is called CowManager, and it uses an ear tag with an accelerometer to monitor the motion of each cow. The system samples and analyzes the accelerometer readings to identify periods of rumination and estrus. VocalTag and SCR accuse the Agis CowManager system of infringing both the rumination patent and the estrus patent. They also contend that Agis copied SCR's Heatime system, and that therefore Agis's infringement is willful.

Agis has no offices in the United States, but it does not contest personal jurisdiction or venue in this court, presumably because it sells the CowManager system in this district. The case arises under the patent laws of the United States, and thus the court has subject matter jurisdiction on the basis of a federal question under 28 U.S.C § 1331.

## ANALYSIS

Defendant has moved for summary judgment of non-infringement of both patents-in-suit.

### A. Basic legal principles

In patent cases, as in civil cases generally, summary judgment is appropriate if a defendant shows that "there is no genuine dispute as to any material fact and [the defendant is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on defendant's motion for summary judgment, the court views all facts and draws all reasonable inferences in the light most favorable to plaintiffs as the non-moving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

3

**A3**

242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

Infringement analysis is a two-step process. *See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002); *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1359 (Fed. Cir. 2000). The first step is claim construction, in which the court must determine the correct scope of the claims. The second step is to compare the properly construed claims to the accused device, to determine as a matter of fact whether every claim element is present, either literally or by a substantial equivalent, in the accused device. When, as in this case, the relevant structure and operation of the accused device is not genuinely disputed, the question of infringement turns on claim construction, and the question of infringement is amenable to resolution on summary judgment. *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997).

The ultimate question of the scope of a patent claim is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). But that determination may, in part, rest on underlying factual determinations that would be reviewed on appeal for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The basic principles of claim construction are well known, and they are not disputed in this case. The court summarizes them only briefly here; the court will address concepts as needed in the context of the analysis that follows.

A "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). In construing a term, the "objective baseline" is the "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. "[T]he person of ordinary

4

**A4**

skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" and the prosecution history. *Id.*

The "primary basis for construing [a] claim" and "the best source for understanding a technical term" is a patent's intrinsic evidence. *Id.* at 1314. Intrinsic evidence includes the patent and its prosecution history, related patents and their prosecution histories, and the prior art that is cited or incorporated by reference in the patent-in-suit and prosecution history. *Id.* Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotations and citations omitted). When a court relies solely upon the intrinsic evidence, the court's construction is a determination of law. *Teva Pharm.,* 135 S. Ct. at 841.

The court may also consider extrinsic evidence, which refers to all other types of evidence, including inventor testimony, expert testimony, documentary evidence of how the patentee and alleged infringer have used the claim terms, dictionaries, treatises, and other similar sources. *Phillips,* 415 F.3d at 1318. Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* at 1317-19. However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.* Intrinsic evidence trumps any extrinsic evidence that would contradict it. *Id.* at 1314.

## B. The rumination patent: U.S. Patent 7,350,481

To put it simply and at a high level of abstraction, the invention of the '481 patent is a system that keeps track of rumination as an indicator of animal health and the suitability of feed, with an eye toward optimizing milk production. '481 patent, at 1:14-16. But the basic notion of monitoring rumination as an indicator of animal well-being was known in the art; the

'481 patent claims a specific system for rumination monitoring.

Although the claims define the legal boundaries of the patent, an embodiment is a good starting point to understand the invention of the '481 patent. In the embodiment described and illustrated by figures 1-6, a sound sensor is attached to a neck band on the cow. '481 patent, at 3:42 - 4:6-17. The sound sensor picks up the sounds made by chewing, converts those sounds to electronic signals, and transmits the signals to a data processor. The data processor samples a three-second period to determine whether two to four chews occurred during the period. After 20 seconds, the data processor samples another three-second period. If the data processor determines that two to four chews occurred in two successive samples, it deems the cow to be ruminating, because those samples suggest the pattern and tempo typical of rumination. The data processor tracks periods of rumination and calculates the rumination time in a larger time period, such as a 24-hour day.

The '481 patent has one independent claim, claim 1:

> 1. A monitoring system for monitoring the suitability of animal feed, of ruminant animals, comprising:
> at least one sensor for sensing chewing actions of the animal produced by the animal while chewing animal feed, including the time of each chewing action and the number of chewing actions per predetermined time interval, for indicating a ruminating activity;
> and a data processor accumulating both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval, for determining the chewing rhythm of the animal indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health.

'481 patent, at 8:56 - 9:3.

Plaintiffs assert claim 1 and dependent claims 8 and 9. Claim 8 depends from claim 1 and adds two further elements: a transmitter included in the sensor; and a receiver at a remote

6

**A6**

location. Claim 9 depends from claim 8, and adds an alarm to be actuated when sensed actions indicate a condition requiring immediate action. *Id.* at 10:12-20. The court's infringement analysis will address only claim 1, because the claims that depend from an independent claim cannot be infringed if the independent claim is not infringed. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989).

### 1. Claim construction

The parties present two terms for judicial construction: "sensor for sensing chewing actions" and "data processor." The issue is whether these are "means-plus-function" limitations, and, if so, how they should be construed.

A patentee may elect to draft a claim limitation in general terms by reciting a specified function without including the specific structure, material, or act that performs the function. 35 U.S.C. § 112(f) (formerly ¶ 6). But if the patentee chooses to draft a claim in this manner, the specification must disclose the particular structures that perform that function. *Id.*; *see also Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Once the court determines that a claim term is a means-plus-function limitation governed by § 112(f), construing a means-plus-function limitation requires the court to (1) identify the claimed function and (2) identify the corresponding structure in the written description that performs the identified function. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318-19 (Fed. Cir. 2003). The scope of the claim is limited to those structures disclosed in the specification as performing that function and equivalents of those disclosed structures. *Aristocrat Technologies*, 521 F.3d at 1333.

### a. "sensor for sensing chewing actions"

Defendant contends that "sensor for sensing chewing actions" in independent claim 1 is a means-plus-function limitation, even though the claim does not use the standard "means for"

language. The lack of "means for" phrasing raises a presumption that the limitation is not a means-plus-function limitation. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). But here, the claim language provides so little information about the structure that would perform the sensing function that the presumption would likely be overcome. *Id.*

The question is definitively resolved by the inventor's statements during prosecution, where he expressly told the USPTO (and, thus, the public) that amendments to the claim were intended to put the claims in means-plus-function format. Dkt. 41-1, at 261.[1] Plaintiffs' position in this litigation is equivocal: they do not "welcome" the means-plus function determination. Dkt. 111 (response to Proposed Fact 41). But plaintiffs concede the critical point: the inventor told the examiner that he intended "sensor for sensing" to be a means-plus-function limitation. Dkt. 111 (Proposed Facts 31-36). And the inventor made this statement to overcome a prior art rejection. *Id*. Under these circumstances, the doctrine of prosecution disclaimer prevents plaintiffs from reversing course and claiming now that the "sensor for sensing" is not a means-plus-function limitation. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003).

The next step is to determine the function of the "sensor for sensing" limitation. The parties agree on the function, which is drawn directly from claim 1: "sensing chewing actions of the animal produced by the animal while chewing animal feed, including the time of each chewing action and the number of chewing actions per predetermined time interval." Dkt. 111 (Proposed Fact 42, citing '481 patent, at 8:58-62).

The final step in the analysis is to determine the corresponding structure that performs the claimed function. Only one structure is disclosed for sensing chewing actions: a "sound

---

[1] Docket citations are made to the ECF page number.

**A8**

sensor." '481 patent, at 3:41 - 4:12. The specification indicates that a sound sensor could include "a diaphragm-type microphone, a piezoelectric device, or any other sound-to-electrical transducer." *Id.* at 4:7-9.

Plaintiffs contend that other structures are also disclosed. Plaintiffs rely on these passages from the specification:

> The sensors for sensing chewing actions are preferably sound sensors . . . However, other types of sensors could be used. For example, chewing actions could be sensed by sensors for sensing the motions of the animal's lower jaw, or the tightening of the animal's muscles in the throat when swallowing.

*Id.* at 2:43-49;

> [C]hewing actions may be sensed in another manner, e.g., by sensing the tightening of the muscles in the animal's neck during chewing or swallowing, or the movement of the animal's jaw during chewing, and that the regurgitations may also be sensed in other manners, e.g. by the use of microswitches . . .

*Id.* at 8:38-43.

But these passages do not adequately disclose alternative structures for two reasons. First, the claimed function is sensing chewing actions, not swallowing or regurgitations. Thus, "microswitches," or any means of sensing swallowing or regurgitation, are not tied to the claimed function, and thus they are not alternative structures for performing that function. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424-25 (Fed. Cir. 1997). (Besides, even if "microswitches" were deemed to be a corresponding structure, it would not affect this case, because the CowManager system does not use microswitches.) Second, the specification does not sufficiently describe any actual structure that senses jaw motions or muscle tightening. *Id.*; *see Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382-83 (Fed. Cir. 2009). These alternatives simply suggest that chewing may be sensed indirectly, by sensing related bodily movements, but no actual sensor structure is disclosed. Accepting these as alternative structures

9

**A9**

would be tantamount to allowing purely functional claiming, which section 112(f) prohibits. *Id.*

The court concludes that "sensor for sensing chewing actions" is a means-plus-function limitation. The claimed function is: sensing chewing actions of the animal produced by the animal while chewing animal feed, including the time of each chewing action and the number of chewing actions per predetermined time interval. The corresponding structure is a sound sensor, which includes a diaphragm-type microphone, a piezoelectric device, or any other sound-to-electrical transducer.

### b. "data processor"

The analysis of the "data processor" term in claim 1 follows the same template as the "sensor for sensing" term. The patentee expressly identified the data processor term as a means-plus-function limitation during prosecution, as plaintiffs concede. Dkt. 111 (Proposed Fact 39).

The parties agree that the claimed function is:

> [A]ccumulating both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval, for determining the chewing rhythm of the animal indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health.

Dkt. 111 (Proposed Fact 53, drawn directly from claim 1).

The next step is to ascertain the corresponding structure. In a case like this, where the corresponding structure of a means-plus-function term is a computer, the patent must disclose an algorithm for performing the claimed function. "[S]imply disclosing a computer as the structure designated to perform a particular function" is insufficient to limit the scope of the claim under § 112(f) because "a general purpose computer programmed to carry out a particular algorithm creates a 'new machine.'" *Aristocrat Technologies*, 521 F.3d at 1333 ("[A] general purpose computer 'in effect becomes a special purpose computer once it is programmed to

10

**A10**

perform particular functions pursuant to instructions from program software.'" (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999))).

Defendant contends that the only corresponding structures are the algorithms in Figures 8 and 11 of the '481 patent. Plaintiffs appear to accept that those two algorithms are corresponding structures, but plaintiff asserts that the algorithm in Figure 6 is also a corresponding structure. Defendant disagrees, arguing that the algorithm in Figure 6 cannot be a corresponding structure because it does not determine the time of each chewing action, but only counts the number of chewing sounds in a particular time period. Plaintiffs contend that this characterization is "inaccurate" in some unspecified way, but they offer no meaningful rebuttal to defendant's argument. Dkt. 111 (response to Proposed Fact 55). Defendant is correct: chew time is represented by "CT" in Figures 8 and 11. Figure 6 does not determine the chewing rhythm using "time of each of said sensed chewing actions."

The court concludes that "data processors" is a means-plus-function claim. The claimed function is: accumulating both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval, for determining the chewing rhythm of the animal indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health. The corresponding structures are the algorithms in Figures 8 and 11.

2. **Infringement**

a. **The accused CowManager system**

The parties' experts agree on the operation of defendant's CowManager system. The CowManager system uses accelerometers attached to ear tags to monitor cow movement, and accelerometer data is analyzed to classify the cows' activities. The CowManager system has four main components. The first component is the SensOor ear tag, containing an accelerometer and

11

**A11**

CONFIDENTIAL MATERIAL REDACTED

a microprocessor which performs a statistical calculation on the accelerometer data. The ear tag also contains a transmitter for sending the statistical calculations to the next component, a router/coordinator. The coordinator is hardware that provides data to the local farm computer; routers may be used to extend the range of the coordinator. The third component is the CowManager user software on the local computer, which serves two functions. First, the user software passes data on to the fourth component, the Agis server in the Netherlands which analyzes the statistical data from the accelerometers. The second function of the user software is to display the processed and analyzed data for use by the dairy farmer.

There is no dispute that the CowManager system monitors and reports rumination and estrus status. The question is whether it does so by practicing the systems claimed in plaintiffs' patents. To answer this question, we must examine in more detail the means by which the CowManager system determines that a cow is ruminating or in estrus.

12

**A12**

CONFIDENTIAL MATERIAL REDACTED

13

**A13**

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

### b. CowManager does not infringe the rumination patent

All agree that defendant's CowManager system detects rumination. The question is whether it does so according to the system claimed in the '481 patent. Defendant is entitled to summary judgment if it can show that even one limitation in claim 1 of the '481 patent is missing from the CowManager system.

### 1. Sound sensor

As construed above, claim 1 includes a means-plus-function element that requires that a sound sensor perform the claimed function of sensing chewing actions. The CowManager system does not have a sound sensor; it detects rumination by means of an accelerometer located on the ear of the animal. Plaintiffs' infringement expert, Daniel J, Aneshansley, PhD, initially confirmed that the SensOor ear tags detected movements, and his report does not suggest that the ear tags sensed sound in any way. Dkt. 85-1.

To fill this obvious gap in the infringement case, plaintiffs argue the accelerometer on the SensOor ear tag is a microphone, or that it is the equivalent of a microphone. Dkt. 93, at 30-31. Plaintiffs cite a declaration by Aneshansley that states:

> [The] accelerometer used in the Agis system has the capability to sense physical vibrations. In this case, sound pressure signals could cause the ear of the cow to move and the movement could be sensed by the accelerometer, effectively acting as a microphone.

14

**A14**

Dkt. 85, ¶ 15. Plaintiffs' argument fails for several reasons.

First, plaintiffs' bear the burden of proof on infringement, and if they proceed under the doctrine of equivalents, they have to set out that theory in their summary judgment opposition. Plaintiffs would have to make a case that the accelerometer in the SensOor ear tag performed substantially the same function in a similar way to achieve a similar result. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Plaintiffs' one-liner about the doctrine of equivalents is insufficient, and the court will deem this argument to be waived. *Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in a meaningful way are waived.").

Second, the only factual support for plaintiffs' contention that the ear tag accelerometer is somehow a sound sensor is the Aneshansley declaration, made January 23, 2015, only after defendant moved for summary judgment, and well after the deadline for disclosure of expert reports. This expert opinion is excluded as untimely.

Third, the notion that the ear tag accelerometer "could" function as a microphone is inconsistent with the undisputed evidence that shows that the accelerometer is configured to take instantaneous samples of acceleration forces, not sound waves. Plaintiffs have presented no admissible evidence that, nor have they offered any analysis to show that, the accelerometer on the SensOor ear tag senses sound in any way.

Plaintiffs' argument is implausible, undeveloped, and supported only by inadmissible evidence. Accordingly, the court concludes that the CowManager system does not use a sound sensor to detect chewing actions as required by claim 1 of the '481 patent. Defendant is entitled to summary judgment of non-infringement of the '481 patent.

## 2.  Number of chews and the time of each chewing action

The report of plaintiffs' infringement expert, Dr. Aneshansley, establishes that the

**A15**

CONFIDENTIAL MATERIAL REDACTED

CowManager system can reliably detect movements characteristic of rumination. But that point is not in controversy. The Aneshansley report falls short of showing that the CowManager system detects rumination according to the system claimed in the '481 patent. According to claim 1, the sensor must sense both "the time of each chewing action," and "the number of chewing actions per predetermined time interval." To put it simply, the claimed system involves counting and timing individual chews; the CowManager system does neither.

Plaintiffs have no effective response to defendant's evidence. Plaintiffs' evidence consists of statements by defendant that it monitors rumination, or that it monitors how often a cow chews its cud. None of this shows that the CowManager system counts individual chews, or that it can detect chewing frequency. Plaintiffs cite the deposition of Paul Rump, Agis's consultant and former Chief Technical Officer, as saying that the CowManager system can detect "the presence of chewing frequency." Dkt. 93, at 28. But this is misleading. Rump made clear that the system "never [is] capable of detecting a frequency." Dkt. 101 (Rump Dep. 131:13-14).

The parties have presented a detailed and undisputed explanation of the operation of the CowManager system. The CowManager system samples acceleration data, it analyzes that data, and it determines whether a cow is ruminating based on that data. But nowhere in the process

does the CowManager system measure the time of each chew or count individual chews. Plaintiffs have not adduced any evidence that the CowManager system measures the time of each chewing action, or that it counts chews in a predetermined time period. Defendant uses a different method of detecting rumination than that claimed in the rumination patent. Defendant is, for this reason also, entitled to summary judgment of non-infringement of the '481 patent.

## C. The estrus patent: U.S. Patent 7,878,149

The '149 patent provides a method and device for detecting estrus in cattle. The invention exploits the well-known fact that a cow in estrus tends to be physically more active than when she is not in estrus. But cows are also physically active when eating, which makes it difficult for an automated system to distinguish estrus-based movement from a cow's other physical activity. The basic steps in the invention of '149 patent are to determine a baseline for an individual cow's normal physical movements when not eating, and to predict estrus by noting when the cow's non-eating physical activity exceeds that baseline.

During prosecution, the examiner determined that an invention claiming these basic steps would have been obvious. The inventors first argued against this determination, and then they amended their claims to overcome it. (More on this process in the claim construction analysis below.) Ultimately the inventors were issued one independent claim to a specific multi-step method for detecting estrus using this basic idea, and a second independent claim to a device for implementing the method. Claim 1, for the method, is thus representative:

> 1. A method for detecting estrus in a cattle animal, comprising the steps of:
>> sensing and accumulating acceleration level of said cattle animal, over a period of time, by an acceleration sensor, wherein the acceleration level is indicated by energy level of an acceleration signal produced by the acceleration sensor;

sensing, over a period of time, data indicative of eating performed by said cattle animal;

attenuating the energy level of the acceleration signal as the indication of eating is stronger, the energy attenuated acceleration signal identifying neutralized motion data;

extracting typical activity level of said animal based on said neutralized motion data; and

identifying abnormal behavior indicative of said estrus in said animal by comparing recently identified neutralized motion data with the extracted typical activity level.

'149 patent, at 8:12-28.

### 1. Claim construction

Defendant asks for judicial construction of three claim elements: (1) the "sensing data . . . indicative of eating" step; (2) the attenuating step; and (3) the term "neutralized motion data."

#### a. The "sensing data . . . indicative of eating" step

A version of this claim element is in both independent claims 1 and 12. Claim 1 requires that the method of detecting estrus include the step of "sensing, over a period of time, data indicative of eating performed by said cattle animal." *Id.* at 8:12-13, 8:19-20. Claim 12 requires that the device for detecting estrus include "at least one sensor for sensing over a period of time, data indicative of eating performed by said cattle animal." *Id.* at 8:66-67, 9:5-6.

Defendant contends that the term "sensing, over a period of time, data indicative of eating" should be construed to require an input signal or data stream that is distinct from the acceleration signal produced by the acceleration sensor. Dkt. 45, at 47-48. In support of its position, defendant cites passages in the specification suggesting that the "present invention" necessarily combines information about the animal's movement with information about the animal's eating to predict estrus, *see, e.g.*, 2:31-41; 5:14-27, and the concept of "combination" necessarily implies separate inputs. Defendant is right that the specification of the '149 patent

consistently discusses the present invention as having two inputs: an acceleration signal and a separate indicator of eating, such as a sensor to detect the position of the head. But the court will not treat the description of embodiments as claim limitations, nor will the court automatically take passing comments about the "present invention" as claim limitations. *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.") (citation omitted), *reh'g denied* (June 17, 2014).

The starting point of construction is the claim language, and when that language is clear, as it is here, it should be given its ordinary meaning. *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). There is simply no ambiguity to resolve as it relates to this claim element. There is nothing in the claim language that requires that the data indicative of eating must come from a source that is separate from the acceleration sensor. Nor is there any statement in the specification that is inconsistent with the idea that the data indicative of eating might come from the acceleration sensor, which also provides an acceleration signal that reflects the animal's overall level of activity. The inventor is not required to expressly anticipate every manner in which the invention might be implemented. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention.").

The court declines to adopt the construction proposed by defendant; this term will be given its ordinary meaning.

**A19**

### b. The attenuating step

The attenuating step lies at the heart of the parties' dispute over the '149 patent. Defendant contends that this claim element should be construed as it is written, to require that the magnitude of a signal produced by the acceleration sensor be reduced when there is data indicating that the animal is eating. Defendant argues, in essence, that the claim is written in signal-processing terms, and that it should therefore be construed to require the signal processing that the claim calls for. Plaintiffs argue for a more expansive, common-sense construction, which they contend would be how one of ordinary skill in the art of dairy management would construe the term. Plaintiffs do not expressly state their proposed construction, but it is apparent that plaintiffs are advocating a broad construction under which the attenuating step covers any manner in which the extent of an animal's physical movement is discounted when the animal is eating.

The core issue here is not the meaning of word "attenuate," which is not really disputed. In the sense relevant to the '149 patent, "attenuate" means to reduce the magnitude of something. The question is what, precisely, must be attenuated. Here the parties diverge.

Defendant draws its definition of the term "attenuate" from the field of signal processing, and in that context, the term means to reduce the magnitude of a signal. One of defendant's experts cites the 1994 edition of the IBM Dictionary of Computing, which defines "attenuation" to mean "decrease in magnitude of current, voltage, or power of a signal in transmission between points." Dkt. 53, at 4-5. Plaintiffs draw their definition from a 2014 general purpose dictionary, which defines "attenuate" to mean "to lessen the amount, force, magnitude or value of." Dkt. 85-2, at 5. Plaintiffs appeal to a general purpose dictionary because they contend that a person of ordinary skill in the art would be one with some post-secondary education in dairy, animal, or veterinary science, and three to five years of experience in dairy

20

**A20**

herd management, but only "a passing knowledge of electronic monitoring devices." Dkt. 85-2, at 4-5. Such a person, according to plaintiffs, would not look to a specialized dictionary in the signal-processing field, but to a general purpose dictionary for the meaning of attenuate. And, using this general-purpose dictionary definition, a broader range of things could be "attenuated."

Plaintiffs' position has two fundamental flaws. First, their person of ordinary skill is, essentially, a potential user of an electronic cattle monitoring system, which is to say, a skilled dairy farmer. But the patent is not written for the dairy farmer, but for the designer of an electronic monitoring system. A dairy farmer with only a passing knowledge of electronic monitoring devices would find the specification of the '149 patent meaningless. This passage, for example, explains the source and quality of the energy level of the signal that the claims will require to be attenuated:

> The motion sensor can be anyone of the sensors described in the prior art. The motion level can be indicated by the energy of the signal. The energy level can be deduced, for example, from the RMS value of a signal produced by a sensor.

'149 patent, at 3:43-47. The patent is written in signal-processing terms, for a person who can understand those terms. (RMS, for example, stands for "root mean square" which is a typical way of measuring the power of a signal in the art of signal processing.) When we speak of the person of ordinary skill in the art, we are speaking of a person who would face and try to solve the same problems faced by the inventor, *see, e.g., KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007), not the person who would be the ultimate user of the invention. Plaintiffs' argument here demonstrates the danger of citing a general-purpose dictionary while ignoring art-specific sources. *Phillips*, 415 F.3d at 1321-22.

The second fundamental flaw of plaintiffs' position is that it ignores the claim language. The claim language makes clear that the object to be attenuated is "the energy level of the acceleration signal." Repeating here the attenuating step of claim 1:

> attenuating the energy level of the acceleration signal as the indication of eating is stronger, the energy attenuated acceleration signal identifying neutralized motion data;

'149 patent, at 8:20-24. Thus, even if the definition of "attenuating" did not necessarily imply the attenuation of the magnitude of a signal, the claim language itself requires it.

Now we step back to the broader question of the scope of the attenuating step. Plaintiffs contend that the attenuating step would include any process by which the level of the physical movement of the animal is discounted while the animal is eating. But plaintiffs' position is foreclosed by amendments made by the inventors during prosecution of the '149 patent.

The '149 patent claims priority from an Israeli patent application, whose PCT prosecution led to U.S. Application 11/795,574 (the '574 application). The original claim set in the '574 application included claims 2 and 15, which, after amendments, eventually became independent claims 1 and 12 of the '149 patent. As originally filed, application claim 2, for the method, did not include any version of the attenuating step. Application claim 15, for the device, required a microprocessor that carried out certain operations, one of which was to identify animal motion that was not related to eating periods:

> 15. A device comprising:
>
> at least one sensor for sensing the motion of a cattle animal;
>
> at least one sensor for sensing when the motion is related to eating periods of said cattle animal;
>
> at least one microprocessor for carrying out one or more of the operations comprising of receiving data of said sensed motion, *identifying when the sensed motion is not related to eating periods* of said

22

**A22**

cattle animal and identifying if said animal is in estrus based on the
sensed motion which is not related to eating periods.

Dkt. 42-1, at 17 (emphasis added). The microprocessor element in application claim 15

performs a function close to what plaintiffs would now call "attenuation."

Application claims 2 and 15 were rejected as anticipated by or obvious over two

references: published U.S. Patent Application 2003/0205208 to Bar-Shalom (which ultimately

issued as the '481 patent, at issue in this case); and U.S. Patent 6,049,280 to Andersson. *Id.* at

159-60, 166. The examiner determined that Andersson taught a microprocessor that identified

when sensed motion was not related to eating periods. *Id.* at 180-81. The inventors argued

unsuccessfully against the rejections, ultimately amending the claims to include a version of the

attenuating step in both the method claim and the device claim.

We need not review every intermediate step in the amendment process for the purposes

of this opinion. However, the final amendment that produced the language of the attenuating

step is particularly pertinent here. Prior to that final amendment, the pertinent parts of claim 2

provided:

> 2. A method, comprising the steps of:
>
> sensing along time and accumulating acceleration level of a cattle
> animal;
>
> sensing along time data indicative of eating performed by said
> cattle animal;
>
> identifying neutralized motion data by reducing effect of
> acceleration level sensed during eating on the accumulated
> acceleration level;
>
> . . . .

23

**A23**

*Id*. at 242. (Claim 15 was in material respects the same, though cast in the form of a device claim.) The examiner again rejected both claim 2 and claim 15 as obvious over the Bar-Shalom '208 application and Andersson. In response, the inventors amended claim 2 to provide:

> 2. A method for detecting estrus in a cattle animal, comprising the steps of:
>
> sensing along time and accumulating acceleration level of said cattle animal by an acceleration sensor, wherein the acceleration level is indicated by energy level of an acceleration signal produced by the acceleration sensor;
>
> sensing along time data indicative of eating performed by said cattle animal;
>
> attenuating the energy level of the acceleration signal as the indication of eating is stronger, the energy attenuated acceleration signal identifying neutralized motion data;
>
> . . .

*Id*. (Again, parallel amendments were made to claim 15.) The inventors contended that neither the Bar-Shalom '208 application nor Andersson contained the amended claim limitations. And, substantially as amended,[3] the claims were allowed and issued as claims 1 and 12 in the '149 patent.

The main point is this: the inventors added a detailed attenuation step to secure the patent over the prior art cited against them. The amended claims specifically require that the acceleration level of the animal is indicated by the energy level of the signal from the acceleration sensor. Further, the attenuation step requires that the energy level of the signal from the acceleration sensor be attenuated in proportion to the strength of the data indicating

---

[3] The claims were slightly adjusted by a non-substantive examiner's amendment by consent of the inventors. In particular, the examiner changed each occurrence of the phrase "along time" to "over a period of time."

that the animal is eating. Plaintiffs now contend that the attenuation step could be performed in any manner in which the acceleration level of the animal is reduced while the animal is eating. Plaintiffs are effectively attempting to undo the final amendment and resurrect the previous version of the claim. The inventors added a detailed attenuation step to secure allowance of the claims; plaintiffs cannot now reverse course and, by means of claim construction, secure the broader construction that the inventors knowingly abandoned.

The court will construe the attenuating step as proposed by defendant, which comports with the plain meaning of the claim. The attenuating step (and its counterpart in claim 12) requires that the energy level of the signal from the acceleration sensor be reduced in proportion to the strength of the indication that the animal is eating.

### c. "Neutralized motion data"

In light of the court's construction of the attenuating step, the parties' dispute over the term "neutralized motion data" is a minor detail. Both agree that the term refers to data reflecting an animal's non-eating movement. The data is "neutralized" in the sense that the animal's movement data is modified to discount the effect of eating-related movement. Defendant would add a further dimension to the term, requiring that "neutralized motion data" be produced, by definition, from an attenuated signal from an acceleration sensor. The court will not construe the term as defendant proposes.

In the invention as ultimately claimed in the '149 patent, neutralized motion data is identified from the attenuated signal from the acceleration sensor. But the specification describes neutralized motion data in broader terms, which is not surprising because the specification was written before the attenuation step was incorporated into the claims. In the specification, neutralized motion data refers to data about "changes in the activity level of said animal which is neutralized from the effect of eating activity." '149 patent, at 2:57-59. The

25

**A25**

CONFIDENTIAL MATERIAL REDACTED

court will construe the term "neutralized motion data" in the broader sense that it is used in the specification.

### 2. Infringement

Given the court's construction of the attenuating step, the infringement analysis is straightforward. The CowManager system performs a statistical analysis of data sampled from the accelerometer in the SensOor ear tag. The system determines when the sampled data shows an unusually high level of physical activity for a cow, and when certain criteria are met, it deems the monitored cow to be in estrus. But the level of physical activity of the cow is not expressed by the energy level of the signal from the accelerometer, and at no point is the energy level of the accelerometer signal attenuated. The CowManager system determines estrus in a manner other than that claimed in the '149 patent.[4]

Plaintiffs' primary argument concerning the attenuating step is a claim construction argument (which the court has rejected). Plaintiffs' summary judgment opposition brief makes almost no effort to show how the CowManager system performs the attenuating step, offering a scant two sentences:

> It is only what occurs in the microprocessor that has the effect of attenuating or neutralizing "the effect of the eating period." Such action is precisely what is accomplished by the microprocessor in the Defendant's system, when the microprocessor carries out the statistical calculations to determine ███████████████
> ████

Dkt. 93, at 45. Beyond this passage in their brief, plaintiffs simply cite to the reports of their experts: IT consultant Jeffry R. M. Hansbury, and electrical engineering professor,

---

[4] Defendant also contends that the asserted method claims cannot be infringed for another reason, namely that steps of the method are performed outside the United States. The court will decline to reach this issue, because it would not pertain to the device claims, and non-infringement is clear anyway.

CONFIDENTIAL MATERIAL REDACTED

Dr. Aneshansley. Dkt. 111 (response to Proposed Fact 159, 164). But neither expert raises a genuine issue of fact as to whether the CowManager system performs the attenuating step as the court has construed that claim limitation. Essentially, Hansbury and Aneshansley simply point out anything that they could conceivably label "attenuation," as though any form of attenuation is sufficient to meet that claim limitation.

The Hansbury report is, for the most part, a description of the operation of the CowManager system. Dkt. 54. Although Hansbury cites both the '481 patent and the '149 patent as among the materials he reviewed, he does not discuss either patent, nor does he purport to compare the CowManager system to the asserted claims. In his conclusions, he identifies several instances of what he labels "attenuation (neutralization)." *Id*. at 16-17. But none of these instances show attenuation of the energy level of the acceleration signal as required in the asserted claims. For example, Hansbury finds "attenuation (neutralization)" in the calculation of the ████████, because ████████ are removed. He also finds "attenuation (neutralization)" in the calculation of the ████ because the calculation ████ ████ somehow reduces the high values. None of these are examples of attenuation of the energy level of the acceleration signal. And Hansbury has not shown that any of these purported attenuations are proportionate to the strength of the indication of eating.

The Aneshansley report, Dkt. 52, suffers from similar problems. Like the Hansbury report, the bulk of the report is a description of the operation of the CowManager system, and there is virtually no discussion of the claim elements. Although the Aneshansley report attaches claim charts, those charts simply state that for each element, "[b]ased on my observation and analysis" the claim element is present.

The Aneshansley report expressly discusses attenuation only in the "Conclusions and Opinions" section. *Id*. at 21-22. Similar to Hansbury, Aneshansley lists ways in which

accelerometer data is transformed, and he contends that in each case "eating energy" is in some sense attenuated. Aneshansley's notion of "attenuation" is a loose one, and it includes any process by which any accelerometer data are removed from the calculation or reduced by computations such as averaging. But Aneshansley does not show, as the asserted claims require, that the energy level of the acceleration signal is attenuated. Nor does Aneshansley show that the attenuation of this energy level is proportionate to the strength of the indication of eating.

In sum, the operation of the CowManager system is undisputed. And, under the court's claim construction, the CowManager system does not perform the critical attenuating step. Defendant is therefore entitled to summary judgment of non-infringement of the '149 patent.

**D. Remaining issues: willful infringement and validity**

Defendant has also moved for summary judgment that any infringement is not willful. To show willful infringement, plaintiffs have the burden to show the two prongs of the *Seagate* test: (1) that defendant acted despite an objectively high likelihood that its actions constituted infringement of a valid patent; and (2) that this risk "was either known or so obvious that it should have been known to the accused infringer." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). If the accused infringer, here Agis, has a reasonable non-infringement position, the objective first prong of the *Seagate* test cannot be met. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310 (Fed. Cir. 2011). The court has concluded that defendant is entitled to summary judgment of non-infringement of both patents, which shows that defendant had at least a reasonable non-infringement position. Thus, plaintiffs cannot meet the objective first prong of the *Seagate* test, and defendant is entitled to summary judgment on the willful infringement allegation.

Defendant has also moved for summary judgment on its counterclaims that the '481 and '149 patents are invalid. It is appropriate for a district court to dismiss counterclaims of

invalidity when non-infringement is clear and invalidity and unenforceability are not plainly evident. *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998) (citing *Leesona Corp. v. United States*, 530 F.2d 896, 906 n.9 (Ct. Cl. 1976)).

Discretionary dismissal is appropriate here. The infringement issue is clear; validity is not. Defendant moved for summary judgment that the patents-in-suit are invalid *under the constructions advanced by plaintiffs*. Because the court has substantially adopted the narrower constructions proffered by defendant, it is not clear how much of the parties' briefing on validity is still pertinent. It would be a poor use of judicial resources to examine and resolve the validity questions without the benefit of the parties' analysis and evidence under the proper claim constructions. Also, given that this order resolves the case, it is no longer clear that defendant has any ongoing interest in the validity of the patents-in-suit, as there is no indication in the record that defendant will face future infringement suits on the '481 and '149 patents. Accordingly, the court will dismiss defendant's counterclaims for declaratory judgment of invalidity without prejudice.

## ORDER

IT IS ORDERED that:

1. Defendant's motion for summary judgment of non-infringement and no willful infringement, Dkt. 36, is GRANTED.

2. Defendant's counterclaims for declaratory judgment of invalidity are DISMISSED, without prejudice.

3. The clerk is ordered to enter judgment for defendant and close this case.

Entered June 4, 2015.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

29

**A29**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

VOCALTAG LTD. and
SCR ENGINEERS LTD.,

      Plaintiffs,

v.

AGIS AUTOMATISERING B.V.,

      Defendant.

JUDGMENT IN A CIVIL CASE

Case No. 13-cv-612-jdp

---

     This action came for consideration before the court with District Judge James D. Peterson presiding.  The issues have been considered and a decision has been rendered.

---

### IT IS ORDERED AND ADJUDGED

that judgment is entered in favor of defendant Agis Automatisering B.V., granting summary judgment of non-infringement and no willful infringement, dismissing without prejudice defendant's counter claims for declaratory judgment of invalidity and dismissing this case.

| s/V. Olmo, Deputy Clerk | 6/8/2015 |
|---|---|
| Peter Oppeneer, Clerk of Court | Date |

**A30**

US007350481B2

(12) **United States Patent**
Bar-Shalom

(10) **Patent No.:** **US 7,350,481 B2**
(45) **Date of Patent:** **Apr. 1, 2008**

(54) **METHOD AND SYSTEM FOR MONITORING PHYSIOLOGICAL CONDITIONS OF, AND/OR SUITABILITY OF ANIMAL FEED FOR RUMINANT ANIMALS**

(76) Inventor: **Avshalom Bar-Shalom**, Kibbutz Nachsolim, 30815 Doar Na Hacarmel (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 480 days.

(21) Appl. No.: **10/332,198**

(22) PCT Filed: **Jul. 18, 2001**

(86) PCT No.: **PCT/IL01/00659**

§ 371 (c)(1),
(2), (4) Date: **Jan. 7, 2003**

(87) PCT Pub. No.: **WO02/07644**

PCT Pub. Date: **Jan. 31, 2002**

(65) **Prior Publication Data**

US 2003/0205208 A1      Nov. 6, 2003

(30) **Foreign Application Priority Data**

Jul. 19, 2000      (IL) ..................................... 137381

(51) **Int. Cl.**
*A01K 29/00*      (2006.01)

(52) **U.S. Cl.** .................................................... **119/859**

(58) **Field of Classification Search** ............. 119/51.02, 119/719, 908, 174, 720, 721, 859; 340/573
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,262,632 A * 4/1981 Hanton et al. ........... 119/51.02

| | | | | |
|---|---|---|---|---|
| 4,618,861 A | * | 10/1986 | Gettens et al. | 340/10.41 |
| 5,265,618 A | * | 11/1993 | Zimmerman | 600/531 |
| 5,503,112 A | * | 4/1996 | Luhman et al. | 119/174 |
| 5,900,818 A | | 5/1999 | Lemnell | |
| 5,901,660 A | * | 5/1999 | Stein | 119/51.02 |
| 6,202,596 B1 | * | 3/2001 | Lopez et al. | 119/174 |
| 6,474,263 B2 | * | 11/2002 | Caja Lopez et al. | 119/174 |
| 6,535,131 B1 | * | 3/2003 | Bar-Shalom et al. | 340/573.1 |

FOREIGN PATENT DOCUMENTS

WO      00/13393      3/2000

* cited by examiner

*Primary Examiner*—Thomas Price

(57) **ABSTRACT**

A method and system for monitoring the physiological condition, and/or suitability of animal feed, of ruminant animals, by: sensing actions of the animal indicating a ruminating activity; and accumulating the time of the ruminating activities over a predetermined time period to provide an indication of the physiological condition of the animal, and/or of desirable changes in its feed for maximizing milk production and/or for maintaining animal health. In one described preferred embodiment, the sensed actions of the animal are chewing actions produced by the animal while chewing animal feed according to a predetermined chewing rhythm indicating a ruminating activity as distinguished from an eating activity. In a second described embodiment, the sensed actions of the animal are regurgitations of a bolus from the animal's rumen to the animal's mouth sensed by a collar around the animal's neck.

**9 Claims, 9 Drawing Sheets**





Fig. 1



Fig. 2



Fig. 3

Fig. 4

U.S. Patent    Apr. 1, 2008    Sheet 3 of 9    US 7,350,481 B2

**A100**



Fig. 5



Fig. 6



Fig. 7



Fig. 8

**A103**



Fig. 9



Fig. 10



Fig. 11

US 7,350,481 B2

1

# METHOD AND SYSTEM FOR MONITORING PHYSIOLOGICAL CONDITIONS OF, AND/OR SUITABILITY OF ANIMAL FEED FOR RUMINANT ANIMALS

## FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to a method, and also to a system, for monitoring certain actions of ruminant animals in order to provide an indication of the physiological condition of the animal, a possible health problem in the animal, the suitability of the animal feed, and/or the suitability of the animal for continued milk production. The invention is particularly useful for monitoring dairy cattle to optimize the cattle feed for milk production and animal health, and the invention is therefore described below with respect to this application.

Ruminant animals, such as cattle, have a stomach divided into a plurality of chambers, the first of which is called the rumen. The animal ingests relatively large amounts of feed into the rumen with a minimum of chewing (a cud), before swallowing, periodically regurgitates a portion of the contents of the rumen (in the form of a bolus) back into the mouth, and further chews the regurgitated portion (bolus) before it is again swallowed and then directed to the other chambers of the stomach where it is further digested with the aid of various micro-organisms in the stomach.

It is well known that the content of the animal feed is an important factor in producing maximum milk production in milking cows, and optimum health in both milking cows and dry cows. Thus, fiber and roughage in the animal's diet stimulates fiber rumination, chewing, and saliva production, all necessary for maximum milk production in milking animals and optimum animal health. Inadequate fiber or roughage in the animal diet decreases chewing, rumination, and saliva such as to decrease milk production and to endanger animal health. Saliva produced by the animal during rumination introduces a bicarbonate which acts to buffer the rumen against acids. Sufficient rumination is also necessary to maintain a functional fiber mat in the rumen, which is important for the prevention of abomasal displacement, ketosis, retained placenta, and other diseases associated with low fiber/acidosis like laminitis, particularly in dry and postpartom cows. Therefore insufficient rumination may produce metabolic problems in the animal, such as acidosis, sore feet and off-feet problems; a decreased fat content of the milk; and/or an inadequate fiber mat in the rumen of dry animals for the prevention of abomasal displacement.

On the other hand, excessive fiber content or roughage in the animal feed limits the intake and digestibility, and therefore tends to reduce milk production.

In general, cows should be chewing their cuds about 50% of the time when not being fed or moved or milked, to produce adequate rumination activities. Also, a failure to chew for a continuous period of 2 or 3 hours would indicate a health problem.

## OBJECTS AND BRIEF SUMMARY OF THE PRESENT INVENTION

According to one aspect of the present invention, there is provided a method of monitoring the suitability of animal feed, of ruminant animals, by: sensing actions of the animal indicating a ruminating activity; and accumulating the time of the sensed actions indicating ruminating activity over a predetermined time period to provide an

2

indication of desirable changes in the animal feed for maximizing milk production and/or for maintaining animal health.

In these described preferred embodiments, the sensor unit further includes a transmitter for transmitting, via a wireless link, the processed information to a remotely-located receiver. This information relating to specific animals, or to the herd in general, may be for statistical purposes, or for alerting the observer to a specific action that may be required with respect to changing the animal's feed, treating a health condition of the animal, or determining whether the animal is still suitable for milk production.

In some preferred embodiments of the invention described below, the sensed actions of the animal are chewing actions produced by the animal while chewing animal feed according to a predetermined rhythm indicating a ruminating activity as distinguished from an eating activity. In the described preferred embodiments, the chewing actions are chewing sounds sensed by a sound sensor carried by the animal's neck.

Further embodiments of the invention are described below, wherein the sensed actions of the animal are regurgitations of a bolus from the animal's rumen to the animal's mouth. In one described preferred embodiment, the regurgitations are sensed by a sound sensor carried around the animal's neck. In another embodiment, the regurgitations are sensed by a first bolus sensor carried by the animal's throat close to the mouth, and a second bolus sensor carried by the animal's throat spaced from the first sensor a predetermined distance in the direction of the animal's stomach, a regurgitation being indicated when the first bolus sensor senses a bolus within a predetermined time interval after a bolus is sensed by the second bolus sensor.

According to another aspect of the present invention, there is provided a system for monitoring the suitability of animal feed, of ruminant animals, comprising: at least one sensor for sensing actions of the animal indicating a ruminating activity; and a data processor for accumulating the time of the sensed actions indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production and/or maintaining animal health.

The sensors for sensing chewing actions are preferably sound sensors, and those for sensing regurgitations are preferably microswitches. However, other types of sensors could be used. For example, chewing actions could be sensed by sensors for sensing the motions of the animal's lower jaw, or the tightening of the animal's muscles in the throat when swallowing. Regurgitations could also be sensed by sound sensors.

The invention of the present application, relating to sensing, and accumulating the time of, ruminating activities to provide an indication of the physiological condition of the animal, and/or the desirability of changes in its feed, is to be distinguished from the system described in our prior PCT Application PCT/IL99/00452, International Publication WO 00/13393, published Mar. 9, 2000, which included a sound sensor attached to the neck of an animal for detecting and identifying sound patterns uttered by the animal when in distress. The invention of the present application is also to be distinguished from the system described in Stein U.S. Pat. No. 5,901,660, which also included a sound sensor attached to an animal for purpose of continuously monitoring the movements and eating activities of the animal.

Further features and advantages of the invention will be apparent from the description below.

US 7,350,481 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention is herein described, by way of example only, with reference to the accompanying drawings, wherein:

FIG. **1** is a diagram illustrating one form of monitoring system constructed in accordance with the present invention;

FIG. **2** is a diagram more particularly illustrating the sound sensor unit in the system of FIG. **1**;

FIG. **3** is a diagram illustrating an example of the electrical output of the sound sensor unit of FIG. **2**;

FIG. **4** is a block diagram illustrating the construction of the sound sensor unit in the system of FIG. **1**;

FIG. **5** is a block diagram more particularly illustrating a preferred construction of the sound sensor unit;

FIG. **6** is a flow chart illustrating the operation of the data processor in the sound sensor unit of FIG. **5** according to one embodiment of the invention wherein chewing actions are detected and analyzed;

FIG. **7** is a flow chart illustrating the operation of the date processor in the sound sensor unit of FIG. **5** according to a second embodiment of the invention wherein regurgitations are detected and analyzed;

FIG. **8** is a flow chart illustrating the operation of the data processor according to another embodiment of the invention wherein chewing actions are detected and analyzed;

FIG. **9** is a diagram illustrating a monitoring system including two sensors mounted to the throat of the animal for detecting regurgitations;

FIG. **10** is a flow chart illustrating the operation of the data processor when regurgitations are detected in accordance with the embodiment of FIG. **9**; and

FIG. **11** is a flowchart illustrating the operation when both regurgitations and chewing actions are detected and analyzed.

## DESCRIPTION OF PREFERRED EMBODIMENTS

With reference to FIG. **1** illustrating a preferred embodiment of the invention, there is shown a cow **2** carrying a sound sensor unit **3** which senses chewing sounds of the cow while feeding on animal feed. Sensor unit **3** converts the sensed chewing sounds to electrical signals and processes them to identify those sensed sounds likely to accompany ruminating activities, as distinguished from eating activities, in a manner to be described more particularly below. As also described below, such identified ruminating activities provide information useful for indicating the physiological condition of the cow, of any desirable changes in its feed for maximizing milk production, and/or of another action that should be taken for maintaining optimum animal health.

The sensor unit **3** further includes a transmitter for transmitting the information processed from the sensed sounds to a remote receiver **4**. Such information may be used at the remote receiver for statistical purposes concerning the respective animal or herd, or for taking an action that may be required with respect to changing the animal feed or treating the animal.

The sound sensor unit **3** is carried by a neckband **6** applied around the neck of the cow and is located to sense the sounds made by the cow during feeding or grazing. As shown in FIG. **2**, the sound sensor unit **3** is carried on the inner face of the neckband **6** so as to be in contact with the skin of the cow. A weight **7** is applied to the lower end of the neckband

to tauten it and to press the sensor unit **3** against the skin at the cow's neck. Weight **7** may be the battery engaging the sound sensor unit **3**.

The sound sensor unit **3** may include any known type of sound sensor for sensing chewing sounds made by the cow while feeding and for converting them to electrical signals. For example, the sound sensor could be a diaphragm-type microphone, a piezoelectric device, or any other sound-to-electrical transducer, for sensing chewing sounds produced by the cow when chewing on the animal feed and for converting them to electrical signals as shown in FIG. **3** to be described below.

FIG. **4** is a block diagram illustrating the construction of the sound sensor unit **3**. It includes a sound detector-transducer **10**, such as a microphone, piezoelectric device, etc., for converting the picked-up sounds to electrical signals; a filter **11** for passing a predetermined signal bandwidth; an amplifier **12** for amplifying the signal; and a data processor **13** for processing the electrical signals produced by the sound detector-transducer **10**. Data processor **13** also includes the animal identification **14**, to identify the animal from which this information was derived.

The information received by data processor **13** from the sound detector-transducer **10** may be processed in the manner described below with respect to any one of FIGS. **4**-**11**, to produce outputs including some or all of the following information: the identification of the respective cow at **15**; ruminating time at **16**$a$, eating time at **16**$b$, non-chewing time at **16**$c$, and, at **16**$d$, other information including signals or alarms indicating an action that may be immediately required with respect to changing the animal feed, treating the animal, etc. The sensor unit **3** further includes a transmitter **17** which transmits the sensed information to the remote receiver **4** (FIG. **1**).

FIG. **5** more particularly illustrates the construction of sensor unit **3**. It includes a microphone **10** serving as the sound detector-transducer, an amplifier **12** together with the active filters, and the data processor **13**. Data processor **13** includes an audio signal analyzer **13**$a$ which converts the analog signal to a digital signal; a microcomputer **13**$b$ which performs the analysis according to a predetermined algorithm (e.g., one of those described below); a programmable I.D. (dip switch) **13**$c$; a test interface **13**$d$; and an EEPROM optional memory **13**$e$. Data processor **13** further includes a transmitter interface **13**$f$ for interfacing with the transmitter **17** (FIG. **4**), which transmits the processed information to the remote receiver **4** (FIG. **1**). The sensor unit **3** is supplied by a battery supply, as shown at **18** in FIG. **5**.

During rumination, cows typically chew in a fairly steady rhythm, with each chew taking about 0.5-1.5 seconds, more particularly 0.70-1.43 seconds, and with swallowing and bolus regurgitations taking place for a period of 2-7 seconds at intervals of about 32-81 seconds. When ruminating, a swallowed bolus will be regurgitated from the rumen back to the mouth usually within 2 seconds after swallowing. On the other hand, when the cow is merely eating, there are no bolus regurgitations, and the chewing actions are much more sporadic, with each chew generally being for a longer or shorter period of time than each chew during rumination.

FIG. **3** illustrates typical electrical signals outputted by the sensor unit **3** while chewing during rumination (as distinguished from eating) and between bolus regurgitations. Thus, as shown in FIG. **3**, each chew is represented by a pulse of electrical energy having a frequency of up to 1,000 Hz and having a duration equal to the duration of the chew. A fairly typical example is illustrated in FIG. **3**, wherein each chew has a duration of slightly less than 1.0 seconds,

# A108

US 7,350,481 B2

5                                                              6

such that slightly more than 3 pulses are produced by the chews during each 3 second sample period. Generally speaking, detecting 2-4 pulses within a three second sample period indicates a ruminating activity as distinguished from an eating activity.

It will thus be seen that the sensor unit 3 senses the chewing sounds by the cow and transmits electrical signals, corresponding to those illustrated in FIG. 3, to the remote receiver 4, which receives the transmitted electrical signals and applies them to the data processor 5. Data processor 5 analyzes the received electrical signals to determine whether the chewing actions represented by them are ruminating activities or eating activities.

FIG. 6 is a flow chart illustrating one algorithm which may be used by the data processor 5 for determining whether the detected chewing sounds represented by the received electrical signals are ruminating activities or eating activities. Briefly, this is done according to the flow chart of FIG. 6 by determining the rhythm (e.g., duration and frequency) of the chewing sounds at time-spaced intervals and comparing the determined rhythm with a predetermined rhythm representing a ruminating activity as distinguished from an eating activity.

More particularly, the rhythm of the chewing actions are determined, according to the algorithm of FIG. 6, by counting the number of chewing sounds in a predetermined sample time period at periodically spaced intervals, comparing the counted number of chewing sounds in each sample time period with the counted number in the immediately preceding sample time period, and determining that the chewing sounds in both sample time periods involve ruminating activities only when the counted number of chewing sounds in two consecutive samples are both within a predetermined range. Preferably, the sample time period is from 1-4 seconds, and the periodically spaced intervals are at least 15 second intervals. In the example illustrated by the flow chart of FIG. 6, the sample time period is 3 seconds, and the periodically spaced intervals are 20 seconds.

A real-time clock (RTC) keeps track of the time period during which the system is in operation (block 29). The time period may be, for example, a 24-hour interval, or any part of such an interval.

During this time interval, a three-second sample time period is examined to see whether at least one chew was detected (blocks 20, 21). If so, a decision is made whether there were two-four chews during the respective sample time period (block 22). If 2-4 chews were not detected, a time memory is reset (block 23a), but if 2-4 chews were detected during the three-second sample period, a ruminating activity is indicated and the time memory is set to measure the times (block 23b). The system then waits for twenty seconds (block 24) and then takes another three-second sample time period (block 24a) to determine whether there were two-four chews during the latter three-second sample time period (blocks 25, 26). If so, and the time memory had been set, the respective time period (26 seconds) is added to the ruminating time register (block 28). On the other hand if the ruminating time register had not been set, it is now set, and the process repeated after another 20-second time period.

It will thus be seen that the data processor produces the following outputs: the ruminating time (block 28) and the total time for the respective period (block 29a).

This information, together with the identification of the respective cow outputted by the data processor 5 (FIG. 5), can be compared to empirical or reference data applicable with respect to milk production and animal health to provide an indication of the physiological condition of the cow, and/or any changes that may be desirable in its feed for maximizing milk production and/or for maintaining optimum animal health. For example, an excessively low ruminating time may indicate inadequate fiber and/or roughage in the animal feed for maximum milk production and therefore that additional fiber and/or roughage should be added. It may also indicate acidosis in the animal because of insufficient saliva and, therefore, insufficient bicarbonate production, such that a buffering additive should be added in order to optimize the pH of the animal's rumen. On the other hand, an excessive ruminating time might indicate an excess of fiber and/or roughage, which could also decrease milk production because this would limit the intake and digestibility of the animal feed. An excessively low chewing time might also indicate that the animal is no longer suitable for milk production.

FIG. 7 illustrates another embodiment of the invention wherein the ruminating time is accumulated, not by detecting the chewing sounds and comparing their rhythm with respect to that during rumination, but rather by detecting swallowing and/or bolus regurgitations that occur during rumination and accumulating the respective time periods. As indicated earlier, during rumination a regurgitation usually occurs about two seconds after swallowing, and the total time for both swallowing and bolus regurgitation generally takes about two-seven seconds, and generally occurs every 32-81 seconds. The flowchart of FIG. 7 utilizes this rhythm of regurgitations to determine whether a ruminating activity is involved.

Thus, as shown in the flowchart of FIG. 7, a time memory is reset until a swallowing and bolus regurgitation sound $(RS_1)$ is detected and determined to have lasted for a time interval of two-seven seconds (blocks 30, 31) at which time a time memory is set (blocks 32a, 32b) to begin measuring the time. When the next bolus regurgitation sound $(RS_2)$ is detected (block 33) and determined to have lasted two-seven seconds (block 34), a determination is made whether the time between the two regurgitations was between 32 and 81 seconds (block 35). If both of the above conditions have been found to have occurred, and the time memory had been set (block 36), the time between $RS_1$ and $RS_2$ is added to the ruminating time register (block 37), and the system returns to the Start to detect the next regurgitation sound $(RS_1)$.

If, however, the regurgitation determined in block 33 $(RS_2)$ is determined not to have lasted two-seven seconds, or not to have occurred within 32-81 seconds from the previous regurgitation, the time measured in the time memory is not added to the ruminating register, but rather the time memory is reset (block 32a) and the system returns to block 33, and the system again returns to the Start to await for the detection of the next regurgitation. Also, if the detected regurgitation $RS_2$ was found to meet both of the above conditions, but the time memory was not in its set condition (block 36), the time memory is then placed in its set condition to begin the measurement of time from that instant, and the system again returns to its Start condition.

The system further includes a real-time clock (RTC) which measures the total time of operation of the system (block 38), so that the system will indicate in the RTC register (block 39) the total time of operation of the system, and in the ruminating time register (block 37) the time during which a ruminating activity occurred.

FIG. 8 is a flow chart illustrating another embodiment of the invention wherein chewing actions are detected and analyzed to determine whether they involve a ruminating activity or an eating activity. Thus, as earlier described,

**A109**

US 7,350,481 B2

7

chewing actions related to rumination have a defined rhythm of generally 0.50-1.50, more particularly 0.70-1.43, seconds per chew. Therefore, if chewing actions are determined to have this rhythm, it is highly reasonable that the chewing actions are those accompanying rumination rather than non-rumination (eating).

As shown in the flow chart illustrated in FIG. 8, chewing actions are detected, measured and counted during a predetermined period of time, such as one minute (blocks 40-44.). If each chew time (CT) is between 0.7 seconds and 1.43 seconds, and if the counted number (N) is equal to or above a predetermined number (M), this indicates a ruminating activity and the ruminating time register is incremented (blocks 45-47) one minute. The predetermined number (M) should be over "42", preferably over "45". Thus, for each minute that 45 or more chews per minute are counted, that minute is recorded in the ruminating time register as a ruminating activity.

However, if the chewing time (CT) is either less than 0.7 seconds or more than 1.43 seconds, or if the counted number of chews per unit of time is less than M (e.g., 45), this indicates a non-ruminating activity, and therefore the one minute is not added to the ruminating-time register 47, but rather to an eating time register (blocks 48, 49).

The system illustrated in FIG. 8 also measures the total time of the respective interval in the real-time clock RTC (block 49), so that the system will provide a measurement of the ruminating time (block 47), the eating time (block 48$a$), and the total time interval involved (block 49$a$).

As indicated earlier, during rumination, swallowing and bolus regurgitations typically take place at intervals of about 32-81 seconds, with each swallowing plus regurgitation time lasting about 2-7 seconds. It is therefore possible to identify a ruminating activity by sensing the rhythm of regurgitations of a bolus from the animal's rumen back to the animal's mouth. Regurgitations may be sensed by the sound sensor unit 3 as described above.

FIG. 9 illustrates another arrangement for sensing regurgitations of the bolus on order to determine whether the regurgitation rhythm corresponds to that of a ruminating activity.

Thus, as shown in FIG. 9, two bolus sensors $S_1$, $S_2$, are applied to the animal's throat by a band or collar 50. Bolus sensor $S_1$ is located close to the animal's mouth, whereas bolus sensor $S_2$ is spaced a short distance, e.g., about 10 cm, from bolus sensor $S_1$ in the direction of the animal's stomach. Such bolus sensors may be microswitches, for example. A regurgitation of a bolus is indicated when bolus sensor $S_2$ is actuated, and bolus sensor $S_1$ is then actuated within a short predetermined time interval (e.g., a small fraction of a second) thereafter.

FIG. 10 is a flow chart illustrating one manner of programming the data processor for measuring ruminating time in this manner.

When a bolus is swallowed, sensor $S_1$ is actuated and when that bolus is regurgitated, sensor $S_2$ is actuated and then a short time thereafter (a small fraction of a second), sensor $S_1$ is again actuated. In this manner, the symptom can measure the time taken to swallow a bolus and the regurgitation of that bolus, and when this time is measured to be between two seconds and seven seconds, this indicates a ruminating activity and records that time (blocks 52, 53). The next time a swallow plus regurgitation is found to take between two seconds and seven seconds, that time ($t_2$) is also recorded (blocks 54, 55). The system then checks to see whether $t_2$-$t_1$ is between 32 and 81 seconds, and if so, this indicates that the two regurgitations were involved in a

8

ruminating activity, and therefore the interval between time $t_2$-$t_1$ is added to the ruminating time register (blocks 57, 58).

The system illustrated in FIG. 10 also includes a real-time clock (block 59), and a real-time clock register (block 59$a$) for displaying the period of time involved in the operation of the system.

The flowchart illustrated in FIG. 11 utilizes both the chewing rhythm of FIG. 8 and the regurgitation rhythm of FIG. 10 for measuring the ruminating time. Thus, as shown in FIG. 11, as soon as a regurgitation is detected indicating a ruminating activity (blocks 60, 61) the time ($t_1$) is recorded (block 62). Then the chewing rhythm is monitored. So long as the duration of each chew, and the frequency of the chews, are both characteristic of a ruminating action as described above and as shown by blocks 63, 64 respectively, the time is added to the ruminating register (blocks 65-67).

The system illustrated by the flowchart of FIG. 11 also includes a real-time clock RTC (block 68), which keeps track of the total time of operation of the system, so that the system outputs the total time of operation (block 68) and the ruminating time (block 67).

It will thus be seen that the invention enables ruminant animals in general, and dairy cattle in particular, to be monitored individually, or as part of a herd, in an efficient and convenient manner to provide an indication of the physiological condition of each animal, and also an indication of any desirable change in the animal feed for maximizing milk production and/or for optimizing animal health. The system can also be programmed to provide an alarm or other signal if a particular action is immediately required. For example, if the sensor senses no chewing actions within a predetermined time interval, e.g., for two or three hours, this may indicate that the animal is ill and requires immediate treatment.

It has been found particularly advantageous to sense both the chewing actions and the regurgitations by a sound sensor, as described above. However, it is also contemplated that the chewing actions may be sensed in another manner, e.g., by sensing the tightening of the muscles in the animal's neck during chewing or swallowing, or the movement of the animal's jaw during chewing, and that the regurgitations may also be sensed in other manners, e.g. by the use of microswitches as described above with respect to FIGS. 9 and 10.

While the invention has been described with respect to several preferred embodiments, it will be appreciated that these are set forth merely for purposes of example, and that many other variations, may be made. For example, in addition to the use of other sensors for detecting chewing actions or regurgitations as indicated above, other algorithms may be used for identifying ruminating activities from the detected actions. Other variations, modifications and applications of the invention will be apparent.

What is claimed is:

1. A monitoring system for monitoring the suitability of animal feed, of ruminant animals, comprising:

at least one sensor for sensing chewing actions of the animal produced by the animal while chewing animal feed, including the time of each chewing action and the number of chewing actions per predetermined time interval, for indicating a ruminating activity;

and a data processor accumulating both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval, for determining the chewing rhythm of the animal indicating ruminating activities over a predetermined time period to

**A110**

US 7,350,481 B2

9

provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health.

2. The monitoring system according to claim 1, wherein said at least one sensor is a sound sensor carried by the animal for sensing chewing sounds of the animal.

3. The monitoring system according to claim 2, wherein said sound sensor is carried by a band around the animal's neck, which band also includes a battery which also serves as a weight for pressing said sound sensor against the animal's neck.

4. The monitoring system according to claim 1, wherein said at least one sensor is a bolus sensor which senses regurgitations of a bolus from the animal's rumen to the animal's mouth.

5. The monitoring system according to claim 4, wherein there are two bolus sensors, one bolus sensor being carried at the animal's throat close to the mouth, and a second bolus sensor being carried at the animal's throat spaced from said one bolus sensor a predetermined distance in the direction of the animal's stomach, said data processor determining that a regurgitation occurs when said one bolus sensor senses a

10

bolus within a short predetermined time interval after said second bolus sensor senses a bolus.

6. The monitoring system according to claim 5, wherein said bolus sensors are microswitches.

7. The monitoring system according to claim 4, wherein said data processor determined that the sensed regurgitations are those of a ruminating activity when the time period for a swallow and a regurgitation is within a predetermined known range indicating a ruminating activity, and when the intervals between regurgitations are also within a predetermined known range indicating a ruminating activity.

8. The monitoring system according to claim 1, wherein said at least one sensor includes a transmitter for transmitting information regarding said sensed actions of the animal indicating a ruminating activity, and a receiver at a remote location for receiving said transmitted information.

9. The monitoring system according to claim 8, wherein said receiver at the remote location also includes an alarm which is actuated when the sensed actions indicate the existence of a condition requiring immediate action.

* * * * *

US007878149B2

(12) **United States Patent**
Voronin et al.

(10) **Patent No.:** **US 7,878,149 B2**
(45) **Date of Patent:** **Feb. 1, 2011**

(54) **METHOD AND DEVICE FOR DETECTING ESTRUS**

(75) Inventors: **Vladimir Voronin**, Netanya (IL); **Eyal Brayer**, Kfaar Monash (IL); **Uri Ben Menachem**, Netanya (IL)

(73) Assignee: **SCR Engineers Ltd.**, Netanya (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 216 days.

(21) Appl. No.: **11/795,574**

(22) PCT Filed: **Jan. 19, 2006**

(86) PCT No.: **PCT/IL2006/000082**

§ 371 (c)(1),
(2), (4) Date: **Jul. 19, 2007**

(87) PCT Pub. No.: **WO2006/077589**

PCT Pub. Date: **Jul. 27, 2006**

(65) **Prior Publication Data**

US 2008/0110405 A1    May 15, 2008

(30) **Foreign Application Priority Data**

Jan. 19, 2005    (IL) ..................................... 166394

(51) **Int. Cl.**
*A01K 29/00* (2006.01)
*A01K 67/00* (2006.01)
(52) **U.S. Cl.** ..................................... **119/174**; 119/712
(58) **Field of Classification Search** .............. 340/573.1, 340/573.2, 573.3; 600/595; 119/174, 712; *A01K 29/00, A01K 67/00*
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,461,241 A | | 7/1984 | Ostler |
| 4,618,861 A | | 10/1986 | Getens |
| 5,005,835 A | * | 4/1991 | Huffman .................... 473/209 |
| 5,838,432 A | * | 11/1998 | Tokuhashi et al. ..... 356/139.03 |
| 5,916,181 A | * | 6/1999 | Socci et al. ................. 600/595 |
| 5,923,263 A | * | 7/1999 | Rodriguez .................. 340/689 |
| 6,049,280 A | | 4/2000 | Andersson |
| 6,104,294 A | | 8/2000 | Andersson et al. |
| 6,532,901 B2 | * | 3/2003 | Isley et al. .................. 119/712 |
| 6,583,725 B2 | * | 6/2003 | Fehrenkamp ............... 340/619 |
| 7,215,991 B2 | * | 5/2007 | Besson et al. ............... 600/509 |
| 7,335,168 B2 | * | 2/2008 | Rugg ........................... 600/595 |
| 2002/0075232 A1 | * | 6/2002 | Daum et al. ................. 345/158 |
| 2003/0205208 A1 | * | 11/2003 | Bar-Shalom ............... 119/859 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 705 536 | 1/1998 |
| JP | 2003219757 A * | 8/2003 |

OTHER PUBLICATIONS

English translation of JP 2003-219757.*
International Search Report for PCT Application No. PCT/IL2006/000082. Mailing Date: Sep. 20, 2006.

* cited by examiner

*Primary Examiner*—Kimberly S Smith
*Assistant Examiner*—Marisa Conlon
(74) *Attorney, Agent, or Firm*—Pearl Cohen Zedek Latzer, LLP

(57) **ABSTRACT**

The present invention provides a method and device for detecting estrus in animal by sensing along time the motion of the animal and identifying when the sensed motion is not related to eating periods of the animal. Based on the sensed motion which is not related to eating periods the estrus in the animal is identified.

**32 Claims, 3 Drawing Sheets**



**A112**



Fig. 1A

Fig. 1B

Fig. 1C



Fig. 2



Fig. 3

# METHOD AND DEVICE FOR DETECTING ESTRUS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a National Phase Application of PCT International Application No. PCT/IL2006/000082, International Filing Date Jan. 19, 2006, claiming priority of Patent Application, IL166394, filed Jan. 19, 2005.

## FIELD OF THE INVENTION

The present invention relates to a method and device for detecting estrus. The invention is applicable to various kinds of animals. In particular this invention is applicable to cattle animals.

## BACKGROUND OF THE INVENTION

It is very common to use artificial insemination on cattle animals. Success of artificial insemination depends highly on accurate identification of the term in which an animal is in estrus. Therefore it is important to have reliable information regarding the estrus term to ensure a successful insemination resulting in pregnancy. The economic importance of the matter gives rise to many different products and methods assigned to detect estrus.

It is known that during estrus the behavior of the cattle animal changes and the over all activity rises. This high activity manifests itself by walking, running, trying to ride other animals and the like. This high activity level is clearly different from the normal activity level of cattle animals, which spends most of the time eating and ruminating. Measuring of the level of activity, that is measuring the level of movement of the body of the animal, is known in the art and may be done by one of known sensors or methods, such measuring the RMS value of a signal produced by a sensor measuring the movements of the animal.

Products for detecting estrus have been in the market for more than two decades. These products are of two types.

The first type includes simple mechanical devices. These products do not transfer the information to any central management system, and the farmer using them has to spend a lot of time in monitoring, finding and separating the cattle according to his findings. Additionally, those products are usually intended for one time use only and consequently a lot of work is involved in mounting and removing them on and from the monitored cattle animal. The reliability of those devices is generally low. For example, devices that detect if a cattle animal is trying to ride each other might help in detecting estrus. However, not all the cattle animals ride other cattle animals during estrus.

The second type includes computerized devices that contain a motion sensor and are mounted on the animal (leg or neck). The leg mounted device count steps. This device might not give accurate information because the animal's leg is not always the most active part of the animal during estrus. In addition, mud tends to stick and harden on the device and cause discomfort and injury. Mounting the device on the leg is not easy. The neck mounted device measures general motion. The animal's neck participate in many activities such as eating, smelling and playing, so a high neck activity exists also when the animal is not in estrus. This of course makes it very difficult to detect the specific activity during estrus, and prevents neck-based sensors from acquiring accurate information.

A glass cell holding electrodes and a drop of mercury is a known technology to measure activity. When motion exists the mercury covers the electrodes and causes the impedance to drop.

A metal ball that creates an electromagnetic field when changing location is also a known technology to measure activity.

Acceleration sensors based on the piezoelectric affect is another known technology to measure activity. Yet, gravity affects such sensors so that the sensor inclination affects and changes the reading.

U.S. Pat. No. 4,846,106 describes an electronic switch mounted on the cow hind and activated when another cow rides it.

U.S. Pat. No. 4,247,758 describes a device that measures and indicates the number of movements of the animal activity for detecting estrus.

U.S. Pat. No. 4,618,861 describes a device that measures activity of an animal, and uses the device's motion for its source of energy.

U.S. Pat. No. 5,111,799 describes an electronic switch attached to the cow's hind and activated when another cow mounts it.

None of these references suggests a method for detecting estrus by combining additional information of the eating periods of the animal and/or it's head inclination with information regarding the animal's motion to detect estrus.

## SUMMARY OF THE INVENTION

The present invention provides a method and device for detecting estrus animals by collecting information related to the animal's motion and information related to the animal's eating periods and combining them together to reduce the impact of the animal's eating habits on the results.

The method and device of this invention have the advantage of using information regarding the animal's eating periods. This property prevents false interpretation of the gathered information indicative of animal's sensed motion, since a large portion of the animal's sensed motion occurs during eating (especially with neck mounted devices).

This invention provides a method that may comprise the steps of sensing and accumulating along time signals indicative of the motion of a cattle animal and identifying when the sensed motion is statistically not related to eating periods of said cattle animal and when it statistically deviates from the range of data indicative of normal behavior of said cattle animal. The identification of eating period of said cattle animal may assist in minimizing false interpretation of motion level deviating above the normal behavior, in order to better identify if the cattle animal is in estrus. On the other hand, identification of motion level deviating below normal behavior of said cattle animal may be indicative of the animal is sick. In order to neutralize the effect of eating periods, typically involving high level of motion, on the sensed motion the sensed data indicative of eating periods is combined with the sensed data indicative of motion. Based on the combined sensed data, changes in activity level of the said animal which is neutralized from the effect of eating activity (herein after neutralized activity or NUT-ACT) can be detected, and the animal can be identified as in estrus based on the changes in NUT-ACT level. Accumulation of said types of data may allow for statistical manipulation of the accumulated data for the identification of normal behavior and of deviations above or below this level of motion.

The detection might be done by establishing a database of typical behavior and then continuously comparing new data

US 7,878,149 B2

3

to the database. The comparison enables detection of changes in activity level that is typical to estrus. This database may also be continuously or periodically be updated.

This invention further provides a device comprising sensors for sensing the motion of a cattle animal and the eating periods of said cattle animal. A microprocessor may receive data of said sensed motion and of said sensed eating periods. The data may then be combined to neutralize the effect of motion associated with eating (during eating periods) on the sensed motion to get a NUT-ACT. Further, a data base of typical behavior may be established, and by comparing new collected data to the data base of typical behavior, relevant changes in activity level may be detected. The changes in activity level may be indicative that said animal is in estrus. For example, if there is a change in the activity level of more than a specified value, e.g. of a specified percentage of a calculated standard deviation of average activity level, the animal can be identified as in estrus. The analysis can strongly rely on statistical basis so the demand on the sensors' accuracy may be relaxed. Good results may be received based merely on good correlation between the sensed activity level identified as related to eating period and actual eating period. The database can be continuously updated with new collected sensed data.

The process of estrus situation detecting may be performed almost or completely entirely by the microprocessor, and notification can be sent when the animal is identified as in estrus. Alternatively, only part of the process may be performed by the microprocessor, and the processed data can be transmitted to a remote receiver, where it can be further processed to detect estrus. The estrus detection may be performed by software. An indicating means can indicate when estrus is detected.

The device may be at least partly contained within a case. The case shall preferably be placed, according to one embodiment of the invention, where the animal's head inclination and/or motion can be sensed. In other embodiments of the invention, the case may be mounted on the animal's neck using a belt. In yet another embodiment, it may be implanted inside the animal or swallowed by it. An indicating means that indicates when the animal is in estrus may be coupled to the case.

The motion sensor can be anyone of the sensors described in the prior art. The motion level can be indicated by the energy of the signal. The energy level can be deduced, for example, from the RMS value of a signal produced by a sensor.

The eating periods can be detected by measuring the animal's head inclination relative to the ground. When the animal eats, the animal's head tend to be lowered towards the ground, while usually the cattle animal tends to hold its head higher when active. While in estrus the percentage of time the animal's neck is lowered is much smaller compared with that of eating periods. A sensor may be mounted on the animal's neck or head to measure its inclination directly or by computing its value based on the measured output of the sensor. The sensed head inclination can be used to assess an eating status. A combination of high motion level and high values of head inclination may indicate with high probability that the animal is eating. Accumulation of an animal's sensed parameters and statistical methods can be used in order to identify eating periods by this method.

The eating periods can also be detected by monitoring and analyzing the sounds and vibrations that typically occur when the animal is eating. When the animal eats its jaw generates sounds and vibrations that can be monitored by a sensor on the animal or inside it and then analyzed to determine an

4

eating activity. The animal's neck is an example for a suitable area for monitoring such sounds or vibrations.

The animal's eating status can also be assessed by monitoring its head's distance to the ground. Small distance and high motion can indicate that the animal is eating. Measuring the distance can be done using methods outlined in prior art such as ultra-sound and light.

It is possible to use a combined sensor to sense both indications of an angle of inclination of the animal's head and of motion. It is statistically expected that when the inclination sensor transmits a signal indicative of a neck of the animal being in low angle (head close to the ground) the probability of the motion represented by the motion signal, to be due to estrus is lower as well. Thus, the combined sensor may comprise internal arrangement that will attenuate the output level of the motion signal as the inclination level is higher (head closer to the ground). Accordingly, a motion signal may include inherently data of the inclination. The output of this combined sensor may than be further evaluated statistically to assess existence of estrus in the sensed animal.

Another combined sensor may be a cell partially filled with liquid and comprising a transmitter and a receiver for electromagnetic radiation, placed in two opposite sides of the cell. The transmitter may radiate electromagnetic radiation. The liquid may attenuate the radiation proportional to the amount of liquid momentarily existing between the transmitter and the receiver. The radiation may be scattered when passing out of the liquid and into the liquid, and so the radiation received by the receiver is indicative of the angle of inclination and movement of the cell. By analyzing the radiation received by the receiver a picture of accelerations and inclination along the time may be deduced.

In addition to the liquid the cell may be filled with gas or with another liquid that do not tend to mix with the first one, or with solid objects. The liquid inside the cell can be with a controllable viscosity, such as silicon, which may be suitable for the purpose of the sensor because it acts as a filter for high frequency noise and may thus enhance detection of true estrus related activity.

The radiation from the transmitters doesn't have to be continuous. The transmitter can send pulses of radiation in any desirable rate, for example a few times per second for the sake of energy conservation.

Sensed information received from a sensor sensing the motion and inclination of an animal's head may comprise two distinguishable phenomena. As the head inclination is changed slowly (typically over many seconds) while the head movement is distinguishably faster, the two components of the signal received from the sensor can be separated using an analysis phase performed by a computation unit, such as a CPU, using standard digital signal processing algorithms (for example filters). The eating periods can be detected by analyzing the DC component of the received radiation signal, and the head acceleration can be detected by analyzing the AC component of the received radiation signal.

The device may also comprise additional sensors and elements.

### BRIEF DESCRIPTION OF THE FIGURES

The present invention will be understood and appreciated more fully from the following detailed description taken in conjunction with the figures in which:

FIGS. 1A-1C are illustrations of various head inclinations of an animal;

FIG. 2 is a schematic illustration of an embodiment of the device according to the invention; and

**A117**

5

FIG. **3** is a schematic illustration of a sensor for sensing both head movement and eating periods according to some embodiments of the invention.

It will be appreciated that for simplicity and clarity of illustration, elements shown in the figures have not necessarily been drawn to scale. For example, the dimensions of some of the elements may be exaggerated relative to other elements for clarity. Further, where considered appropriate, reference numerals may be repeated among the figures to indicate corresponding or analogous elements.

DETAILED DESCRIPTION OF THE INVENTION

The method and device of this invention have the advantage of using information indicative of the animal's eating periods directly (such as noises typical of digestion) or indirectly (such as angle of inclination of the animal's neck) in combination with information indicative of the animal's level of activity, such as sensing of the animal's motion. Combining of the two types of data may dramatically enhance the probability of a signal indicative of high activity to be rightly construed as indicative of estrus if indication of the animal eating is used to mark "eating periods", which, as discussed earlier, are of very low probability to involve estrus behavior. This property prevents false interpretation of the information gathered, since a large portion of the animal's head movement occurs during eating.

The eating periods can be detected by measuring the animal's head inclination relative to the ground. Attention is made to FIGS. **1A-1C**, which are schematic illustrations of various head inclination positions of an animal in various situations. A sensor **12** may be attached to the animal so as to sense variations in the inclination of the animal's head or neck. When the animal is not busy eating the inclination may be as illustrated in FIG. **1A** or **1B**. When the animal is in estrus the head and neck inclination may probably be in inclination as illustrated in FIG. **1A** for long periods. When the animal eats, the inclination of animal's head tend to be lowered towards the ground as illustrated in FIG. **1C**. Sensor **12** can measure the inclination of the animal's head. The sensed head inclination can be used to assess whether the animal is eating. A motion sensor (not shown) may sense the level of activity of the animal. The motion sensor may be one of those described herein above, and may also be combined with inclination sensor **12**. A combination of high motion level and large head inclination points to a high probability that the animal is eating. Statistical methods can be used in order to identify eating periods by this method. Two different methods may be used to interpret the inclination data. A first method may be to identify eating times by setting a predefined fixed threshold for the inclination angle signal, as received from the sensor, so that when the received inclination signal crosses this threshold it means that the movement signal should be interpreted as representing an eating period. A second method may be to monitor the sensed inclination angle over a defined period of time, for example a few days, to set an initial threshold based on these measurements and to automatically or manually set a new threshold around that value, based on the further accumulated data or on other basis. According to this method the value of NUT-ACT may be calculated as explained above and when NUT-ACT is high this may indicate an estrus type of activity.

Attention is made now to FIG. **2**, which is a schematic block diagram illustration of an estrus identification device **20** constructed and functioning according to embodiments of the present invention. Device **20** may comprise a microprocessor **1**, capable of receiving input **3** and **4** from a sensor device, a

6

power source **2** to supply energy to device **20** and a transceiver unit **5** to transmit and receive data from and to device **20**. A memory unit and a real time clock function (not shown) may be embedded in microprocessor **1**. Sensor input **3** may indicate the animal's head motion and sensor input **4** may indicate the eating periods of the animal. Alternatively, it is possible to use one sensor with one output that may provide a signal composed of eating/inclination data mixed with the motion data. In such case **3** may represent combined data indicating animal's motion and eating and **4** may not be needed. The single input **3** can be further filtered by microprocessor **1** using an appropriate software or combination of software and hardware. The data processed by the microprocessor may be transmitted by transceiver unit **5**, which may be a wireless transceiver. The device may be enclosed inside case **6** that may provide physical, RF, UV and the like protection to the electronics and can be mounted on the animal's body, such as on its neck.

In embodiments where sensors **3**, **4** are part of case **6**, case **6** can be placed anywhere on or at the animal's body as long as the animal's motion and eating status can be sensed. In some embodiments of the invention, case **6** may be mounted on the animal's neck. In other, it may be implanted inside the animal or under its skin or swallowed by it. Indicating means (not shown) that indicates when the animal is in estrus may be coupled to the case.

Microprocessor **1** may sample and collect the data received from sensors **3** and **4** into the memory. For some initial period, such as a period of a few days, the data may be used for establishing a database (not shown) of the animal's typical behavior. After the initial period, new collected data may be compared to the animal's typical behavior registered in the database. The comparison may be used by microprocessor **1** to enable detection of changes in activity level that are typical to estrus.

The data base of typical behavior may continuously be updated with new information gathered. The data analysis may comprise of algorithms that take into account the accelerations along three orthogonal axes and the eating related data along the time. This data analysis may be done continuously by processor **1** and optionally transmitted outside for further processing and action taking.

Software installed in the memory for running by microprocessor **1** may be adapted to detect estrus with a very high sensitivity and very low false alarm rate based on the eating related data and activity level combined data.

The process of estrus detecting may be performed entirely by microprocessor **1**, and notification can be sent by transceiver unit **5** when the animal is identified as in estrus. Alternatively, only part of the process may be performed by microprocessor **1**, and the processed data can be transmitted by transceiver unit **5** to a remote receiver, where it can be further processed to detect estrus by said remote receiver. The estrus detection may be performed by software. An indicating means can indicate when estrus is detected.

According to another embodiment of the present invention, microprocessor **1** may only be used to store the sensor's data (eating, inclination, motion . . . ) and to send it outside by transceiver unit **5** for analysis.

The microprocessor **1** might perform only preliminary analysis (for example averaging or weighting or any other algorithm that typically compress the data). The analysis results can be sent outside by transceiver unit **5** for analysis.

Alternatively, microprocessor **1** may do all that is needed in order to reach the decision whether the animal is in estrus based on the sensed data from sensors **3**, **4** and typical behavior profiles stored in said memory. Such a device can indicate

7

that the animal is in estrus by a visual indication installed on device **6**, such as a lamp or any other indicating means.

An embodiment of a sensor **30** for sensing both head movement and eating periods is schematically described in FIG. **3**. Sensor **30** may comprise a liquid **34** trapped inside a cell **33**. Liquid **34** may fill the cell only partially and a small gas **35** bubble may fill the residual internal space of cell **33**. Sensor **30** may further comprise transmitter **32** and receiver **31** mounted adjacent to outside wall of cell **30** so that transmission of electromagnetic (EM) energy from transmitter **32** may travel through liquid **34** and gas bubble **35** on its way to receiver **31**. When sensor **30** accelerates this bubble temporary changes it location with respect to the traveling EM energy. When the inclination of sensor **30** changes, bubble **35** also changes its location similarly. Transmitter **32** and receiver **31** of electromagnetic radiation (NIR light is very suitable) are situated on the cell sides. Cell **33** is composed of a material that allows passage of this radiation. Liquid **34** attenuates the radiation and the radiation is scattered when passing out of the liquid **4** and into the liquid **4**, and so the radiation received by the receiver **31** is indicative of the angle of inclination of sensor **30** and of the movement of sensor **30**. By analyzing the changes in the magnitude of radiation received by receiver **31** a picture of accelerations and inclination along the time is available.

According to another embodiment of the present invention bubble **35** may be filled with another liquid that do not tend to mix with liquid **34**, or with solid objects. Liquid **34** inside the cell can be silicon, which has suitable and controllable viscosity.

The radiation from transmitter **32** doesn't have to be continuous. Transmitter **32** can send pulses of radiation a few times per second for the sake of energy conservation.

The eating periods can be detected by analyzing the DC component of the signal received by receiver **31**, and the head motion can be detected by analyzing the AC component of said signal.

According to yet another embodiment of the present invention multiple transmitters **32** and receivers **31** can be used for monitoring the liquid trapped inside the cell.

According to another embodiment of the present invention one cell filled with liquid can be used for sensing motion and another sensor using different technology may be used for sensing eating related data.

According to yet another embodiment of the present invention one cell filled with liquid can be used for sensing eating related data and another sensor using different technology used for sensing motion.

According to another embodiment of the present invention, the eating status can be assessed by monitoring the distance of the head from the ground. Small distance and high motion can indicate that the animal is eating. Measuring the distance can be done using methods outlined in prior art such as ultrasound and light.

According to another embodiment of the present invention the inclination and or distance from the ground data are combined with the motion data for assessing the NUT-ACT. No explicit determination of the animal's eating state is established but rather only statistical analysis for reducing the eating periods affect is performed. Such data handling may be of larger attenuating of the motion signal as the head inclination is larger.

It will be appreciated by persons of ordinary skill in the art that according to some embodiments of the present invention other designs of estrus identifying devices with two different

8

inputs indicative of the behavior of the animal according to the principles of the present invention are possible and are in the scope of this application.

While certain features of the invention have been illustrated and described herein, many modifications, substitutions, changes, and equivalents will now occur to those of ordinary skill in the art. It is, therefore, to be understood that the appended claims are intended to cover all such modifications and changes as fall within the true spirit of the invention.

The invention claimed is:

**1**. A method for detecting estrus in a cattle animal, comprising the steps of:

sensing and accumulating acceleration level of said cattle animal, over a period of time, by an acceleration sensor, wherein the acceleration level is indicated by energy level of an acceleration signal produced by the acceleration sensor;

sensing, over a period of time, data indicative of eating performed by said cattle animal;

attenuating the energy level of the acceleration signal as the indication of eating is stronger, the energy attenuated acceleration signal identifying neutralized motion data;

extracting typical activity level of said animal based on said neutralized motion data; and

identifying abnormal behavior indicative of said estrus in said animal by comparing recently identified neutralized motion data with the extracted typical activity level.

**2**. A method according to claim **1**, further comprising establishing a database of typical behavior, wherein said data base is continuously updated.

**3**. A method according to claim **1**, further comprising the step of transmitting to a remote receiver at least one of a list comprising the sensed motion, the information related to eating periods, the collected neutralized motion data, the extracted activity level and the identification if the animal is in estrus.

**4**. A method according to claim **1**, further comprising a step of indicating by indication means when the animal is identified as in estrus.

**5**. A method according to claim **1**, further comprising a step of sending notification when the animal is identified as in estrus.

**6**. A method according to claim **1**, wherein at least one of the steps is performed inside a case which is placed where the animal's head inclination can be sensed.

**7**. A method according to claim **1**, wherein at least one of the steps is performed inside a case which is placed where the animal's head inclination can be sensed and wherein said case is at least one of the following: mounted on the animal's neck, implanted inside the animal or swallowed by the animal.

**8**. A method according to claim **1**, wherein the step of sensing data indicative of eating comprises a step of measuring the inclination of the animal's head relative to the ground.

**9**. A method according to claim **1**, wherein the step of sensing data indicative of eating comprises a step of measuring the distance of the animal's head to the ground.

**10**. A method according to claim **1**, wherein the step of sensing data indicative of eating comprises a step of monitoring and analyzing the sounds and vibrations that occur when the animal is eating.

**11**. A method according to claim **1**, wherein the step of sensing the acceleration level comprises a step of measuring the accelerations in up to three orthogonal directions of said animal.

**12**. A device for detecting estrus in a cattle animal, comprising:

US 7,878,149 B2

| 9 | 10 |

at least one acceleration sensor for sensing acceleration level of said cattle animal over a period of time, wherein the acceleration level is indicated by energy level of an acceleration signal produced by the acceleration sensor;

at least one sensor for sensing over a period of time, data indicative of eating performed by said cattle animal; and

at least one microprocessor for accumulating said acceleration signal, attenuating the energy level of the acceleration signal as the indication of eating is stronger, the energy attenuated acceleration signal identifying neutralized motion data, extracting typical activity level of said animal based on said neutralized motion data and identifying abnormal behavior indicative of said estrus in said animal by comparing recently identified neutralized motion data with the extracted typical activity level.

**13**. A device according to claim **12**, said microprocessor further comprising a memory.

**14**. A device according to claim **12**, said microprocessor further comprising a real time clock.

**15**. A device according to claim **12**, further comprising a transceiver unit to transmit data processed by said microprocessor to a remote receiver.

**16**. A device according to claim **15**, wherein said transceiver unit is adapted to send notification when the animal is identified as in estrus.

**17**. A device according to claim **12**, further comprising an indicating means which indicates when the animal is identified as in estrus.

**18**. A device according to claim **12**, wherein the device is at least partly contained within a case which is placed where the animal's head inclination can be sensed.

**19**. A device according to claim **18**, wherein said case is at least one of the following: mounted on the animal's neck, implanted inside the animal or swallowed by the animal.

**20**. A device according to claim **12**, wherein said sensor for sensing data indicative of eating is adapted to measure the animal's head inclination relative to the ground.

**21**. A device according to claim **12**, wherein said sensor for sensing data indicative of eating is adapted to measure the distance of the animal's head to the ground.

**22**. A device according to claim **12**, wherein said sensor for sensing data indicative of eating is adapted to monitor and analyze the sounds and vibrations that occur when said animal is eating.

**23**. A device according to claim **12**, wherein said sensor for sensing the motion is adapted to measure the accelerations in up to three orthogonal directions.

**24**. A device according to claim **12**, comprising a combined sensor comprising said at least one sensor for sensing the motion and said at least one sensor for sensing data indicative of eating.

**25**. A device according to claim **24**, wherein said combined sensor reports head motion values inversely proportional to the head's inclination angle.

**26**. A device according to claim **24**, wherein said combined sensor comprises:

a cell partially filled with a first type of liquid comprising:
at least one transmitter and at least one receiver of electromagnetic radiation, the radiation received by said at least one receiver is indicative of an angle of inclination of said cell.

**27**. A device according to claim **26**, wherein said electromagnetic radiation is substantially in the near infrared light (NIR light) range.

**28**. A device according to claim **26**, wherein said microprocessor is adapted to identify the eating periods by analyzing a DC component of the received radiation signal, and sensing of the motion is done by analyzing an AC component of the received radiation signal.

**29**. A device according to claim **26**, wherein said cell is further filled with gas.

**30**. A device according to claim **26**, wherein said cell is further filled with a second type of liquid that does not tend to mix with said first type.

**31**. A device according to claim **26**, wherein said cell is further filled with at least one solid object.

**32**. A device according to claim **26**, wherein said first type of liquid is silicon.

\* \* \* \* \*

**A120**

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,379 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated:  December 7, 2015                          /s/ Gregory A. Castanias
                                                 Gregory A. Castanias
                                                 JONES DAY
                                                 51 Louisiana Ave., N.W.
                                                 Washington, DC 20001
                                                 (202) 879-3939

# CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2015, I caused the foregoing Non-Confidential Brief for Appellants VocalTag Ltd. and SCR Engineers Ltd. to be filed via CM/ECF with the Clerk of the Court, thereby electronically serving it on all counsel of record in this matter.

Dated: December 8, 2015

/s/ Gregory A. Castanias
Gregory A. Castanias
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939