No. 2015-1804

# United States Court of Appeals for the Federal Circuit

VOCALTAG LTD. AND SCR ENGINEERS LTD.,

*Plaintiffs-Appellants,*

v.

AGIS AUTOMATISERING B.V.,

*Defendant-Appellee.*

Appeal from the United States District Court for the Western District of Wisconsin in Case No. 3:13-cv-00612-JDP

**CORRECTED NONCONFIDENTIAL APPELLEE'S BRIEF**

Jonathan H. Margolies
Katherine W. Schill
Andrew T. Dufresne
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Avenue, Suite 3300
Milwaukee, WI 53202
Telephone: 414-271-6560
Facsimile: 414-277-0656
*Attorneys for Appellee*
*Agis Automatisering B.V.*

February 24, 2016

# CERTIFICATE OF INTEREST

Counsel for Appellee Agis Automatisering B.V. certifies the following:

1. The full name of every party or amicus represented by me is:

Agis Automatisering B.V.

2. The name of the real party in interest represented by me is:

None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Agis Harmelen Holding B.V.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Michael Best & Friedrich LLP
Jonathan H. Margolies
Katherine W. Schill
Andrew T. Dufresne

DATED: February 24, 2016        /s/ Jonathan H. Margolies

*Jonathan H. Margolies*
Attorney for Appellee

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF CONTENTS ........................................................................ii

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF RELATED CASES ...................................................ix

STATEMENT OF THE CASE .................................................................1

   I.   Background on Livestock Monitoring Technology .........................1

     A.   Rumination Detection .................................................................2

     B.   Estrus Detection..........................................................................3

   II.   The Asserted Patents......................................................................4

     A.   The '481 Patent ...........................................................................4

        1.   Disclosure and Claims of the '481 Patent...........................4

        2.   Prosecution History of the '481 Patent................................5

     B.   The '149 Patent ...........................................................................8

        1.   Disclosure and Claims of the '149 Patent...........................8

        2.   Prosecution History of the '149 Patent..............................10

   III.   Agis's CowManager System......................................................13

     A.   CowManager Functions ...........................................................14

     B.   CowManager Hardware............................................................14

     C.   CowManager Algorithms .........................................................17

     D.   Development of CowManager ..................................................19

   IV.   District Court Proceedings ..........................................................20

     A.   Noninfringement of the '481 Patent........................................21

        1.   Construction of the "Sensor" and "Data Processor" Limitations...............................................................................21

        2.   Noninfringement Analysis for the '481 Patent .................22

           a.   Lack of a Sound Sensor in CowManager ...........................23

           b.   The Time of Each Chewing Action .....................................24

c.   The Number of Chewing Actions Per Predetermined Time Interval .................................................................. 25

B.   Noninfringement of the '149 Patent ........................................ 27

1.   Construction of the "Attenuating" Step ................................ 27

2.   Noninfringement Analysis for the '149 Patent ..................... 28

a.   Attenuating the Energy Level of the Acceleration Signal 29

b.   As the Indication of Eating is Stronger ............................ 32

C.   No Willful Infringement ........................................................... 33

D.   Summary of District Court Holdings ....................................... 33

SUMMARY OF THE ARGUMENT ...................................................... 34

STANDARDS OF REVIEW .................................................................. 35

ARGUMENT ......................................................................................... 36

I.   The District Court's Judgment of Noninfringement Regarding the '481 Patent was Correct as a Matter of Law ................................ 36

A.   The District Court Correctly Construed "Sensor for Sensing Chewing Actions" to Require a Sound Sensor ......................... 36

1.   Sound Sensors are the Only Disclosed Structures Corresponding to the "Sensor" Limitation in the '481 Patent.. ........................................................................ 37

2.   Microswitches Were Not Disclosed as Sensors for Sensing Chewing Actions .................................................................. 48

3.   Claim Differentiation Does Not Alter the Correct Construction of "Sensor for Sensing Chewing Actions" ........ 49

B.   There is No Evidence that Agis Practiced any Algorithm Disclosed in the '481 Patent ..................................................... 52

C.   The Agis System Does Not Sense the Time of Each Chew ...... 57

D.   CowManager Does Not Sense the Number of Chewing Actions Per Predetermined Time Interval .............................................. 64

II.   The District Court Correctly Granted Summary Judgment of Noninfringement as to the '149 Patent ........................................ 64

A.  The District Court Correctly Construed "Attenuating the Energy Level of the Acceleration Signal as the Indication of Eating is Stronger" ................................................................... 65

1.  SCR Cannot Introduce a New Construction for the "Attenuating" Step on Appeal ................................................. 65

2.  The District Court's Construction did not Include a "Transmission" Requirement ................................................. 68

3.  "Attenuating . . . as the Indication of Eating is Stronger" Requires Proportionality in the Level of Attenuation .......... 70

4.  The District Court Did Not Err by Considering the Prosecution History ............................................................ 72

B.  SCR's New Proposed Construction Cannot Create a Genuine Issue of Fact ................................................................... 73

1.  It is Undisputed that the Agis System Never Attenuates or Otherwise Modifies the Energy Level of an Acceleration Signal ..................................................................... 73

2.  The Agis System Performs the Same Functions at All Times . ..................................................................... 75

III.  Willfulness .................................................................... 76

CONCLUSION ...................................................................... 77

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted on pages 15-18, 24, 26, 29-32, 61-63, 74, and 75 of this brief contains proprietary technical information regarding the operation of Agis's monitoring system that has been designated as confidential pursuant to the protective order entered by the district court.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ....................................................37, 42

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
  216 F.3d 1042 (Fed. Cir. 2000) ....................................................61, 62

*Atmel Corp. v. Information Storage Devices*,
  198 F.3d 1374 (Fed. Cir. 1999) ..........................................................44

*B. Braun Med., Inc. v. Abbott Labs.*,
  124 F.3d 1419 (Fed. Cir. 1997) ..........................................................49

*Biomedino, LLC v. Waters Techs. Corp.*,
  490 F.3d 946 (Fed. Cir. 2007) ............................................................42

*Blackboard, Inc. v. Desire2Learn Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ....................................................41, 42

*Bloch v. Frischholz*,
  587 F.3d 771 (7th Cir. 2009) (en banc)..............................................35

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001) ....................................................44, 45

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
  145 F.3d 1303 (Fed. Cir. 1998) ..........................................................41

*Conoco, Inc. v. Energy & Envt'l Int'l L.C.*,
  460 F.3d 1349 (Fed. Cir. 2006) ..........................................................66

*Diadenko v. Folino*,
  741 F.3d 751 (7th Cir. 2013)..............................................................35

*Digital-Vending Servs. Int'l v. Univ. of Phoenix, Inc.*,
  672 F.3d 1270 (Fed. Cir. 2012) ..........................................................67

*Finnigan Corp. v. ITC,*
    180 F.3d 1354 (Fed. Cir. 1999) .................................................... 66, 67

*Fresenius USA, Inc. v. Baxter Int'l, Inc.,*
    582 F.3d 1288 (Fed. Cir. 2009) .................................................... 40

*Goodman v. Nat'l Sec. Agency, Inc.,*
    621 F.3d 651 (7th Cir. 2010) ...................................................... 35

*Harris Corp. v. Ericsson Inc.,*
    417 F.3d 1241 (Fed. Cir. 2005) .................................................... 57

*Humphries v. CBOCS West, Inc.,*
    474 F.3d 387 (7th Cir. 2007) ...................................................... 40

*Intel Corp. v. VIA Techs.,*
    319 F.3d 1357 (Fed. Cir. 2003) .................................................... 44, 45

*Interactive Gift Express, Inc. v. Compuserve Inc.,*
    256 F.3d 1323 (Fed. Cir. 2001) ................................................... 67

*Laitram Corp. v. Rexnord, Inc.,*
    939 F.2d 1533 (Fed. Cir. 1991) .................................................... 49, 50

*Linear Tech. Corp. v. Impala Linear Corp.,*
    379 F.3d 1311 (Fed. Cir. 2004) .................................................... 44, 45

*Noah Sys., Inc. v. Intuit Inc.,*
    675 F.3d 1302 (Fed. Cir. 2012) ................................................... 42

*NTP, Inc. v. Research in Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005) ................................................... 67

*Pond v. Michelin N. Am., Inc.,*
    183 F.3d 592 (7th Cir. 1999) ...................................................... 35, 39

*S3 Inc. v. nVIDIA Corp.,*
    259 F.3d 1364 (Fed. Cir. 2001) ................................................... 43

*Saffran v. Johnson & Johnson,*
    712 F.3d 549 (Fed. Cir. 2013) .................................................... 41, 42

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) .......................................................... 40

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
726 F.3d 1306 (Fed. Cir. 2013) .......................................................... 35

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008) .......................................................... 44

*Telcordia Techs., Inc. v. Cisco Sys.*,
612 F.3d 1365 (Fed. Cir. 2010) .......................................................... 44

*Tex. Instruments, Inc. v. ITC*,
988 F.2d 1165 (Fed. Cir. 1993) .......................................................... 70

*Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*,
753 F.3d 1375 (Fed. Cir. 2014) .......................................................... 37

*United States v. Butler*,
71 F.3d 243 (7th Cir. 1995) ............................................................... 61

*VocalTag Ltd. v. Agis Automatisering B.V.*,
No. 3:13-cv-00612-JDP (W.D. Wis.), ECF Nos. 304, 321,
325, 330, 333 .................................................................................... 33

*Whittaker Corp. v. UNR Indus., Inc.*,
911 F.2d 709 (Fed. Cir. 1990) ............................................................ 45

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ................................................... 52, 57

## STATUTES

35 U.S.C. § 112, ¶ 6 ..................................................................... passim

35 U.S.C. § 285 ................................................................................. 33

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ....................................................................................... 23

## STATEMENT OF RELATED CASES

Agis's motion to find this case exceptional under 35 U.S.C. § 285 remains pending before the district court. *See VocalTag Ltd. v. Agis Automatisering B.V.*, No. 3:13-cv-00612-JDP (W.D. Wis.), ECF Nos. 304, 321, 325, 330, 333. There are no other cases known to counsel pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# STATEMENT OF THE CASE

This appeal follows a decision of the United States District Court for the Western District of Wisconsin granting summary judgment of noninfringement in favor of defendant-appellee Agis Automatisering, B.V. ("Agis") regarding U.S. Patents 7,350,481 ("the '481 patent") and 7,878,149 ("the '149 patent") asserted by Plaintiffs-appellants VocalTag Ltd. and SCR Engineers Ltd. ("SCR").[1] A1-29. The court concluded that the function of Agis's product was undisputed and, in view of clear differences between that product and the asserted claims, Agis was entitled to summary judgment on multiple independent grounds for each patent. *See* A14-17, A26-28.

## I.    Background on Livestock Monitoring Technology

The technology at issue concerns automated systems for monitoring livestock, particularly dairy cattle. The '481 patent claims systems that monitor rumination activity, and the '149 patent claims certain methods and devices for detecting when cattle enter estrus.

---

[1]    When this case was filed, VocalTag owned the '481 patent, SCR owned the '149 patent, and SCR was a licensee and part owner of VocalTag. During discovery, however, SCR acquired VocalTag. Agis therefore refers to the plaintiffs-appellants collectively as "SCR" on appeal.

1

## A.    Rumination Detection

Cows and other ruminants engage in behavior known as rumination, which involves regurgitating and re-chewing stomach contents to facilitate breakdown of previously ingested material. A1624-25; A107 at 1:21-28. Dairy farmers have long recognized the correlation between feed content, rumination, health, and milk production. *See, e.g.*, A1162-67; A107 at 1:29-52; A1625. It has also long been recognized that rumination can be identified and tracked based on the distinctive pattern of chewing exhibited during rumination. A ruminating cow chews with highly regular, recurring jaw movements separated by periodic intervals without chewing for swallowing and regurgitation. A108 at 4:49-59; A1159; A288.

The practical importance and distinctive characteristics of rumination have for decades spurred development of automated systems for monitoring rumination. *E.g.*, A3309 at 149:20 – 150:2 (deposition of SCR's expert Dr. Randy Shaver) ("Shaver Dep."); A1155-60; A1241-42. Those systems have used various sensors to detect jaw movements during chewing—such as pressure sensors, strain gauges,

or lever switches mounted on or around a cow's jaw. *See* A1155-56; A1242.

## B.    Estrus Detection

On a dairy farm, regular calving is critical for maintaining milk yields. A275; A1186 at 1:34-40. For efficiency and control over genetic selection, most dairy operations breed cattle via artificial insemination. A275; A116 at 1:21-22. Artificial insemination programs require identifying estrus—the window of time when a cow becomes fertile—in a timely and accurate manner. A116 at 1:24-26.

For more than sixty years, it has been known that cows in estrus exhibit significantly increased physical activity. A1178-81; *see* A116 at 1:29-39. Numerous devices configured to monitor an animal's activity have been developed and used to detect estrus in cattle. *See, e.g.*, A116 at 1:40 – 2:23; A1178; A1169-77; A1182-89; A1272-83.

It is also well recognized that a considerable amount of a cow's physical activity—in estrus or not—occurs when the animal eats. The high daily baseline of activity due to eating can mask estrus-related increases in other types of activity, thus reducing the sensitivity and effectiveness of estrus detection. A116 at 1:62-67; A1200 at 1:55 – 2:10;

A1256 at [0005]. Thus, various estrus detection systems were designed to address that problem by distinguishing between eating and non-eating activity, discounting activity measured during eating, and predicting estrus based on observed increases in non-eating activity. *E.g.*, A1200-01 at 2:32 – 3:49; A1257-58 at [0018] – [0021].

## II.    The Asserted Patents

### A.    The '481 Patent

The '481 patent relates to systems for monitoring rumination. *See* A97-111. The disclosed systems draw upon well-known aspects of cattle behavior, and the issued claims were derived through multiple rounds of rejection and amendment during prosecution.

#### 1.    Disclosure and Claims of the '481 Patent

The '481 patent contains nine claims. Claim 1, the only independent claim, recites:

> 1.    A monitoring system for monitoring the suitability of animal feed, of ruminant animals, comprising:
> at least one sensor for sensing chewing actions of the animal produced while chewing animal feed, including *the time of each chewing action and the number of chewing actions per predetermined time interval*, for indicating a ruminating activity;
> and a data processor accumulating *both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval*, for determining the chewing rhythm of the animal indicating

4

> ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health.

A110-11, '481 patent at 8:55–9:3 (emphases added).

The '481 patent discloses systems including a neck-mounted sound sensor that converts chewing sounds to electrical signals and processes the chewing data to identify rumination. A108 at 3:44-48. According to the specification, rumination can be identified by detecting the duration of each chew and counting the number of chews in a set period of time, among other things. The '481 patent specifies that during rumination, each individual chew takes "about 0.5-1.5 seconds, more particularly 0.70-1.43 seconds." A108 at 4:49-59; A110 at 7:10-14. In addition, the specification discloses counting characteristic numbers of chews associated with rumination, such as 2-4 chews in three seconds or at least 42-45 chews in a minute. A108-09 at 4:60 – 5:5; A110 at 7:11-18.

## 2.    Prosecution History of the '481 Patent

The '481 patent was filed as U.S. Patent Application No. 10/332,198 ("the '198 application). A97. As filed, the '198 application included 28 claims, with claims 18-28 directed to rumination

monitoring systems. A539-43. Claim 18 of the '198 application, which eventually became claim 1 of the '481 patent, is reproduced below:

> 18. A monitoring system for monitoring the physiological condition, or suitability of animal feed, of ruminant animals, comprising:
> at least one sensor for sensing actions of the animal indicating a ruminating activity;
> and a data processor accumulating the time of said sensed actions indicating ruminating activities over a predetermined time period to provide an indication of the physiological condition of the animal, or of desirable changes in its feed for maximizing milk production or for maintaining animal health.

A710.

The examiner repeatedly rejected the claims over the prior art. A732-35; A762-66. The applicant initially attempted to distinguish the claimed systems based on their specific use for detecting rumination. *See* A750-60. The examiner responded that "the intended use of the sensor cannot be given patentable weight." A764-65. At that point, the applicant amended claim 18 as follows:

> 18. (Currently Amended) A monitoring system for monitoring suitability of animal feed, of ruminant animals, comprising:
> at least one sensor for sensing <u>chewing </u>actions of the animal <u>produced by the animal while chewing animal feed, including the time of each chewing action and the number of chewing actions per predetermined time interval, for </u>indicating a ruminating activity;

6

> and a data processor accumulating <u>both</u> the time of <u>each</u> <u>of</u> said sensed <u>chewing</u> actions <u>and the number of said</u> <u>chewing actions per unit time interval, for determining</u> <u>the chewing rhythm of the animal</u> indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health.

A779. Claim 18 was thus amended to require (i) sensing the time of each chewing action *and* (ii) sensing the number of chewing actions per predetermined time interval, as well as (iii) using a processor to accumulate *both* of those parameters for determining rumination. *Id.*

The applicant also chose to argue that the recited functions were entitled to patentable weight as means-plus-function terms, specifically asserting that "the recitation in Claim 18 of a 'sensor for sensing' means exactly the same as 'means for sensing'" and that the claimed "data processor . . . is also a recitation of 'means plus function' expressly permitted under 35 U.S.C. 112, last paragraph." A782-83; *see also* A769-70.

In response to those arguments and amendments, the examiner allowed claim 18 and dependent claims 20, 21, and 23-28 of the '198 application, which issued as claims 1-9 of the '481 patent. A788.

7

## B.    The '149 Patent

The '149 patent relates to estrus detection. *See* A112-20. Claims 1-11 recite methods for detecting estrus in cattle, and claims 12-32 recite devices for doing so. A119-20. The '149 patent incorporates basic principles of cattle behavior and issued only after extensive amendments to distinguish the prior art during prosecution.

### 1.    Disclosure and Claims of the '149 Patent

Regarding the '149 patent, SCR has asserted claims 1-6, 11-17, 23, and 24. A1320. Independent claim 12 is representative for purposes of the issues raised in this appeal:

> 12.    A device for detecting estrus in a cattle animal, comprising:
>> at least one acceleration sensor for sensing acceleration level of said cattle animal over a period of time, wherein the acceleration level is indicated by energy level of an acceleration signal produced by the acceleration sensor;
>> at least one sensor for sensing over a period of time, data indicative of eating performed by said cattle animal; and
>> at least one microprocessor for accumulating said acceleration signal, *attenuating the energy level of the acceleration signal as the indication of eating is stronger*, the energy attenuated acceleration signal identifying neutralized motion data, extracting typical activity level of said animal based on said neutralized motion data and identifying abnormal behavior indicative of said estrus in said animal by comparing

> recently identified neutralized motion data with the extracted typical activity level.

A119-20, '149 patent at 8:66–9:15 (emphasis added).

The background section of the '149 patent notes that estrus-detection aids "have been in the market for more than two decades," including computer-based systems with leg- or neck-mounted motion sensors. A116 at 1:40-41, 1:54-67. The '149 patent notes known sensitivity problems caused by high baseline eating activity that "exists also when the animal is not in estrus." A116 at 1:61-67. The disclosure discusses ways to determine when an animal is eating and apply that information when detecting estrus.

The '149 patent describes several approaches to determine eating: measuring the animal's head inclination (A117 at 3:48-60; A118 5:28-41), monitoring sounds and vibrations generated when the animal eats (A117 at 3:63 – 4:2), and measuring the distance between the animal's head and the ground (A117 at 4:3-7).

Certain disclosed embodiments include devices in some way configured to "attenuate" a signal produced by a sensor. A119 at 7:3-25; A117 at 4:8-20, 4:21-32. For example, the specification discloses a sensor comprising a liquid and gas bubble trapped within a cell, with a

transmitter and receiver positioned near the cell. A119 at 7:3-25; *see also* A117 at 4:21-32; A115. As the sensor's inclination changes, the bubble and liquid change positions relative to the path of a signal transmitted into the cell. A119 at 7:6-15. The '149 patent discloses that the liquid "attenuates the radiation and the radiation is scattered when passing out of the liquid and into the liquid, and so the radiation received by the receiver is indicative of the angle of inclination of the sensor and the movement of the sensor." A119 at 7:18-22. In addition, the '149 patent discloses that in some embodiments, "larger attenuating of the motion signal" may occur "as the head inclination is larger." A119 at 7:62-64.

### 2.    Prosecution History of the '149 Patent

The '149 patent was filed as U.S. Patent Application No. 11/795,574 ("the '574 application). A112. During prosecution, the applicants faced repeated novelty and obviousness rejections and filed a series of responsive amendments.

As originally filed, the '574 application included 35 claims. Claims 1-14 of the application recited methods, and claims 15-35 recited

devices. A826-29. Original claim 15 of the '547 application, which eventually became claim 12 of the '149 patent, is reproduced below:

> 15. A device comprising:
>> at least one sensor for sensing the motion of a cattle animal;
>> at least one sensor for sensing when the motion is related to eating periods of said cattle animal;
>> at least one microprocessor for carrying out one or more of the operations comprising of receiving data of said sensed motion, identifying when the sensed motion is not related to eating periods of said cattle animal and identifying if said animal is in estrus based on the sensed motion which is not related to eating periods.

A826-27.

The examiner rejected the claims, A898-922, concluding that the prior art disclosed every feature of the claims and that it would have been obvious to make the claimed devices, *see* A903; A910.

The prosecution history reflects several rounds of subsequent amendment and rejection. The applicants first attempted to overcome the rejections by amending both independent claims to recite "identifying neutralized motion data *by reducing effect* of motion data sensed concurrently with data indicative of eating," A949-51 (emphasis added), and arguing that the prior art did not teach or suggest that limitation, A955-58. In response, the examiner not only maintained the

11

obviousness rejection of claim 15, but also rejected independent claim 2 as anticipated in light of the amendment. A966-70, A976.

The applicants next amended the claims to require sensing the "acceleration level" rather than "motion" of an animal. A995-96. Once again, the examiner rejected the claims as obvious, concluding that the prior art disclosed sensing the acceleration level. A1027-30, A1035-36.

Following that rejection, the applicants introduced additional amendments. The amendments to claims 2 and 15 were similar:

> 15. (Currently Amended) A device <u>for detecting estrus in a cattle animal,</u> comprising:
>> at least one <u>acceleration</u> sensor for sensing along time acceleration level of [[a]] <u>said</u> cattle animal <u>wherein the acceleration level is indicated by energy level of an acceleration signal produced by the acceleration sensor;</u>
>> at least one sensor for sensing along time data indicative of eating performed by said cattle animal; and
>> at least one microprocessor for accumulating said acceleration <u>signal</u> ~~level~~, <u>attenuating the energy level of the acceleration signal as the indication of eating is stronger, the energy attenuated acceleration signal identifying neutralized motion data, extracting typical activity level of said animal based on said neutralized motion data</u> ~~identifying neutralized motion data by reducing effect of acceleration level sensed during eating on the accumulated acceleration level~~ and identifying <u>abnormal behavior indicative of estrus in</u> [[if]] said animal ~~is in estrus~~ <u>by comparing recently identified</u> ~~based on said~~ neutralized motion data <u>with the extracted typical activity level.</u>

12

A1051-54.

The independent claims were thus amended (i) to specify that the recited acceleration level is indicated by the "energy level of an acceleration signal" produced by an acceleration sensor, and (ii) to replace generalized language directed to "reducing effect of acceleration level sensed during eating" with the more specific "attenuating the energy level of the acceleration signal as the indication of eating is stronger." *See id.* The applicants argued that all pending claims were patentable over the prior art in view of those amendments to claims 2 and 15. A1057-63.

The examiner subsequently allowed claims 2 and 5-35 of the '574 application, which became claims 1-32 of the '149 patent. A1089.

## III.  Agis's CowManager System

Agis is a family-owned Dutch company that makes and sells a monitoring system known as CowManager. CowManger allows farmers to monitor the health and behavior of their animals continuously using a small electronic tag mounted on the ear of each cow. *See* A265-66 at ¶¶ 6-12; A2363-65; A2548-49. Agis spent years developing unique hardware and proprietary algorithms to identify animal behavior based

13

on movements measured at the ear, and CowManager is the only livestock monitoring system that uses ear-mounted sensors.

## A.    CowManager Functions

As described in greater detail below, CowManager uses data recorded by the ear tag to classify each minute of an animal's day into one of five reported behavior categories: not active, active, high active, ruminating, and eating. *See* A2552. The farmer can monitor the proportion of time classified into those categories for each animal; particular changes in activity, as well as variations in ear temperature measured by the Agis tag, can indicate a sick animal in need of veterinary attention. *See* A2552; A2568-74; A2860 at 137:1-13.

CowManager also offers estrus prediction capabilities. A3170-71 at 93:16 – 94:5; A2363-64; A2562-63. As described in further detail below, CowManager makes estrus predictions by detecting increases in the amount of activity identified as "high active" in the Agis classification scheme. *See* A2008 (Report of SCR's expert Jeffrey Hansbury).

## B.    CowManager Hardware

During discovery, SCR's technical experts examined Agis's source code and the functional details of Agis's proprietary algorithms, and

14

SCR received a fully operational CowManager system for inspection and testing. A1999-2000; A1921-22. As those analyses showed, CowManager includes four main components:

- *Ear tags*. Each tag includes a temperature sensor, an accelerometer, and a microprocessor. The tags are configured to sample the magnitude of acceleration at discrete time points ██████████, calculate ████████████████████████████████████████ ████████████████████████████████████████ and transmit the resulting ████████████ values for subsequent analysis. *See* A2000, A2003-04.

- *Router/Coordinator*. One or more routers and/or a coordinator are positioned around the farm to collect the statistical values produced by individual ear tags and pass that information to a computer located at the farm site. *See* A2000-01.

- *Local computer*. Agis provides software for customers to install on a local computer, enabling the customer's computer to send statistical values generated by the ear tags to a remote server operated by Agis in the Netherlands. *See* A2001.

**CONFIDENTIAL MATERIAL REDACTED**

- *Agis server*. Agis maintains a central server in the Netherlands that receives information from customers' computers via the internet. The server applies proprietary algorithms to the ███████ values, allowing the system to classify the values calculated for each minute into behavior categories and use those behavior predictions to identify estrus. The Agis server makes the resulting behavior and estrus predictions available to the user. *See* A2001, A2004-08.

A schematic depiction of CowManager is provided below:



A2002.

## C.    CowManager Algorithms

Agis's behavior classifications begin with the ear tag sampling acceleration ██████████. A3572 (Proposed Fact 158). For each minute, the tag's microprocessor uses the sampled acceleration data, without modification, to calculate ████████████████████ ██████████████. A3573 (Proposed Fact 162); A2003. CowManager calculates those statistical values using the same algorithms at all times. A3954 at 20:22 – 21:12.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

**CONFIDENTIAL MATERIAL REDACTED**

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ █ ████████

The Agis server uses the ████████████ values to assign behavioral categories. A3575 (Proposed Fact 166); A2004-08. The Agis server sorts each minute to ████████ behavior categories based on ██████████████████████████████████████████████ A2004-08; A2016. The resulting ████████████████████████ ████████████ into the five categories reported to the user. A2008.

CowManager predicts estrus by comparing ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████ █ █ ████████████████ ██████████████████████████████████████████████ ████████████ the animal is identified as being in estrus. A2009-11.

## D.    Development of CowManager

During product development, Agis researchers evaluated and improved their system by outfitting cattle with prototype ear tags and visually observing the tagged animals, recording each animal's actual behaviors by hand on a minute-by-minute basis. *E.g.*, A3151 at 14:7-15, 17:10-24; A3154 at 27:11–29:3; A3157-58 at 41:6–45:8; A3159 at 47:19–49:9. As the human observers recorded the cows' actual behavior and estrus status, the Agis ear tags generated electronic data, and Agis then worked to develop and refine algorithms that would optimize the fit between the behaviors recorded by the human observers and the automated predictions of the Agis system. A2969 at 67:15-20; A2970 at 71:10-16; A2868 at 170:10-14.

Agis's use of ear-based sensors presented unique technical hurdles during algorithm development. *See* A4816 (discussing the effect of fly activity on ear movements and noting that the ear "has so many degrees of freedom compared to the body that it complicates matters considerably"). Through its painstaking research, Agis succeeded in developing robust algorithms for behavior and estrus prediction. *See* A4127 at 86:5–87:8.

Agis assessed its progress during development by comparing the accuracy of its prototype systems to that of products already on the market. For example, Agis conducted experiments to compare the effectiveness of its system with two commercial systems—a collar-mounted sensor system offered by SCR and a leg-mounted sensor system sold by a company called NEDAP. A2868 at 170:18–171:24; A3160 at 51:14–52:9; A4815-16. Again, human observers monitored the behavior of cows wearing sensors of all three systems, and the predictions of each were compared for accuracy against the visual observations. A3161 at 56:10–57:24; A2819 at 63:18-25; A4128 at 90:17–91:25; A2975 at 92:12–93:22.

## IV.  District Court Proceedings

SCR filed suit in September 2013, alleging that CowManager infringed the '481 and '149 patents. A121-28. After discovery, Agis moved for summary judgment of noninfringement, and the district court granted that motion.

## A.    Noninfringement of the '481 Patent

### 1.    Construction of the "Sensor" and "Data Processor" Limitations

SCR asserted claims 1, 8, and 9 of the '481 patent. A1320. The district court construed two terms from claim 1: "sensor for sensing chewing actions" and "data processor." A7-A11.

In light of the applicant's affirmative statements during prosecution regarding § 112, ¶ 6, Agis argued that the "sensor" and "data processor" terms should be read as means-plus-function limitations. A1519-26; A1295-96. SCR maintained that that means-plus-function interpretation did not apply. A2764-65; A1323-24; *see also* A2770 ("Plaintiffs do not urge" means-plus-function interpretation). The district court agreed with Agis and held that the prosecution history compelled means-plus-function construction. A8, A10.

For the "sensor" limitation, the court identified the claimed function recited in claim 1 and held that the corresponding structures disclosed in the specification included a sound sensor, a diaphragm-type microphone, a piezoelectric device, or any other sound-to-electrical transducer. A8-10 (citing A108 at 3:41–4:12).

The district court construed "data processor" to require the function recited in the claim and concluded that because the recited structure is a computer, the corresponding structures are the algorithms disclosed in the specification for carrying out the claimed function. A10-11. Agis argued that the only algorithms disclosed in the specification that carry out the claimed function (*i.e.*, identifying rumination using the time of each chewing action *and* the number of chewing actions per unit time) are the algorithms disclosed in Figures 8 and 11 of the '481 patent. A1524-26. SCR did not identify any corresponding structure in the '481 patent or assert that CowManager performed any disclosed algorithm or equivalent. A2765. The district court held that Figures 8 and 11 provide the corresponding algorithms for the data processor limitation. A10-11.

### 2.    Noninfringement Analysis for the '481 Patent

Having construed the claims, the district court turned to the question of infringement. Noting that the parties' experts agreed on the operation of CowManager, the court identified multiple independent grounds for granting summary judgment of noninfringement as to the '481 patent. A11-17.

### a.    Lack of a Sound Sensor in CowManager

Agis explained that CowManager contains only two types of sensors—an acceleration sensor and a temperature sensor—and lacks any sound sensor or equivalent structure capable of sensing sound. A1529.

Neither of SCR's liability experts opined or suggested in any of their reports that CowManager could sense sound. *See* A1918-45; A1999-2015; A1968-76. In connection with its brief opposing summary judgment, SCR submitted a new expert declaration (not a Rule 26 report) that included the following statement: "The Bosch accelerometer used in the Agis system has the capability to sense physical vibrations. In this case, sound pressure signals *could* cause the ear of the cow to move and the movement *could* be sensed by the accelerometer, effectively acting as a microphone." A2088 (emphases added). Relying on that one statement, SCR asserted that the accelerometer in the CowManager system is a sound sensor. A2765.

Noting that the original report of SCR's expert "does not suggest that the ear tags sensed sound in any way," the district court excluded SCR's new declaration evidence as untimely. A15. The court also

observed that "the notion that the ear tag accelerometer 'could' function as a microphone" conflicted with the otherwise undisputed evidence characterizing the actual operation of CowManager. *Id.* The court concluded that SCR's arguments regarding a sound sensor in CowManager were "implausible, undeveloped, and supported only by inadmissible evidence" and ruled that Agis was entitled to summary judgment on that basis. A15.

### b.    The Time of Each Chewing Action

In addition, the district court recognized that claim 1 of the '481 patent on its face requires a system that senses "the time of each chewing action." A16; A110 at 8:60-64. According to the '481 patent, each chew by a cow during rumination takes "about 0.5-1.5 seconds, more particularly 0.70-1.43 seconds." A108 at 4:49-51; *see also* A110 at 7:10-14, 7:19-22; A108 at 4:63-67.

Agis explained that CowManager does not and cannot time each chew during rumination, citing expert testimony that ██████████████ ████████████████████████████████ for the system to identify and time each chew during rumination. A1526-28; A1814-19; A4507-12.

SCR offered no evidence or argument that CowManager senses the time of each chew during rumination. *See* A2760-64. Instead, SCR argued that the Agis system "detects chewing of rumination" or "monitors chewing behavior on a herd level," A2761, and cited an unsupported statement in its expert's untimely declaration: "The Agis system gives 'the time of each chewing action' within the context of its time resolution of Agis system." A2763 (citing A2086-87). That same expert acknowledged at deposition that CowManager does not measure the time of each chew. A3906 at 133:2 – 134:6.

The district court considered the record and concluded that SCR had "no effective response to [Agis's] evidence." A16. The court held that the undisputed evidence established that CowManager does not sense the time of each chew and that Agis was entitled to summary judgment on that additional basis. A16-17.

### c.    The Number of Chewing Actions Per Predetermined Time Interval

Claim 1 of the '481 patent also recites "sensing the number of chewing actions per predetermined time interval." A110 at 8:60-62; 8:64-65. The specification teaches that chews during rumination occur at a rate of 2-4 chews within a three-second sample period, A109 at 5:2-

5, 5:47-51, or at least 42-45 chews in a one-minute sample period, A110 at 7:7-24. Agis established that CowManager does not and cannot determine the number of chews per time interval, again noting that the undisputed ███████████████ accelerometer in the Agis ear tag precludes counting or identifying individual chews during rumination. A1528; A1814-19.

As with the "time of each chew," SCR did not provide any evidence that the Agis system senses the number of chewing actions per predetermined time period, nor did it endeavor to compare the accused system to the actual limitations of claim 1. *See* A2760-64. SCR offered no contrary facts or specific evidence in response to Agis's sampling rate analysis. A3530-34 (Proposed Facts 63-69). Rather, SCR relied on general assertions that the Agis system allows a farmer to see "how often a cow chews her cud," that the Agis system stores acceleration data collected when a cow is ruminating, and that the Agis system can sense "the presence of a frequency." A2761-62.

SCR also cited a snippet of a deposition answer that the district court found in context to be "misleading" and concluded that none of SCR's proffered evidence showed that the Agis system counts chewing

actions during a set time interval as required by claim 1. A16. Because there was no genuine dispute of fact, the court held that Agis was entitled to summary judgment on that additional basis. A16-17.

## B.    Noninfringement of the '149 Patent

### 1.    Construction of the "Attenuating" Step

Regarding the '149 patent, SCR asserted claims 1-6, 11-17, 23, and 24. A1320. The parties disputed the construction of "attenuating the energy level of the acceleration signal as the indication of eating is stronger" (the "attenuating step"), which appears in both independent claims. A119-20 at 8:20-21, 9:8-9.[2]

Agis asserted that the attenuating step should be construed to require reducing the magnitude or amplitude of a signal produced by the acceleration sensor and that the attenuation must occur on a selective basis, *i.e.*, "as the indication of eating is stronger." A1546-49.

In response, SCR did not identify or propose a contrary construction. *See* A2776-78. In fact, SCR never committed to an affirmative definition for the attenuating step at any point in the case. *See* A3561-62 (Proposed Fact 131). SCR merely asserted that a person

---

[2]    The district court also construed "sensing data . . . indicative of eating" and "neutralized motion data," which are not at issue here. A18-19; A25-26.

of ordinary skill in the art would have had only "a passing knowledge" of electronic monitoring devices. According to SCR's own expert, however, that level of skill would have been insufficient to make the device recited in claim 12 upon reading the '149 patent. A2773; A3308 at 146:24 – 147:3. SCR also denied that the amendments made during prosecution had any narrowing effect on claim scope and maintained that "[w]hat is being done is to change 'the effect of motion during eating.'" A2777-78.

The district court noted SCR's failure to propose an affirmative construction for the attenuating step. A20. Considering the claim language, specification, and prosecution history of the '149 patent, as well as extrinsic evidence submitted by the parties, the district court correctly construed the attenuating step to require that "the energy level of the signal from the acceleration sensor be reduced in proportion to the strength of the indication that the animal is eating." A18-25.

## 2.    Noninfringement Analysis for the '149 Patent

Regarding the '149 patent, the district court considered the evidence and arguments and again identified multiple independent grounds for granting summary judgment of noninfringement. A26-28.

In particular, the court concluded that SCR could not establish that the Agis system attenuated the energy level of an acceleration signal, or that it did so as the indication of eating is stronger.

### a. Attenuating the Energy Level of the Acceleration Signal

According to the express language of the attenuating step, it is the "energy level of the acceleration signal" that must be attenuated, which claims 1 and 12 specifically identify as being "produced by the acceleration sensor." A119-20 at 8:15-17, 9:3-4.

There was no dispute that the accelerometer in the Agis ear tags produces and digitizes discrete acceleration signals ███████████ ███████ and the microprocessor uses the resulting acceleration data, *without modification*, as the input for the ██████████ calculations. A3572-73 (Proposed Facts 158, 162). ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████

The resulting ██████████████ values are not produced by the acceleration sensor (A3909 at 145:19 – 146:3). They are not acceleration signals—rather, they are statistical values ████████████████████

███████████ of acceleration signals. A2003; A3573-74 (Proposed Fact 163). Once ██████████ values have been calculated for each sample set, they are transmitted to the Agis server, which assigns behavioral categories based on the reported ████████████ values. A2004; A3575 (Proposed Fact 166).

Agis's summary judgment motion explained that CowManager never attenuates or otherwise modifies the energy level of an acceleration signal at any step of its operation. *See* A1554-56. Agis further pointed out that the prosecution history of the '149 patent foreclosed any argument that statistical analyses extrapolated from groups of acceleration signals could satisfy the specific requirement for "attenuating the energy level of the acceleration signal" recited in the issued claims. A1556.

SCR's responsive discussion of the attenuating step did not compare that limitation to the CowManager system, and indeed never addressed the claim language. *See* A2776-78. Rather, SCR employed numerous other linguistic formulations—all without citation, no two of which were the same—that variously modified, misstated, and conflated the terms of the claims. *See* A2776 ("Attenuating the Energy Level of

the Acceleration *System*" (emphasis added)), ("attenuating the level of the acceleration"); A2777 ("attenuating the signal occurring during eating"), ("neutralize such motion"), ("change 'the effect of motion during eating'"), ("effect of the acceleration signal during eating is 'neutralized'"); A2778 ("neutralizing the eating"), ("neutralizing the eating signal"); *see also* A2779 (arguing that ███████████ result in "attenuating or neutralizing 'the effect of the eating period.'").

To support its infringement assertions, SCR offered a single parenthetical citation referencing several undifferentiated pages of reports submitted by two of its experts. A2777 (citing A1938-40 and A2013-15). Those passages, like SCR's briefing, did not address "attenuating the energy level of the acceleration signal" or provide any opinion regarding whether CowManager carries out that specific step as recited in the claims. *See* A1938-40 (discussing "attenuation or neutralization of Eating energy" or "attenuating Eating data"); A2013-15 (discussing "attenuation (neutralization)").

The district court noted that SCR made "almost no effort" to show how CowManager allegedly performs the claimed attenuating step and concluded that SCR's experts "simply point out anything that they could

31

conceivably label 'attenuation,' as though any form of attenuation is sufficient to meet that claim limitation." A26-27. Because the undisputed operation of CowManager did not meet the claimed attenuating step, the court granted summary judgment of noninfringement. A28.

### b.     As the Indication of Eating is Stronger

The claims of the '149 patent not only recite "attenuating the energy level of the acceleration signal," they also require doing so selectively "as the indication of eating is stronger," *i.e.*, proportionate to the strength of the indication of eating. A119-20 at 8:20-21, 9:9; A25.

There was no dispute that CowManager carries out its ███████ ███████ calculations and behavior classifications in the same way at all times. No evidence even suggested that CowManager varies its operations as an indication of eating is stronger—or, indeed, in response to any factor. Nor was it disputed that CowManager performs all of those operations before any behavior classifications, including eating, are ever assigned or reported. A1838-40; A3954 at 20:22 – 21:12; A2003-06.

The district court thus concluded that SCR and its experts had provided no evidence that any of the "attenuations" they purported to identify were proportionate to the strength of an indication of eating. For that additional reason, the court granted summary judgment of noninfringement of the '149 patent. A27-28.

### C.    No Willful Infringement

SCR argued willful infringement entirely as an issue of fact, ignoring the objective prong of the willfulness test. *See* A2789-90. Having granted summary judgment of noninfringement, and having thus determined that Agis had objectively reasonable noninfringement positions, the district court granted summary judgment on willfulness. A28.

### D.    Summary of District Court Holdings

The district court granted summary judgment for Agis on multiple grounds regarding alleged infringement of the '481 and '149 patents. *See* A29. In view of those rulings, the court exercised its discretion and declined to reach invalidity. *Id.* Agis's post-judgment motion to find the case exceptional under 35 U.S.C. § 285 has been fully briefed and remains pending. *See VocalTag Ltd. v. Agis Automatisering B.V.*, No. 3:13-cv-00612-JDP (W.D. Wis.), ECF Nos. 304, 321, 325, 330, 333.

## SUMMARY OF THE ARGUMENT

SCR bore the burden of establishing that the accused system practiced every limitation of the asserted claims. SCR failed to do so for either patent, and the district court correctly entered summary judgment on multiple grounds—all of which provide independent, well-founded grounds for affirmance on appeal.

SCR criticizes the district court based on new arguments and new supposed evidence that were never presented below and should not be considered for the first time on appeal. Moreover, even those new arguments cannot save SCR's fatally flawed infringement case.

On the '481 patent, the district court correctly construed the means-plus-function "sensor" limitation to require a sound sensor, and SCR's position on appeal would amount to claiming the recited function. Furthermore, SCR still has no evidence to indicate whether Agis performs any algorithm corresponding to the means-plus-function "data processor" limitation, or times or counts chewing actions as recited on the face of the claims. On the '149 patent, SCR never proposed any construction of the "attenuating step" below, yet its entire argument on appeal turns on disputing the district court's construction. The district

court's construction was proper, but even under SCR's new construction, it is undisputed that CowManager never modifies an acceleration signal or alters its operation in any way, based on an indication of eating or otherwise. The district court's judgment should be affirmed.

## STANDARDS OF REVIEW

When reviewing a district court's grant of summary judgment, this Court applies regional circuit law—here, the 7th Circuit, which applies a *de novo* standard. *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1322 (Fed. Cir. 2013). In the 7th Circuit, "summary judgment is the put up or shut up moment in a lawsuit." *E.g., Diadenko v. Folino*, 741 F.3d 751, 757-58 (7th Cir. 2013); *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Arguments not raised or "raised in a conclusory or underdeveloped manner" before the district court are waived on appeal. *Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 597 (7th Cir. 1999); *Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009) (en banc).

# ARGUMENT

## I. The District Court's Judgment of Noninfringement Regarding the '481 Patent was Correct as a Matter of Law

On appeal, SCR criticizes several aspects of the district court's decision, despite its own failure to argue or present evidence on those very issues below. SCR has not identified any error of fact or law in the district court's decision, and summary judgment should be affirmed for at least four independent reasons.

### A. The District Court Correctly Construed "Sensor for Sensing Chewing Actions" to Require a Sound Sensor

As SCR now concedes, the term "sensor for sensing chewing actions" in claim 1 of the '481 patent is a means-plus-function limitation. Appellants' Br. 20. In addition, SCR does not dispute the claimed function identified by the district court: "sensing chewing actions of the animal produced by the animal while chewing animal feed, including the time of each chewing action and the number of chewing actions per predetermined time interval." A8.

With respect to the "sensor" limitation, SCR challenges only the district court's identification of corresponding structure under § 112, ¶ 6. As the district court correctly determined, however, sound sensors

are the only particular structures disclosed in the specification for carrying out the claimed function.

A patentee may use § 112, ¶ 6 to express a claim limitation in functional terms. The trade-off, however, is that "the patent specification must disclose *with sufficient particularity* the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014) (emphasis added). Requiring the patentee to disclose particular structures in the specification and limiting the scope of the claim to those structures serves to prevent pure functional claiming. *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

> **1.    Sound Sensors are the Only Disclosed Structures Corresponding to the "Sensor" Limitation in the '481 Patent**

The specification of the '481 patent discloses systems comprising a "sound sensor unit" that senses sounds made by a cow while chewing, with several specific structures provided: a diaphragm-type microphone, a piezoelectric device, or any other sound-to-electrical transducer. A108

37

at 3:42-46, 4:4-17. Those are the only particular structures linked to the claimed function in the specification of the '481 patent.

SCR contends, however, that the '481 patent discloses additional corresponding structures, relying on the following language in the specification: "[O]ther types of sensors could be used. For example, chewing actions could be sensed by sensors for sensing the motions of the animal's lower jaw, or the tightening of the animal's muscles in the throat when swallowing." Appellants' Br. 23 (quoting A107 at 2:44-50); *see also* A110 at 8:35-44. According to SCR, that reference to "sensors for sensing the motions of the animal's lower jaw"—which SCR broadly recharacterizes as describing "motion sensors"—conveyed a class of corresponding structures that were known to a person of ordinary skill in the art. Appellants' Br. 22-30. SCR is wrong for several reasons.

As a threshold matter, SCR's current theory was never presented to the district court. On appeal, SCR has spent twelve pages of its opening brief arguing that one of ordinary skill would have understood "sensors for sensing the motions of the animal's lower jaw" to describe a particular class of structures, presenting various authority alleged to

support that position. *See* Appellants' Br. 21-33. The contrast with the district court record, however, could hardly be greater.

In its summary judgment briefing, SCR's infringement arguments regarding the '481 patent included only a bare quotation of the language it now relies upon, with no explanation, no legal argument, no cited authority, and no reference at all to a person of ordinary skill, much less argument or evidence establishing how such a person would have understood "sensors for sensing the motions of the animal's lower jaw." A2764-65. SCR's sole supporting citation referenced a declaration that does no more than quote the same language from the specification, without analysis or opinion. *See* A2765 (citing A2022 ¶ 9). The focus of SCR's arguments opposing summary judgment lay in its "Hail Mary" attempt to establish that Agis's accelerometer could be considered a sound sensor. *See* A2764-65.

SCR complains that the district court "entirely discounted" the argument it now presses on appeal, but that *post hoc* criticism is not well taken. SCR's appellate position is so far removed from anything presented to the district court that it should not be considered on appeal, particularly under 7th Circuit standards. *E.g.*, *Pond*, 183 F.3d

at 597-98 (finding waiver of a theory referenced without "any argument or explanation" in the district court); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 407-08 (7th Cir. 2007); *see also Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) (waiver may apply where a party "presents only a skeletal or undeveloped argument to the trial court"); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).

Even if SCR had presented a developed argument below, the language it now relies upon does not recite structure at all. Indeed, SCR's position is nonsensical. The specification offers not one example of particular "sensors for sensing the motions of the animal's lower jaw."[3] While SCR maintains that language itself provides structure for carrying out the claimed function, the phrase "sensors for sensing motions of the animal's lower jaw" is nothing more than a synonym for the claimed function—sensing chewing actions—because *chewing actions are motions of the lower jaw*. Construing the means-plus-

---

[3]    To the extent that SCR relies on "sensors for sensing . . . tightening of the animal's muscles in the throat when swallowing," such a sensor could not correspond to the claimed function, which requires sensing *chewing*, not swallowing. Furthermore, there has never been any argument or evidence that CowManager has any capacity to sense tightening of an animal's throat muscles when swallowing.

function "sensor" limitation to cover every sensor capable of sensing lower jaw motions would effectively encompass every manner of carrying out the claimed function and every possible sensor for doing so. "[S]ensors for sensing the motions of the animal's lower jaw" simply describes the function to be performed—it "describes an outcome, not a means for achieving that outcome." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009). That is not permissible under § 112, ¶ 6.

Rather, the specification "must disclose the *particular* structure that is used to perform the recited function," and a patentee may not use means-plus-function language "to capture any possible means for achieving that end. Section 112, paragraph 6 is intended to prevent such pure functional claiming." *Id.* at 1385 (emphasis added); *Saffran v. Johnson & Johnson*, 712 F.3d 549, 563 (Fed. Cir. 2013) (rejecting a patentee's attempt to include all "chemical bonds and linkages" as corresponding structure); *see also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308-09 (Fed. Cir. 1998) (rejecting a "support surface or plate" as functional language that failed to provide corresponding structure for "supporting the surface . . .

during cutting"); *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 951-53 (Fed. Cir. 2007); *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317-18 (Fed. Cir. 2012); *Aristocrat*, 521 F.3d at 1334-35.

SCR's contention that persons of ordinary skill would have been familiar with "motion sensors" (SCR's broadening shorthand for "sensors for sensing the motions of the animal's lower jaw") does not support its strained application of § 112, ¶ 6. As this Court has consistently held, "the question is not what structures a person of ordinary skill in the art would know are capable of performing a given function, but *what structures are specifically disclosed and tied to that function in the specification*." *Saffran*, 712 F.3d at 563 (emphasis added); *see also Blackboard*, 574 F.3d at 1385 ("That ordinarily skilled artisans could carry out the recited function in a variety of ways is precisely why claims written in 'means-plus-function' form must disclose the particular structure that is used to perform the recited function.").

Moreover, SCR never provided any evidence to indicate how one of ordinary skill in the art would have read "sensors for sensing the motions of the animal's lower jaw" in the '481 patent. As noted, SCR's

passing reference to that language before the district court did not even mention a person of ordinary skill, much less explain how that person would have understood the cited disclosure. A2764-65. On appeal, SCR attempts to backfill with several new record citations. *See* Appellants' Br. 28. But those documents do not support SCR's position. The cited materials address motion sensors in general, with no reference to "sensors for sensing the motions of the animal's lower jaw" and no discussion of how a person of ordinary skill would have understood that phrase in the specification of the '481 patent. Even if SCR had cited those materials below, the district court would have lacked any basis for the finding SCR now seeks.

SCR seeks refuge in several of this Court's decisions, but those precedents do not apply to this case. In each of the cited cases, the patentee presented particularized evidence regarding how a disclosure alleged to provide structure would have been understood by one of ordinary skill in the art. For example, in one case cited by SCR, the patentee provided uncontested inventor and expert testimony that a disclosed "selector" would have been recognized as a particular, well-known electronic structure. *S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364,

1370-71 (Fed. Cir. 2001); *see also Telcordia Techs., Inc. v. Cisco Sys.*, 612 F.3d 1365, 1377 (Fed. Cir. 2010) (expert testimony); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1339 (Fed. Cir. 2008) (inventor testimony); *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1322 (Fed. Cir. 2004) (technical textbooks and electronic parts catalogs); *Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) (expert testimony); *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1382 (Fed. Cir. 2001) ("The record reflects, as found by the district court, that vacuum sensors were well known in the art."); *Atmel Corp. v. Information Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) (expert testimony).[4] SCR offered no expert testimony or other evidence directed to the art's understanding of "sensors for sensing the motions of the animal's lower jaw" in this case.

Those cases also did not involve purely functional disclosures that would have swallowed every structure for performing the claimed function. For example, a "PWM circuit" was held to provide corresponding structure where "other types of circuits" could also be

---

[4] It is unclear how SCR's arguments regarding definiteness affect the issues on appeal. Appellants' Br. 29-30. Definiteness was not an issue presented at summary judgment.

used for the function recited in the claim—varying the regulator duty cycle. *Linear Tech.*, 379 F.3d at 1322; *see also, e.g.*, *Intel*, 319 F.3d at 1367 (noting that "one may design around the invention by using another signal protocol"); *Budde*, 250 F.3d at 1381-82 (finding corresponding structure limited to "commercially available," analog vacuum sensors). In contrast, and as described above, the '481 patent's disclosure of "sensors for sensing the motions of the animal's lower jaw" is effectively coextensive with the claimed function—sensing chewing actions. To use the analogy from *Intel*, offering "sensors for sensing the motions of the animal's lower jaw" as corresponding structure in this case is more akin to relying on a "seat," rather than a chair, as structure corresponding to a "means for seating." *See* Appellants' Br. 30; *Intel*, 319 F.3d at 1367.

SCR's newly proposed construction for the sensor limitation is untenable for two additional reasons. First, SCR's construction would run the '481 patent's claims directly into the prior art. "[C]laims are generally construed so as to sustain their validity, if possible." *Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed. Cir. 1990).

45

SCR's argument that the phrase "sensors for sensing the motions of the animal's lower jaw" qualifies as structure under § 112, ¶ 6, turns on establishing that such sensors were "known in the field of invention" and "in the prior art." Appellants' Br. 25. No doubt recognizing the validity problems accompanying that assertion, SCR looks to prior art raised against the *'149 patent* describing general-purpose motion sensors used for estrus detection, Appellant's Br. 28 (citing A1182-89, A1253-71, A1272-91), while deliberately avoiding the far more apt prior art of record that discloses rumination monitoring systems with sensors designed specifically for sensing motions of the lower jaw. *See* A1155-60; A1241-48. For example, one such reference disclosed a rumination monitoring system that sensed chewing using a "jaw motion detecting device" mounted at the animal's jaw. A1155-56. And under SCR's construction, that prior art system would meet every limitation of claim 1 of the '481 patent, as verified by SCR's own expert. A3298-99, Shaver Dep. at 108:12 – 111:13; *see also* A1155-60.

SCR cannot have it both ways. Its proposed construction of the "sensor" limitation, if adopted, would sweep in prior art that undisputedly disclosed "sensors for sensing the motions of the animal's

lower jaw," as well as every other limitation of the asserted claims. In short, SCR's expansive construction of the "sensor" limitation would lead inexorably to summary judgment of invalidity.

SCR's construction also conflicts with its own representations to the PTO. Before the '481 patent issued, its specification published as U.S. Patent Application Publication No. 2003/0205208 ("the '208 publication"). *See* A97; A1138-53. During prosecution of SCR's '149 patent, the examiner cited the '208 publication as prior art, and SCR argued in response that '208 publication disclosed detecting rumination "by either detecting *chewing sounds* . . . or by sensors on the animal's neck which detect whether the timing of the swallowing movements [are] characteristic of rumination." A955. SCR continued that the '208 publication disclosed collecting "*only the swallowing movements* indicative of rumination" and thus could not sense other types of motion by the animal. A956. SCR made similar public representations about the '208 publication in proceedings before the EPO. *See* A1250-51.

SCR thus publicly represented that the only motion that could be sensed by any system disclosed in the '208 publication—and thus, the '481 patent—was *swallowing* motion. Having read the '481 patent

narrowly when convenient during prosecution, SCR now seeks to expand that reading dramatically to suit its divergent purposes in this litigation. Those positions cannot be reconciled, and SCR's litigation-inspired repurposing of the "sensor" limitation should be rejected.

### 2.   Microswitches Were Not Disclosed as Sensors for Sensing Chewing Actions

SCR also attempts to incorporate microswitches as corresponding structure into the "sensor" limitation. Appellants' Br. 23-24. That assertion is both incorrect and irrelevant to the judgment of noninfringement.

The '481 patent discloses two approaches to detecting rumination: (i) sensing and analyzing chewing, and (ii) sensing and analyzing boluses. *See, e.g.*, A97 at Abstract; A107 at 2:13-33. Where the '481 patent discloses microswitches, they are expressly and specifically identified as sensors for sensing a bolus, not for sensing chewing actions. A107 at 2:45-46; A110 at 7:47, 8:41-44; A111 at 10:3-4. There is simply no basis to assert that the '481 patent "clearly links" microswitches to the function recited in claim 1—sensing *chewing actions* of the animal—as required to establish a corresponding

structure under § 112, ¶ 6. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

Moreover, even if the sensor limitation did cover microswitches, SCR has never argued or provided any evidence that the Agis system includes a microswitch, and it does not attempt to do so before this Court. As the district court recognized, the issue is irrelevant because CowManager undisputedly has no microswitches. A9.

### 3. Claim Differentiation Does Not Alter the Correct Construction of "Sensor for Sensing Chewing Actions"

SCR argues that claim differentiation precludes the district court's construction because (i) claim 2 depends from claim 1 and recites that the sensor is a sound sensor, and (ii) claims 4 and 6 depend from claim 1 and recite that the sensor is a bolus sensor, which can be a microswitch. Appellants' Br. 31-32.

This Court has long rejected SCR's argument on claim 2. In *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991), a patentee argued that a means-plus-function term could not be limited to a structure specified in a dependent claim. That argument was soundly rejected: "A means-plus-function limitation is not made open-ended by

the presence of another claim specifically claiming the disclosed structure which underlies the means clause or an equivalent of that structure. If [that] argument were adopted, it would provide a convenient way of avoiding the express mandate of section 112(6)." *Id.*

SCR's reliance on claims 4 and 6 is equally unavailing. Claim 4 depends from claim 1 and recites that the "sensor is a bolus sensor which senses regurgitations of a bolus from the animal's rumen to the animal's mouth." A111 at 9:12-15. According to SCR, that is inconsistent with limiting the "sensor" of claim 1 to sound sensors. Appellants' Br. 31-32. The specification of the '481 patent, however, discloses that a sound sensor can be used to sense *both* chewing actions and bolus regurgitations. A110 at 8:35-37; A107 at 2:44-51. Furthermore, no other type of sensor is disclosed as having that dual capability. In light of those disclosures and the applicant's undisputed decision to invoke means-plus-function construction during prosecution, claim 4 makes sense *only if* the "sensor" limitation of claim 1 requires sound sensors. Accordingly, claim 4 reinforces, rather than contradicts, the district court's construction of claim 1.

Claim 6 depends from claims 5, 4, and 1. Claim 5 depends from claim 4 and recites "wherein there are two bolus sensors" and specifies a configuration similar to that illustrated in Figure 9. *See* A111 at 9:16-21; A104. Claim 6 recites that "said bolus sensors are microswitches." A111 at 10:3-4. Claim 5 can be read to require adding two additional bolus sensors to the system recited in claim 4, with those additional bolus sensors provided as microswitches pursuant to claim 6. That reading comports with the district court's construction of claim 1 and with the rest of the specification—which, as described above, never describes a microswitch used to sense chewing actions or links microswitches to "sensor" limitation under § 112, ¶ 6. Claim differentiation provides no support for SCR's overbroad reading of claim 1.

The district court correctly construed the "sensor for sensing" limitation as requiring a sound sensor, in accordance with the corresponding structures disclosed in the specification of the '481 patent. On that basis alone, the district court's judgment of noninfringement should be affirmed because CowManager undisputedly lacks a sound sensor.

### B.     There is No Evidence that Agis Practiced any Algorithm Disclosed in the '481 Patent

Turning to the "data processor" limitation of claim 1, the record establishes a second basis for affirming the district court's judgment regarding the '481 patent: at no point has SCR has argued, much less adduced evidence, that Agis practiced any algorithm corresponding to the "data processor" limitation.

As with "sensor for sensing chewing actions," SCR no longer disputes that "data processor" is a means-plus-function term, nor does SCR dispute the claimed function identified by the district court. Appellants' Br. 20-21, 33-37. SCR also now acknowledges that the corresponding structure for processor-based means-plus-function terms must include an algorithm for performing the claimed function. Appellants' Br. 33-37; *see, e.g.*, *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999).

On appeal, SCR's sole argument regarding the "data processor" limitation is that the district court should have included the algorithm disclosed in Figure 6 as corresponding structure covered by claim 1. Appellants' Br. 33-37. That argument is both incorrect and beside the point—the algorithm of Figure 6 does not perform the claimed function,

and even if it did, there is no evidence or argument that Agis performs *any* algorithm disclosed in the '481 patent.

The algorithm of Figure 6 plainly does not correspond to the data processor's claimed function. The recited function is

> accumulating *both the time of each of said sensed chewing actions and the number of said chewing actions per unit time interval*, for determining the chewing rhythm of the animal indicating ruminating activities over a predetermined time period to provide an indication of desirable changes in the animal feed for maximizing milk production or for maintaining animal health.

A10; A110-11 at 8:63 – 9:3 (emphasis added). The claimed function thus expressly requires that any corresponding algorithm must use *both* the time of each chewing action *and* the number of chewing actions per unit time to determine rumination.

Consistent with the claimed function, Figures 8 and 11 disclose algorithms for determining rumination that include both identifying the time of each chew ("CT") and counting the number of chews per minute ("N"). For example, Figure 8 is reproduced below:



**Fig. 8**

A103; A109-10 at 6:65 – 7:24 (Fig. 8); *see also* A106, A110 at 8:7-16 (Fig.

11). In both algorithms, rumination is identified only if the time of each

chew falls between 0.7 and 1.43 seconds and the counted number of

chews exceeds a set threshold ("M"), such as 45 chews per minute. A110

at 7:7-24, 8:7-8. In contrast, the algorithm of Figure 6 determines

rumination solely "by counting the number of chewing actions in a

predetermined sample time period" (specifically three seconds), without addressing the time of each chew:



Fig. 6

A101, A109 at 5:24-60.

Straining to support its position, SCR contends that the time of each chew "can be determined" by carrying out additional operations not specified in Figure 6. Appellants' Br. 36. The algorithm *actually disclosed* in Figure 6, however, contains no such steps directed to the

time of each chewing action, as affirmatively required by the function recited in claim 1. SCR's hypothetical argument cannot supplant the actual disclosures of Figure 6.

SCR also latches onto a long-since corrected error by one of Agis's experts. In his initial report addressing validity, Agis's expert Dr. Michael Sidman stated that Figures 6, 8, and 11 of the '481 patent corresponded to the "data processor" function recited in claim 1.[5] A1773. Dr. Sidman recognized and expressly corrected that error in his timely prepared noninfringement report issued before summary judgment. A1810-11. Agis's claim construction arguments to the district court likewise cited Figures 8 and 11. A1523-26. In sum, the district court correctly identified the algorithms of Figures 8 and 11 as corresponding to the data processor limitation. A10-11.

More importantly, however, the record is devoid of evidence that Agis performed *any algorithm* disclosed in the '481 patent, including those of Figures 8, 11, or 6. For all of SCR's argument that Figure 6 should be included among the corresponding algorithms, it never

---

[5]     SCR asserts that Dr. Stevenson also included Figure 6 as a corresponding algorithm, but his statement expressly relied upon the since-corrected opinion in Dr. Sidman's first report. A303.

explains how that proposition has any bearing on the actual outcome of this case. SCR does not assert, and never asserted below, that Agis performs any algorithm disclosed in the '481 patent, or any equivalent thereof. *See* A2765-66. And SCR has not offered or identified any evidence to show that Agis performs any of the disclosed algorithms, as would be required to establish infringement under the acknowledged means-plus-function construction of the "data processor" term. *Id.*; *see also Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) ("*WMS Gaming* restricts computer-implemented means-plus-function terms to the algorithm disclosed in the specification.").

SCR's complete failure of proof regarding whether the Agis system performs an algorithm corresponding to the "data processor" limitation of claim 1 provides an independent ground for affirming the judgment of noninfringement as a matter of law.

## C. The Agis System Does Not Sense the Time of Each Chew

The district court concluded that SCR had failed to provide any evidence that CowManager senses "the time of each chewing action" as required by claim 1. A15-17. There is no dispute that Agis's system does

not sense the time of each chew, and the district court's conclusion was correct.

On appeal, SCR contends that the district court (i) misapplied the claim language by importing extraneous limitations, (ii) disregarded SCR's expert testimony, and (iii) and improperly considered testimony provided by Agis personnel. Appellants' Br. 37-48. All three contentions ring hollow.

First, the district court did not read numerical or "measuring" limitations into the claims. The '481 patent discloses, as all parties agree, that the duration of each chew during rumination is "about 0.5-1.5 seconds, more particularly 0.70-1.43 seconds." A108 at 4:49-51. Individual chews lasting between 0.5-1.5 seconds could occur no less than 0.67 times per second and no more than twice per second, consistent with the rest of the specification. *See* A108-109 at 4:66 – 5:5 (disclosing 2-4 chews per three seconds, or .67-1.33 chews per second); A110 at 7:7-18 (disclosing at least 42-45 chews per minute, or at least 0.7-0.75 chews per second).

Given those undisputed realities of bovine behavior, a system configured to both time *and* count each chew during rumination, as

required by claim 1, would need to sense chews lasting between 0.5-1.5 seconds and occurring somewhere between 0.67-2 times per second. As the district court recognized, a system unable to time and count individual chews occurring with the duration and rate characteristic of rumination—such as CowManager—simply could not function in the manner specified by claim 1. The district court's insightful noninfringement analysis in no way altered its underlying construction of the claims.

The district court also did not "rewrite" the claims to import a "measuring" limitation. Claim 1 on its face requires a system that senses "the time of each chew," and the specification makes quite clear that term means identifying how long each chew takes to the hundredth of a second—in other words, measuring the duration of each chew. A108 at 4:49-59, 4:66-67; A110 at 7:7-11, 7:19-22; A99-106 (Figs. 3, 8, 11). SCR itself interpreted "time of each chewing action" to mean "the length of time for each chewing action" during discovery in this case. A1308. Tellingly, although SCR takes issue with the district court's use of the word "measure" in discussing that function, it offers no explanation or

analysis of how the alleged error would have any effect on the substantive meaning of the claims or the outcome in this case.

Second, the district court did not disregard SCR's expert testimony—the court considered SCR's evidence and determined that it was not probative of infringement. *See* A16 (noting SCR had "no effective response" to Agis's noninfringement case). SCR's arguments on appeal underscore the point.

SCR points to its expert's experiments that consisted of attaching CowManager ear tags to a mechanical device for "rumination simulations" that allegedly simulated chewing motions at rates consistent with rumination. Appellants' Br. 41 (citing A1401-06). From those "simulations," SCR's expert concluded that the results "indicate that rumination is detected by the Agis System if the chewing rate is within a narrow band of chewing rates." *Id.* (quoting A1407). Even if true, that conclusion says nothing about *how* the Agis system identifies rumination, and it completely ignores the requirement for sensing the time of each chewing action. Read charitably, those experiments at most suggest that Agis's system can perceive simulated rumination as rumination—*i.e.*, Agis's system works—but the '481 patent does not and

could not cover every possible rumination detector. Specific evidence bearing on each limitation of the asserted claims was required, and the bare, illogical conclusion of SCR's expert that "This is covered by claim 1," A1407, cannot by itself create a genuine issue of material fact. *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046-48 (Fed. Cir. 2000).

SCR also relies on another similarly conclusory statement from an untimely expert declaration.[6] Appellants' Br. 43. The cited paragraph briefly describes the ▮▮▮▮ calculation and a limit value used in Agis's behavioral classifications, then offers the following non-sequitur: "The Agis system gives the 'time of each chewing action' within the context of its time resolution of Agis System.." [sic]. A2086 ¶ 10. Even if it had appeared in a timely expert report, that conclusory, indecipherable statement would have provided no cognizable evidence to support SCR's case and could not establish a genuine dispute of material fact. *See*

---

[6]     District judges "have considerable discretion in making evidentiary rulings." *United States v. Butler*, 71 F.3d 243, 250 (7th Cir. 1995). The district court set expert disclosure deadlines and restricted supplementation "to matters raised in an expert's first report." A171-72 at ¶ 6. SCR submitted Dr. Aneshansley's post-deadline declaration without any attempt to establish that those opinions addressed matters raised in his first report, and indeed, they did not. The district court was well within its discretion to exclude that evidence.

*Arthur A. Collins*, 216 F. 3d at 1046-48. Furthermore, when questioned, that same expert acknowledged that the CowManager system does not determine the time of each chew. A3906 at 133:2 – 134:6.

The other evidence cited by SCR is similarly lacking. The notion that using ███ to classify rumination somehow alters the "'frequency' of the cow's accelerations," Appellants' Br. 42 (citing A1492), bears no resemblance to the claims, says nothing about the time of each chew, and makes no sense. Moreover, SCR did not cite that "evidence" in its summary judgment briefing, *see* A2759-65, so it is difficult to understand how the district court can be faulted for having "entirely ignored" evidence it was never presented. *See also* Appellants' Br. 44-45 (citing a report prepared well after summary judgment briefing was complete); *id.* at 43 (referencing A2087 ¶ 12, an untimely opinion not cited in SCR's summary judgment briefing). SCR also fails to explain how Agis's ████████████████ provides any evidence that the CowManager system times each chewing action during rumination. *See* Appellants' Br. 42-43 (citing A2559, A2325-26).

Third, the district court did not make credibility determinations based on the testimony of Agis personnel. On the contrary, the district

court simply read the cited testimony and concluded that it provided no support for SCR's infringement position. *See* A16 (citing A2762). Dr. Rump stated that Agis's system can sense when a cow is ruminating, can sense "the *presence* of a frequency," and takes ████████████ ████████████. *See* Appellants' Br. 46-48 (quoting A3007-08). As the District Court noted, SCR excerpted and characterized that testimony in a "misleading" manner in alleging infringement. A16 (citing A3007 at 131:13-14 ("We never are capable of detecting a frequency. We are capable of sensing the presence of a frequency.")). It is not making a credibility determination to read testimony as a whole rather than a phrase out of context. Even viewed in the light most favorable to SCR, those statements do not support the proposition that the Agis system senses the time of each chewing action and uses that information to detect rumination as claimed in the '481 patent.

In short, SCR did not provide to the district court, and still cannot identify, any cognizable evidence to indicate that CowManager senses the time of each chewing action in accordance with the claims of the '481 patent.

### D.    CowManager Does Not Sense the Number of Chewing Actions Per Predetermined Time Interval

For many of the same reasons regarding the "time of each chewing action," Agis was also entitled to summary judgment on the basis that its system does not sense "the number of chewing actions per predetermined time interval" as also required by the claims. SCR again relies on evidence that does not address whether CowManager counts chewing actions per predetermined time interval, was not presented to the district court, was not timely submitted, and/or presents bare expert conclusions without any supporting data or analysis. None of that suffices to create a genuine issue of material fact. The Agis system does not and cannot sense the number of chewing actions per predetermined time interval, and Agis was entitled to summary judgment on that additional basis.

In summary, all of the foregoing grounds of noninfringement demonstrate that Agis was entitled to summary judgment, but a ruling for Agis on any one or more of them would suffice to affirm the result.

## II.    The District Court Correctly Granted Summary Judgment of Noninfringement as to the '149 Patent

SCR also briefly challenges the district court's grant of summary judgment regarding the '149 patent, arguing that the court erred in

construing one limitation of the independent claims and asserting that under its newest construction of that term—presented for the first time on appeal—there remain genuine issues of fact regarding infringement. *See* Appellants' Br. 49-59. Those contentions are unsound, and the district court's judgment should be affirmed.

## A. The District Court Correctly Construed "Attenuating the Energy Level of the Acceleration Signal as the Indication of Eating is Stronger"

SCR first alleges error in the district court's construction of "attenuating the energy level of the acceleration signal as the indication of eating is stronger" (the "attenuating step"). The district court construed that term to require "that the energy level of the signal from the acceleration sensor be reduced in proportion to the strength of the indication that the animal is eating." A25. SCR has not identified any error in that construction.

### 1. SCR Cannot Introduce a New Construction for the "Attenuating" Step on Appeal

SCR's arguments on appeal regarding the '149 patent all center on construction of the attenuating step of claims 1 and 12. *See* Appellants' Br. 49-59. And, buried within a section of its brief ostensibly discussing the prosecution history, SCR proposes a new construction for that term.

Appellants' Br. 56. But as the district court recognized and noted in its opinion, SCR declined to propose a construction at the summary judgment stage. *See* A20 (noting that "[p]laintiffs do not expressly state their proposed construction"). SCR cannot do so for the first time on appeal, and its belated attempt to rely on a construction never presented or argued to the district court should be rejected. *Conoco, Inc. v. Energy & Envt'l Int'l L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006) ("a party may not introduce new claim construction arguments on appeal").

The construction of the attenuating step was disputed from the earliest stages of this case. *E.g.*, A1295-1300. Nevertheless, SCR meticulously avoided any definite claim construction or infringement theory, preferring fluid interpretations that shifted at every turn during discovery. *See* A1326; A1938-39; A1974; A2044; A1304; *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1363 (Fed. Cir. 1999) ("A party's argument should not be a moving target."). The district court's rules made clear that claim construction would be briefed and decided in conjunction with summary judgment. A171 ¶ 4. Yet SCR's summary judgment briefing offered no construction at all for the attenuating step,

presenting only nebulous infringement assertions untethered to any specific claim meaning. *See* A2776-78.

SCR has formulated a new construction for the attenuating step in its opening brief—a construction that was never before the district court. That construction is waived and should not be considered on appeal. *Finnigan*, 180 F.3d at 1363 ("The argument at the trial and appellate level should be consistent, thereby ensuring a clear presentation of the issue to be resolved . . . ."); *see also Digital-Vending Servs. Int'l v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1273-74 (Fed. Cir. 2012); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1296 (Fed. Cir. 2005); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1344-47 (Fed. Cir. 2001).

Furthermore, SCR's new construction cannot be correct. SCR's proposal vaguely references reducing the "acceleration value." Appellants' Br. 56. But the actual claim language is precise: what must be attenuated is the "energy level of the acceleration signal," not any possible "value" or other abstraction somehow based on or derived from an acceleration signal. SCR equivocates because it knows there can be

no dispute that Agis never attenuates *the energy level of an acceleration signal* as recited on the face of claims 1 and 12.

### 2.   The District Court's Construction did not Include a "Transmission" Requirement

SCR's first attack on the district court's construction rests on a false premise. SCR contends that (i) Agis proposed a construction of the attenuating step that required attenuation to occur during transmission between points, and (ii) the district court stated that it "construe[d] the attenuating step as proposed by defendant," so (iii) the district court therefore construed the attenuating step to require attenuating the energy level of the signal during transmission from the acceleration sensor. *See* Appellants' Br. 49-52. SCR's reasoning contains numerous fatal flaws.

Agis did not construe the attenuating step to require attenuation during transmission of an acceleration signal. To support its argument, SCR cites a dictionary definition of the word "attenuating" referenced by one of Agis's experts. Appellants' Br. 49 (citing A20; A1548). The disputed claim term, however, was not just "attenuating," but rather the claimed attenuating step: "attenuating the energy level of the acceleration signal as the indication of eating is stronger." A20-25;

A2776; A1546. Agis's actual proposed construction of that term contains no mention of transmission. A1546, A1549-50.

Accordingly, the district court's statement that it would "construe the attenuating step as proposed by defendant" did not import or imply a transmission requirement. *See* A25. Furthermore, the court's actual express construction makes no mention whatsoever of transmission: "The attenuating step . . . requires that the energy level of the signal from the acceleration sensor be reduced in proportion to the strength of the indication that the animal is eating." A25. Nor did the district court's noninfringement analysis applying that construction discuss or in any way rely upon a limiting concept of transmission. *See* A26-28.

SCR also suggests that the district court's construction "improperly scrambles the claim language by requiring attenuating 'the signal *from the acceleration sensor*.'" Appellants' Br. 49-50. Notably, SCR neglects to explain where it believes the acceleration signal comes from, if not "from the acceleration sensor." And indeed, regardless of where the claimed attenuation occurs, the acceleration signal *must* come from the acceleration sensor—common sense and the claims themselves require it. Claims 1 and 12 of the '149 patent both specify

that the recited acceleration signal is "produced by the acceleration sensor." A119 at 8:16-17; A120 at 9:3-4. The district court recognized as much, and its construction was correct.

### 3.    "Attenuating . . . as the Indication of Eating is Stronger" Requires Proportionality in the Level of Attenuation

SCR next asserts that the district court erred in construing the attenuating step to include reducing the energy level of the acceleration signal "*in proportion* to the strength of the indication that the animal is eating." Appellants' Br. 53-54. According to SCR, nothing in the claim language or in the specification "compels that attenuation be 'in proportion' to an animal's eating." *Id.* at 53-54. SCR's argument simply ignores the plain meaning of the claim language.

Claims 1 and 12 recite "attenuating the energy level of the acceleration signal *as the indication of eating is stronger.*" A119-20 at 8:20-21, 9:8-9 (emphasis added). The phrase "as the indication of eating is stronger" appears in the attenuating step of both independent claims; it must mean *something. Tex. Instruments, Inc. v. ITC*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (rejecting a construction that would render claim terms "mere surplusage"). In keeping with its now-familiar approach,

SCR simply attacks the court's interpretation, with no affirmative discussion of what that language *does* mean and with no alternative proposal.

The most fundamental aim stated in the '149 patent is to improve estrus detection by "reducing the impact of the animal's eating habits on the results." A116 at 2:31-35. Absent some selectivity regarding when and to what extent the recited "attenuating" occurs, the claimed methods and devices would not serve the basic purpose described in the specification. Furthermore, the words "as the indication of eating is stronger" were introduced by amendment in response to continuing rejections during prosecution, replacing language that had simply specified reducing the effect of acceleration "during eating." *See* A1052-54. That change from reciting an essentially binary approach—specifying reductions "during eating" and not at other times—to attenuating "as the indication of eating is stronger" marked a shift to both temporal *and* proportional selectivity in attenuation, based on the relative strength of the indication of eating at any given time. It is also what the preferred embodiment does—by scattering radiation, the

energy level of the acceleration signal is attenuated proportional to the inclination as an indication of eating. A117 at 4:21-32.

The district court's construction is thus well supported by the claim language, the specification, and the prosecution history of the '149 patent. SCR's arguments should be rejected.

### 4. The District Court Did Not Err by Considering the Prosecution History

Finally, SCR contends that the district court "misapplied the prosecution history" in construing the claims of the '149 patent. *See* Appellants' Br. 54-56. The bulk of SCR's complaints regarding the prosecution history pertain to its straw-man contention that the claims should not be construed to require attenuation "during transmission." As discussed above, the district court's construction did not include that concept.

More generally, the district court correctly consulted and applied the prosecution history in construing the attenuating step in this case. SCR's narrowing amendments during prosecution demonstrate that the applicants relinquished claims directed generally to "reducing effect" of motion sensed during eating, instead adopting the specific attenuating step to distinguish the claims over the cited prior art. The district court

therefore did not err in rejecting SCR's attempts to read the issued claims to cover "any manner in which the acceleration level of the animal is reduced while the animal is eating." A25.

## B.    SCR's New Proposed Construction Cannot Create a Genuine Issue of Fact

SCR alleges that factual disputes exist only if its newly proposed claim construction is adopted. *See* Appellants' Br. 57 ("*Under a proper construction*, the record evidence demonstrates the existence of genuine issues of material fact.") (emphasis added). In other words, if the district court's construction is upheld, SCR does not dispute that summary judgment is appropriate. Even under SCR's newly argued claim interpretation, however, Agis would still be entitled to summary judgment for the reasons identified below.

### 1.    It is Undisputed that the Agis System Never Attenuates or Otherwise Modifies the Energy Level of an Acceleration Signal

SCR expends substantial effort trying to establish that the claims of the '149 patent cover "statistically reduc[ing] the value of the acceleration signal," Appellants' Br. 56, and then cataloging every reference to statistics associated with the Agis system as if any use of statistical calculations would necessarily establish infringement, *id.* at

57-59. SCR does not hold exclusive rights to statistical analysis. Furthermore, the cited reference to statistics in the specification relates to statistically determining whether the animal is eating (*i.e.*, sensing data indicative of eating) and whether measured activity deviates from normal behavior (*i.e.*, identifying abnormal behavior indicative of estrus). *See* A116 at 2:43-48. Those statements concern claim steps other than the attenuating step and make no reference to attenuating an acceleration signal. During prosecution the applicants relinquished claims broadly directed simply to "reducing effect" of eating periods when determining estrus; the issued claims specifically require attenuating the energy level of an acceleration signal.

There is no genuine dispute of fact that the Agis system never modifies an acceleration signal in any way. A3573-74 (Proposed Facts 162-63); A2003. The Agis system uses acceleration signals as inputs for ███████████████ calculations that ███████████████ ███████████████ sampled acceleration signals. A3573-74 (Proposed Facts 162-63); A2003. The calculated ██████████ values are not produced by an acceleration sensor and are not acceleration signals. (A3909 at 145:19 – 147:20).

**CONFIDENTIAL MATERIAL REDACTED**

SCR's newly proposed construction of the attenuating step still requires some type of reduction to an acceleration signal: "*reduc[ing] the value of the acceleration signal* when the indication of the animal's eating increases." Appellants' Br. 56. As set forth above, it is undisputed that the Agis system does not modify acceleration signals in any way throughout the course of its ███████████ calculations, and no acceleration signals exist at the Agis server during behavioral classifications. The conclusory statements of SCR's expert regarding purported "attenuation" during behavior classifications or perceived attenuation of undefined "Eating energy" contradict the undisputed record and the plain language of the claims. *See* Appellants' Br. 58-59. Accordingly, the record would compel summary judgment of noninfringement even under SCR's new construction.

## 2. The Agis System Performs the Same Functions at All Times

In addition, it is undisputed that CowManager performs the same ███████████ calculations at all times during its operation. A3954 at 20:22 – 21:12. Claims 1 and 12 of the '149 patent, however, require attenuating "as the indication of eating is stronger," and SCR's new construction reads that language to mean "*when* the indication of the

animal's eating increases." Appellants' Br. 56. SCR's inclusion of the conditional "when" requires at least temporal selectivity, *i.e.*, attenuating does not occur all the time, but only at certain times as dictated by "the indication of the animal's eating." The undisputed facts regarding the uniform operation of Agis's system over time foreclose any possibility of infringement even under SCR's construction.

## III.  Willfulness

SCR's argument regarding summary judgment on willfulness should be rejected. In requesting remand on willfulness, SCR simply reiterates its disagreement with the district court's claim construction and noninfringement determinations. Appellants' Br. 59-60. But the district court premised its willfulness decision on a conclusion that Agis had "at least a reasonable non-infringement position," A28, which SCR has never disputed. *See* 2789-90; Appellants' Br. 59-60. Summary judgment of no willfulness should be affirmed.

## CONCLUSION

In view of the foregoing, Agis respectfully requests that the district court's judgments of noninfringement with respect to the '481 and '149 patents be affirmed.

Respectfully submitted,

Dated: February 24, 2016        /s/ Jonathan H. Margolies

Jonathan H. Margolies
Katherine W. Schill
Andrew T. Dufresne
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Avenue, Suite 3300
Milwaukee, WI 53202
Telephone: 414-271-6560
Facsimile: 414-277-0656

*Attorneys for Appellee*
*Agis Automatisering B.V.*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,996 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

Dated: February 24, 2016       /s/ Jonathan H. Margolies
Jonathan H. Margolies
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Avenue, Suite 3300
Milwaukee, WI 53202
Telephone: 414-271-6560
Facsimile: 414-277-0656

*Attorney for Appellee*
*Agis Automatisering B.V.*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all counsel of record.


Dated: February 24, 2016     <u>    /s/ Jonathan H. Margolies    </u>
Jonathan H. Margolies
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Avenue, Suite 3300
Milwaukee, WI 53202
Telephone: 414-271-6560
Facsimile: 414-277-0656

*Attorney for Appellee*
*Agis Automatisering B.V*